C
Only the Westlaw citation is currently available.

United States District Court, M.D. Florida.

Brenda G. ELKINS and Jerry Bedenbaugh, Individually and On Behalf of A Class of Persons Similarly Situated, Plaintiffs,
v.
EQUITABLE LIFE INSURANCE COMPANY OF IOWA, Equitable of Iowa Companies and Equitable American Life Insurance Company, Defendants.

No. CivA96-296-Civ-T-17B.

Jan. 27, 1998.

Barry A. Weprin, Melvyn I. Weiss, Brad N. Friedman, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, John Ray Newcomer, Jr., W. Christian Hoyer, James, Hoyer, Newcomer, Forizs, & Smiljanich, P.A., Tampa, FL, Ronald R. Parry, Arnzen, Parry & Wentz, P.S.C., Covington, KY, John J. Stoia, Jr., Andrew Hutton, Ted J. Pintar, Milberg, Weiss, Bershad, Hynes, & Lerach, San Diego, CA, Andrew S. Friedman, H. Sullivan Bunch, Bonnett, Fairbourn, Friedma, Hienton, Miner & Fry, P.C., Pheonix, AZ, Stephen L. Hubbard, Cantilo, Maisel & Hubbard, Dallas, TX, David W. Dunn, Davis, Brown, Koehn, Shors, & Roberts, P.C., Des Moines, IA, for Brenda G. Elkins, individually and on behalf of a class of persons similarly situated, plaintiff.

Barry A. Weprin, Melvyn I. Weiss, Brad N. Friedman, John Ray Newcomer, Jr., W. Christian Hoyer, Ronald R. Parry, John J. Stoia, Jr., Andrew Hutton, Ted J. Pintar, Andrew S. Friedman, H. Sullivan Bunch, Stephen L. Hubbard, David W. Dunn, (See above), for Jerry Bedenbaugh, individually and on behalf of a class of persons similarly situated, plaintiff.

Robert V. Williams, R. Marshall Rainey, Ricardo A. Roig, Williams, Reed, Weinstein, Schifino & Mangione, P.A., Tampa, FL, Thomas M. Zurek, Randall G. Horstmann, Nyemaster, Goode, McLaughlin, Voigts, Des Moines, IA, for Equitable Life Insurance Company of Iowa, defendant.

R. Marshall Rainey, Thomas M. Zurek, Randall G. Horstmann, (See above), Gerald J. Newbrough, Nyemaster, Goode, McLaughlin, Voigts, Des Moines, IA, for Equitable of Iowa Companies, defendant.

Sheri Kephart, Irving, CA, movant pro se.

Kyle E. Stewart, Dubuque, IA, movant pro se.

John Hoppey, Jr., Hazleton, PA, movant pro se.

Patrick A. Staloch, Hartland, MN, movant pro se.

Mark R. Kerfeld, Tewksbury, Kerfeld L Zimmer, for Eugene R. Olson, movant.

David H. Fleck, Law Office of David H. Fleck, Whitefish Bay, WI, for David H. Fleck, movant.

FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER NUNC PRO TUNC

KOVACHEVICH, J.

INTRODUCTION

*1 1. The matter of the final approval of the proposed settlement of this class action lawsuit came on for hearing on December 19, 1997. The hearing ("Fairness Hearing"), as set forth in the Court's Hearing Order dated August 14, 1997 ("Hearing Order"), was convened at 10:25 a.m., with plaintiffs appearing through counsel and defendants appearing through counsel and by a company representative. Although the Fairness Hearing was well publicized, as described below, no Class Members attended the Fairness Hearing. The proposed settlement, embodied in the parties' First Amended Stipulation of Settlement (including Exhibits A through L), dated July 18, 1997 and filed with the Court on August 8, 1997, was thoroughly briefed by the parties, and was supported with affidavits and declarations of fact and of expert witnesses. Oral presentations of plaintiffs' and defendants' counsel were received at the Fairness Hearing. At the conclusion of the Fairness Hearing, with the parties having met their burden for final approval of the settlement and for the proposed award of attorneys' fees and expenses, the Court requested and received from the parties a proposed form of order, called Final Order and

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 133741                                                                                                         Page 2
(Cite as: 1998 WL 133741 (M.D.Fla.))

Judgment, finally approving the settlement, certifying the Class, and awarding plaintiffs' counsel the requested fees and expenses, which the Court then signed, to be effective December 19, 1997. The Court also informed the parties it would be supporting the Final Order and Judgment with additional findings of fact and conclusions of law, to be entered *nunc pro tunc,* and instructed the parties to present proposed findings of fact and conclusions of law for the Court's consideration.

2. Now, having further considered the evidence and other submissions of the parties, and all objections to the settlement, the Court makes the following findings of fact and conclusions of law, effective as of December 19, 1997, to be added to and made a part of the Court's Final Order and Judgment dated December 19, 1997, *nunc pro tunc.* Further, the Final Order and Judgment dated December 19, 1997 is also modified as follows, as of December 19, 1997, *nunc pro tunc:*

a. The date December 19, 1997 in clause (iv) in the second sentence of paragraph 2 of the Final Order and Judgment is changed to the correct and actual date, August 14, 1997;

b. The sixteen subparagraphs numbered B.1.(b)(i) through B.1.(b)(xvi) in paragraph 8 (Release and Waiver) of the Final Order and Judgment are renumbered B.1.(b)(1) through B.1.(b)(16), to reflect their correct and actual numbers;

c. The words "and enjoined," unintentionally omitted before, are added to the first clause following the semicolon in the first sentence of paragraph 10 of the Final Order and Judgment, immediately following the words "and all persons are barred"; and

d. The first sentence of paragraph 15 of the Final Order and Judgment is changed to read as follows:
> Neither this Final Order and Judgment (including the Court's Findings of Fact and Conclusions of Law thereto and therefor) nor the Stipulation of Settlement (including any document referred to in the Stipulation of Settlement and any action taken to implement the Stipulation of Settlement) is, may be construed as, or may be used as an admission by or against defendants of: (i) the validity of any claim, or (ii) any actual or potential fault, wrongdoing or liability, or (iii) any fact or legal issue in another case.

*2 e. Clause (i) beginning on the first line of paragraph 1 of the Final Order and Judgment is changed to read as follows:
(i) the First Amended Stipulation of Settlement, dated as of July 18, 1997 and filed with the Court on August 8, 1997; and

Otherwise, the Court's Final Order and Judgment is unchanged, and remains effective as of December 19, 1997.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

I. *BACKGROUND*

A. *The Complaint*

3. Representative plaintiffs Brenda G. Elkins and Jerry Bedenbaugh ("plaintiffs" or "named plaintiffs") filed this action on behalf of themselves and a putative nationwide class on February 14, 1996. They amended their complaint on July 26, 1996, and filed their Second Amended Class Action Complaint (hereinafter the "Complaint" or "Compl. ¶ ___") on July 17, 1997.

4. Defendant Equitable Life Insurance Company of Iowa ("Equitable of Iowa") answered plaintiffs' amended Complaint on August 22, 1996, and all three defendants, including Equitable of Iowa, Equitable of Iowa Companies and Equitable American Life Insurance Company (collectively the "defendants") answered the Second Amended Class Action Complaint on August 6, 1997.

5. This action is brought on behalf of a nationwide class of persons or entities (the "Class" or "Class Members") who have or had an ownership interest in certain life insurance policies upon which Equitable of Iowa was or is obligated and that were issued between January 1, 1984 and December 31, 1996 (the "Class Period"), with certain persons and entities excluded by definition. The Class is fully described in the Final Order and Judgment. The Complaint asserts claims based upon, among other things, negligent misrepresentation, negligent supervision, breach of contract, breach of duty of good faith and fair dealing, breach of fiduciary duty, fraudulent inducement and common law fraud. It seeks (i) compensatory and punitive damages, (ii) attachment, impounding, disgorgement or the imposition of a constructive trust, (iii) declaratory and injunctive relief, and (iv) expenses and

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

attorneys' fees.

6. At the heart of the Complaint are plaintiffs' allegations that defendants induced Class Members to purchase whole life and universal life insurance policies issued by Equitable of Iowa [FN1] based upon uniform, misleading and deceptive sales practices. In particular, the Complaint alleges: (i) that defendants misled Class Members into believing that their life insurance policies would remain in force after the payment of a single out-of-pocket premium or a fixed or limited number of out-of-pocket premiums; (ii) that defendants induced Class Members to use the cash values of existing permanent life insurance policies to purchase new Equitable of Iowa policies; and (iii) that defendants sold life insurance principally as an investment, savings or retirement plan, without adequately disclosing that the product being sold was life insurance. Plaintiffs also allege: (a) that defendants injured Class Members through its policies, practices and actions concerning dividend scales, interest crediting rates and monthly deduction rates, as well as how it administered and serviced the life insurance policies owned by Class Members; (b) that defendants misled Class Members to believe that the dividend scales and interest rates illustrated at the time their policies were sold were reasonable, were not likely to change, or would not change in an amount sufficient to cause the policies to perform differently than was represented at the time of sale; (c) that defendants improperly decreased dividend scales and interest crediting rates on Class Members' policies to compensate for the "Deferred Acquisition Cost" or "DAC tax," when the policies did not permit such decreases; and (d) that defendants' "direct recognition practices" (*i.e.*, its reduction of dividends or interest credits on Class Members' policies with outstanding policy loans) were improper.

> FN1. Almost all of the life insurance policies involved in this action and the settlement were issued by Equitable of Iowa. The others were issued by defendant Equitable American Life Insurance Company and were assumed by Equitable of Iowa in 1984.

*3 7. Defendants strongly deny the wrongdoings alleged by plaintiffs. These denials, including defendants' explanation of Equitable of Iowa's conduct and practices, are set out in § 3 of the Notice of Class Action (Ex. A to the Declaration of Jeffrey D. Dahl ("Dahl Decl."). *See also* Declaration of Richard L. Bailey ("Bailey Decl.") (No. 2), ¶¶ 10-14.

B. *The Parties*

1. *The Class Representatives*

8. **Plaintiff Brenda G. Elkins ("Ms.Elkins").** Ms. Elkins is a resident of Arizona. When she purchased her four Equitable of Iowa life insurance policies in 1990, and when she filed this class action lawsuit in 1996, she was a resident and citizen of Florida. Ms. Elkins claims she was induced to buy her policies based on misrepresentations that after five additional annual premiums were paid, no more premiums would be necessary, *i.e.*, her premiums would "vanish." She also claims to be a "twisting" (replacement) victim, in that she was improperly induced to terminate her existing life insurance policies, having cumulative death benefits of $200,000, to purchase new cash value life insurance policies from Equitable of Iowa, having cumulative death benefits of $700,000. In addition, she claims the four Equitable of Iowa policies were sold to her not as life insurance but as a retirement plan for herself and as investment plans for her daughters.

9. **Plaintiff Jerry Bedenbaugh ("Mr.Bedenbaugh").** Mr. Bedenbaugh is a resident and citizen of the State of Florida. He bought his $350,000 Equitable of Iowa life insurance policy in 1992, based on an allegedly misleading and inaccurate vanishing premium presentation. Like Ms. Elkins, Mr. Bedenbaugh also claims he was twisted, in that an existing cash value life insurance policy was cashed out to fund the purchase of his Equitable of Iowa policy. He also claims the Equitable of Iowa policy was sold to him as a retirement vehicle. Mr. Bedenbaugh, like Ms. Elkins, further alleges that the substantial commission and surrender charges attending the purchase of the Equitable of Iowa policy were not disclosed to him.

10. **Class Counsel.** Ms. Elkins, Mr. Bedenbaugh and the Class are represented by the law firms of Milberg Weiss Bershad Hynes & Lerach LLP and

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 133741 Page 4
(Cite as: 1998 WL 133741 (M.D.Fla.))

James, Hoyer & Newcomer, P.A. (collectively and individually "Co-Lead Counsel"). Plaintiffs and the Class are also represented by the law firms of Bonnett, Fairbourn, Friedman & Balint, P.C.; Arnzen, Parry & Wentz, P.S.C.; Cantilo, Maisel & Hubbard, LLP; and Davis, Brown, Koehn, Shors & Roberts, P.C. All are experienced plaintiffs' counsel with expertise in the insurance, consumer and class action litigation fields. *See* Affidavit of Melvyn I. Weiss and John J. Stoia, Jr. in Support of Final Certification of the Class, Approval of Settlement and Award of Fees and Expenses ("Weiss/Stoia Aff.") ¶ 5.

2. *Defendants*

11. Defendant Equitable Life Insurance Company of Iowa is a stock life insurance company incorporated under the laws of the State of Iowa. Its principal place of business is Des Moines, Iowa. Defendant Equitable American Life Insurance Company was an Iowa corporation before it was merged into Equitable Life Insurance Company of Iowa in 1984. Defendant Equitable of Iowa Companies was an Iowa corporation with its principal place of business in Des Moines, Iowa until October of 1997, when it was merged into Equitable of Iowa Companies, Inc., a Delaware corporation. Bailey Decl. (No. 1) ¶ 6. Defendants are represented by their outside attorneys, Nyemaster, Goode, Voigts, West, Hansell & O'Brien, P.C., in the persons of Thomas M. Zurek and Gerald J. Newbrough.

C. *History Of The Litigation*

*4 12. The claims of plaintiffs and the defenses of defendants have been vigorously contested in this case, and in precursor litigation in the Iowa District Court for Polk County in 1995. The parties' factual and legal skirmishes, plus numerous discovery disputes, are well-chronicled in their adversary papers and more recently in their submissions respecting the proposed settlement. Weiss/Stoia Aff. ¶¶ 20-25, 32-43; Bailey Decl. (No. 2) ¶¶ 10- 15. *See also* Plaintiffs' Memorandum in Support of Application for Final Certification of the Class and of Approval of the Proposed Settlement ("Plaintiffs' Mem."). It is not necessary for the Court to itemize these contests and disputes in this Order.

13. It is also not necessary for the Court to recount the lengthy discussions and negotiations between the parties precipitating the proposed settlement, other than to note that these discussions and negotiations, which did not proceed substantively until plaintiffs had virtually completed their broad and thorough discovery, were intense, continuous and hard fought, and involved numerous capable and experienced attorneys on both sides. These negotiations took over a year to complete and ultimately culminated in the Stipulation of Settlement filed with this Court on July 18, 1997. Weiss/Stoia Aff. ¶¶ 49- 54; Bailey Decl. (No. 2) ¶ 20. The discussions and negotiations respecting plaintiffs' attorneys' fees did not commence until all material terms of the proposed settlement had been agreed to by the parties. Weiss/Stoia Aff. ¶¶ 54, 56; Bailey Decl. (No. 2) ¶ 21.

14. By the end of the discovery process, Equitable of Iowa had produced and plaintiffs' counsel had reviewed voluminous materials, *e.g.,* papers, computer media and videotapes, relevant to the issues in this case. These materials included, *inter alia,* policy forms, product materials, training materials, sales illustrations software, other sales material, pricing and interest crediting materials, agent files, complaint files and relevant communications between Equitable of Iowa and its agents. In addition, plaintiffs' counsel deposed five officers of Equitable of Iowa familiar with its products, sales and marketing activities, pricing and interest crediting practices, complaint resolution procedures and other relevant matters. They also conducted extensive and on-going interviews of a senior actuary in the company, and interviewed the actuarial consulting firm retained by Equitable of Iowa on several occasions. Plaintiffs' counsel also conducted extensive informal discovery, including, *inter alia,* obtaining complaint files from various departments of insurance, and the review and analysis of media reports, SEC filings, state regulatory filings, industry bulletins and periodicals. They also utilized an expert for evaluation of Equitable of Iowa's sales illustrations. Bailey Decl. (No. 2) ¶ 19; Weiss/Stoia Aff. ¶¶ 32-43.

15. The Stipulation of Settlement, dated July 18, 1997, including Exhibit A thereto, was presented to the Court by the parties on July 18, 1997 at a previously scheduled status conference. The Stipulation of Settlement was presented with a proposed form of hearing order (now Exhibit K to the Stipulation of Settlement), which, *inter alia,*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

scheduled a fairness hearing on the proposed settlement and described the form and procedures of notice to the Class respecting the proposed settlement. The Court took the Stipulation of Settlement and the proposed hearing order under advisement.

*5 16. On August 8, 1997, the parties filed their First Amended Stipulation of Settlement ("Stipulation of Settlement"), dated as of July 18, 1997, which was identical to their original Stipulation of Settlement, except Exhibits B through L to the Stipulation of Settlement were now also attached.

17. On August 14, 1997, after reviewing the Stipulation of Settlement, the Court signed the Hearing Order that, among other things, (i) preliminarily certified, for settlement purposes, the Class described in the Stipulation of Settlement, (ii) found that the Stipulation of Settlement was sufficient to warrant providing notice to the Class, and scheduled a final hearing to consider approval of the proposed settlement, (iii) directed the forms and methods of notice to the Class, (iv) authorized defendants to retain one or more class action administrators, (v) set forth procedures whereby Class Members could exclude themselves from the Class or object to any aspect of the proposed settlement, (vi) appointed Co-Lead Counsel for the Class and directed Co-Lead Counsel to make available to all Class Members the documents produced to Co-Lead Counsel by defendants as well as the deposition transcripts and accompanying exhibits generated in this action, and (vii) preliminarily enjoined Class Members who had not timely excluded themselves from the Class from participating in any lawsuit relating to the claims in this action or their underlying transactions, and preliminarily enjoined all persons from commencing or prosecuting a lawsuit as a class action in any jurisdiction, based on or relating to the claims or causes of action in this case and/or the "Released Transactions" (as defined in the Stipulation of Settlement). Paragraph 6(a) of the Hearing Order was corrected *nunc pro tunc* on September 2, 1997.

18. After issuance of the Hearing Order, extensive notice, describing the proposed settlement and Class Members' options in connection with the settlement, was provided to the Class, using the forms and methods proscribed in the Hearing Order. Among other things, this notice consisted of (i) comprehensive individual notice sent by first class mail to the approximately 109,000 Class Members (respecting the approximately 130,000 policies covered by the proposed settlement), and (ii) publication notice that appeared in the national editions of *The Wall Street Journal*, *USA Today* and *The Chicago Tribune* and also in *The Tampa Tribune*, *The Arizona Daily Star* and *The Arizona Citizen*. In addition, Equitable of Iowa established and operated a toll-free telephone information center--in consultation with and monitored by Co-Lead Counsel-- staffed with trained operators who provided Class Members with additional information about the proposed settlement. As of November 21, 1997, the class action information center had received approximately 6,627 calls on its policyowner hotline. The Court's findings concerning the notice provided to the Class are set forth in Part IV below.

D. *The Fairness Hearing*

*6 19. On December 19, 1997, this Court held the Fairness Hearing to hear argument and consider evidence concerning the fairness, adequacy and reasonableness of the proposed settlement, which the parties had fully briefed and documented with declarations and affidavits, including extensive exhibits, in support of the settlement.

20. The Court considered all of the written objections of Class Members who objected to the settlement, including objections to plaintiffs' counsel's request for attorneys' fees and expenses. Although all objectors had the opportunity to appear in person or through counsel and present objections at the Fairness Hearing, no objectors availed themselves of that opportunity.

21. The Court considered the testimony submitted by plaintiffs in support of the settlement through (i) the joint affidavit of Melvyn I. Weiss and John J. Stoia, Jr. of Milberg Weiss Bershad Hynes & Lerach LLP; (ii) the affidavit of Terry M. Long of Lewis & Ellis, Inc. ("Long Aff."); (iii) the declaration of Geoffrey P. Miller, Professor of Law, New York University Law School ("Miller Decl."); and (iv) the affidavits of Co-Lead Counsel and other counsel (collectively, "Plaintiffs' Counsel Declarations") in support of plaintiffs' application for attorneys' fees and expenses.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

22. The Court also considered the testimony submitted by Equitable of Iowa in support of the settlement through (i) the declarations of Richard L. Bailey; (ii) Exhibit A to the declaration of John Snyder of Milliman & Robertson, Inc. ("M & R Report") and the Declaration of Dale S. Hagstrom of Milliman & Robertson, Inc. ("Hagstrom Decl."); (iii) the declaration of Professor George L. Priest ("Priest Decl."), the John M. Olin Professor of Law and Economics, Yale Law School; (iv) the declaration of Thomas Tew ("Tew Decl."), former outside litigation counsel to the Florida Department of Insurance and presently with the law firm of Tew & Beasley, L.L.P.; and (v) the declaration of Jeffrey D. Dahl ("Dahl Decl."), of Rust Consulting, Inc., the Administrator retained in this action.

23. The Court has also considered the reaction of the state insurance departments to the proposed settlement. *See* Bailey Decl. (No. 2) ¶¶ 24-25.

24. At the conclusion of the Fairness Hearing, this court entered its Final Order and Judgment, which, among other things: (i) approved the settlement as fair, adequate and reasonable, (ii) certified the Class, (iii) approved plaintiffs' request for attorneys' fees and expenses totalling $5 million, and (iv) ordered the parties to submit proposed findings of fact and conclusions of law for the Court's consideration.

II. *THE SETTLEMENT*

A. *Overview*

25. The settlement provides the Class with an innovative package of relief options that are specifically responsive to the allegations of the Complaint. Although the basic structure of the settlement resembles that employed in court-approved settlements of other life insurance sales practices class actions across the country--*see, e.g., Spitz v. Connecticut General Life Ins. Co.,* MDL No. 1136, Nos. CV95-3566-HLH & CV96-8484-HLH, Order (C.D.Cal. Jan. 13, 1997) (Weiss/Stoia Aff. Ex. 4); *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F.Supp. 450 (D.N.J.1997); *Michels v. Phoenix Home Life Mut. Ins. Co.,* No. 95/5318, 1997 N.Y.Misc. LEXIS 171 (N.Y.Sup.Ct. Jan. 3, 1997) (Weiss/Stoia Aff. Ex. 2); *Willson v. New York Life Ins. Co.,* No. 94/127804, 1995 N.Y.Misc. LEXIS 652 (N.Y.Sup.Ct. Nov. 8, 1995), 228 A.D.2d 368 (1996), *appeal denied,* 677 N.E.2d 289 (1997) (Weiss/Stoia Aff. Ex. 1); *Natal v. Transamerica Life Insurance Co.,* Case No. 694829 (San Diego Superior Ct., July 28, 1997) (Weiss/Stoia Aff. Ex. 3)--that structure has been substantially modified to address the allegations in the Complaint and to meet the particular needs of individual Class Members. *See* Weiss/Stoia Aff. ¶¶ 8, 10-17.

*7 26. Under the settlement, each Class Member will be offered the choice of Individual Claim-Review Relief through a Claim-Review Process or General Policy Relief. The Claim-Review Process provides all Class Members with the opportunity to submit policy-related claims to a two-tiered claim resolution system that is designed to be a fair, efficient and cost-free alternative to court litigation. Class Members who choose not to participate in the Claim-Review Process will be eligible to apply for one or more forms of General Policy Relief, which require no showing of fault or wrongdoing on defendants' part. The forms of relief made available under the settlement are summarized below and are described in detail in the Stipulation of Settlement.

B. *The Claim-Review Process*

27. Any Class Member who believes that he or she was misled by a misrepresentation or omission of material information or otherwise harmed by wrongdoing in connection with a policy covered by the settlement will have the opportunity to submit a claim for relief to the Claim-Review Process. The Claim-Review Process is described in detail at § IV of the Stipulation of Settlement.

28. Under the Claim-Review Process, which is provided to individual Class Members at no cost, the Class Member will submit a claim form describing his or her claim, along with all documents in his or her possession relating to the claim. The agent who sold the policy will be asked to provide a sworn statement about the claim and documents relating to the claim. Equitable of Iowa is obligated to investigate the Class Member's claim, as described in the Stipulation of Settlement, and to provide information obtained through that investigation, including relevant documents, to the Claim-Review Team that initially reviews the claim.

29. Under the Claim-Review Process, claims will initially be reviewed and scored, and relief (if any)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

will be awarded, by a Claim-Review Team appointed by Equitable of Iowa. The Claim-Review Team will evaluate claims using procedures, including detailed substantive evaluation and relief criteria, agreed to by plaintiffs and Equitable of Iowa and set forth in the Stipulation of Settlement (particularly, Exhibits A and B to the Stipulation of Settlement). For each claim, scores will be assigned to the several claim-resolution factors set forth in the Stipulation of Settlement for that type of claim, based on scoring guidelines set forth in the Stipulation of Settlement. The score ultimately assigned to a claim-resolution factor may not be averaged with the score assigned to any other claim-resolution factor; instead, relief will be awarded based on the highest score merited by any claim-resolution factor. Once scoring is complete, decisions to award relief must be based only on the relief criteria set forth in the Stipulation of Settlement.

30. The relief available through the Claim-Review Process varies depending on the type of claim and the highest score awarded it. The various types of relief are designed to provide substantial compensation that addresses the harm associated with each type of claim. If a Class Member submits a claim that alleges more than one type of misrepresentation, he or she may be able to choose between different relief options, depending on the scores awarded to the claim. Punitive or exemplary damages may not be awarded.

*8 31. Importantly, there is no cap on the aggregate relief for which Equitable of Iowa may be liable by way of awards made pursuant to the Claim-Review Process. Equitable of Iowa will provide relief to all Class Members who submit claims and establish their entitlement to relief under the Claim-Review Process, and each Class Member's award under the process will be determined without regard to the value of awards provided to other Class Members. Weiss/Stoia Aff. ¶ 10; Priest Decl. ¶ 35; Tew Decl. ¶ 10. c.

32. Claim-Review Team decisions will be binding on Equitable of Iowa. However, a Class Member who is dissatisfied with the Claim-Review Team's disposition of his or her claim may appeal, at Equitable of Iowa's expense, to a Claim-Appeal Panel, a panel of independent arbitrators selected by Co-Lead Counsel from a list approved by the parties. The Claim-Appeal Panel that reviews a claim on appeal may first attempt to informally resolve the claim. If this attempt is unsuccessful, the Claim-Appeal Panel will review the claim *de novo*, using the same criteria employed by the Claim-Review Team. A Class Member who appeals a decision of a Claim-Review Team will have the right to appear at an appeal hearing, either in person, by telephone, or through an attorney retained at the Class Member's expense. Equitable of Iowa may appear at such a hearing only through the method chosen by the Class Member. The outcome of an appeal is binding on the Class Member; Equitable of Iowa may seek reconsideration only if the Claim-Appeal Panel awards relief that is not specified under the Stipulation of Settlement.

33. To help ensure that claims are fairly evaluated and that relief is awarded in accordance with the Stipulation of Settlement, a Policyowner Representative selected by Co-Lead Counsel and compensated by Equitable of Iowa will participate as each Class Member's advocate throughout the Claim-Review Process. Among other things, the Policyowner Representative will be able to participate (but not vote) in Claim-Review Team discussions, submit materials from the discovery record and written statements for consideration in connection with individual claims, and, under circumstances specified in the Stipulation of Settlement, appear and present oral argument at appeal hearings.

34. The Claim-Review Process is not restricted to claims expressly alleged in the Complaint. Rather, so long as they comply with the requirements set forth in the Stipulation of Settlement, Class Members may, if they so desire, submit to the Claim-Review Process any claim with respect to a policy included in the Class definition. Stipulation of Settlement, Ex. A (Parts VIII.A.1(i) and VIII.A.2).

35. The settlement also provides for the resolution of certain claims outside the Claim-Review Process. Specifically, the settlement provides that Equitable of Iowa may require Class Members to resolve certain claims other than those submitted to the Claim-Review Process through certain procedures, called "Part VIII.A.ii Claim-Review Procedures," described in Part VIII of Exhibit A to the Stipulation of Settlement. *See* Stipulation of Settlement, Ex. A, Parts VIII.A. (ii) and VIII.A.3.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

In addition, if a Class Member can demonstrate that, through the exercise of reasonable care, he or she could not have known at the time the settlement became final of a released claim involving the administration or servicing of a policy (included within the Class definition) after its purchase, under the settlement Equitable of Iowa will be required to resolve that claim through the Part VIII.A.ii Claim-Review Procedures, even though the deadline for submission of claims to the Claim-Review Process has passed. *Id.; see also* Stipulation of Settlement, §§ IV.B and IX.B.4.

C. *General Policy Relief*

*9 36. As an alternative to Individual Claim-Review Relief through the Claim-Review Process, the settlement makes six types of General Policy Relief available to Class Members. General Policy Relief is described in detail in § V of the Stipulation of Settlement. It is also described in the individual notice sent to Class Members pursuant to the Hearing Order. *See* Dahl Decl.Ex. A.

37. Depending on eligibility, every Class Member who does not choose to submit a claim to the Claim-Review Process may obtain or apply for one or more of the six types of General Policy Relief. Eligibility for specific types of General Policy Relief is based on characteristics of the policy that makes each policyowner a member of the Class, such as policy type, face amount and status (in-force or terminated) Class Members need not show fault, injury or damages to be entitled to General Policy Relief. Eligibility criteria are set forth in § V.B of the Stipulation of Settlement. They are also described in the individual notice to Class Members. *See* Dahl Decl.Ex. A.

38. The six types of General Policy Relief may be generally described as follows:

a. **Dividend Enhancement.** Eligible Class Members will receive Dividend Enhancement on each of their policies equal to a 60 basis-point enhancement to the unloaned interest component of the annual base dividend for the policy, plus another 60 basis-point enhancement to the unloaned interest component of the annual paid-up additions dividend for the policy (if it has paid-up additions), for the policy year ending on the policy's anniversary date following the date 120 days after the settlement is final. For policies that terminate after July 31, 1997, and before they are credited with dividend enhancement, Equitable of Iowa will pay dividend enhancement directly to the Class Members within 30 days after the date their policies would have been credited dividend enhancement had they not terminated.

b. **Interest Enhancement.** Eligible Class Members will receive Interest Enhancement on each of their policies. For policies where excess interest is used to purchase paid-up additions, Equitable of Iowa will pay interest enhancement by crediting each such policy with an amount equal to a 60 basis- point enhancement to the current interest rate applied to the unloaned policy value of the policy, including the unloaned value of any paid-up additions for the policy (if it has paid-up additions) for the policy year ending on the policy's anniversary date first following the date 120 days after the settlement is final. For policies where interest is applied to the policy account value or policy accumulation value, Equitable of Iowa will pay, within 120 days of the date the settlement is final, interest enhancement by crediting each such policy with an amount equal to a 60 basis-point enhancement of the policy's unloaned account value as it existed on July 31, 1997.

C. **Optional Premium Loans.** Eligible Class members may obtain Optional Premium Loans at a rate substantially equivalent to Equitable of Iowa's cost of borrowing. Optional premium loans are a special type of loan and are not policy loans pursuant to the policy loan provisions of the Class Members' policies. The maximum number of Optional Premium Loans an eligible Class Member may obtain will depend on the year his or her policy was issued. Optional Premium Loans can only be used to pay all or portions of one or more premiums due under the policies that make the Class Members eligible for Optional Premium Loans.

*10 d. **Enhanced Value Policies.** Eligible Class Members may apply for Enhanced Value Policies. Enhanced Value Policies are whole life and universal life insurance policies, issued by Equitable of Iowa from its current product line, enhanced with a financial contribution from Equitable of Iowa equal to 50% of the first year premium and, if the Class Member keeps the enhanced value policy in force for five years, an additional 25% of the first year premium. Enhanced

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 133741 Page 9
(Cite as: 1998 WL 133741 (M.D.Fla.))

Value Policies have relaxed underwriting requirements and special contestability and suicide provisions. Failure to make a timely election disqualifies otherwise eligible Class Members from this type of General Policy Relief.

e. **Enhanced Value Deferred Annuities.** Eligible Class Members may obtain Enhanced Value Deferred Annuities, which are non-qualified, single-premium, fixed, deferred annuities issued by Equitable of Iowa from its current product line, and enhanced with contributions from Equitable of Iowa. Each Enhanced Value Deferred Annuity will receive from Equitable of Iowa, at the end of its first policy year, a contribution equal to 2% or 3% of the annuity's premium, depending on the size of the premium, plus another contribution at the end of the fifth policy year equal to 1% or 1.5% of the annuity's premium, depending on the size of the premium. Each Enhanced Value Deferred Annuity will have its applicable surrender charge waived when the Class Member reaches age 59 1/2 or the annuity has been in force for four years, whichever is later. Failure to make a timely election disqualifies otherwise eligible Class Members for this type of General Policy Relief.

f. **Enhanced Value Immediate Annuities.** Eligible Class Members may obtain Enhanced Value Immediate Annuities, which are non-qualified, single-premium, fixed, life-contingent, immediate annuities issued by Equitable of Iowa from its current product line, and enhanced with contributions from Equitable of Iowa. Each Enhanced Value Immediate Annuity will receive, at the time of issue, a contribution equal to 2.5% of the annuity's premium. Failure to make a timely election disqualifies otherwise eligible Class Members for this type of General Policy Relief.

39. The parties designed each of the six types of General Policy Relief to respond to the various circumstances described in the Complaint and to assist Class Members (who do not wish to participate in the Claim-Review Process) in achieving financial security objectives that might have influenced their original purchasing decisions. The purpose of Dividend Enhancement is to enhance the dividend accumulation component of Class Members' in-force policies and thereby increase the policies' ability to bear the cost of future premiums. The purpose of Interest Enhancement is to enhance the cash accumulation component of Class Members' policies and thereby increase the policies' ability to bear the cost of mortality and administrative charges or future premiums. The purpose of Optional Premium Loans is to lessen the burden to Class Members of additional out-of-pocket premiums, which may be due beyond those originally illustrated. Enhanced Value Policies are designed for Class Members who terminated their policies, or who have borrowed heavily against their policies and want a fresh start, to obtain new policies, enhanced by Equitable of Iowa, to help them attain their original insurance objectives. Enhanced Value Deferred Annuities and Enhanced Value Immediate Annuities are intended to address the savings and investment or income and cash flow objectives of Class Members whose need for life insurance death benefits may be outweighed by other considerations. *See* Stipulation of Settlement § V.A; Plaintiffs' Mem. pp. 14-15.

D. *Release*

*11 40. In exchange for the settlement benefits described above, the Stipulation of Settlement releases defendants from all claims covered by the Release, which is set forth in full in § IX of the Stipulation of Settlement and in Appendix A (pp. 28-31) to the individual notice mailed to Class Members. Dahl Decl.Ex. A.

III. *CLASS CERTIFICATION*

A. *Introduction*

41. The legitimacy of a settlement class was recently confirmed by the Supreme Court in *Amchem Prods. v. Windsor,* 521 U.S. 591 117 S.Ct. 2231, 2252 (1997). There, the Court established that not only is the proposed settlement and its terms relevant to the class certification analysis, it alleviates the need to address potential management problems that might arise were the case to be tried. *Id.* at 2252. Most importantly, the Supreme Court reiterated the "dominant concern" that governs the proper analysis under each Rule 23 subsection: "whether a proposed class has sufficient unity so that absent members can fairly be bound by decisions of class representatives." *Id.* at 2248. Here the proposed Class satisfies this dominant concern, as well as all other prerequisites to certification set forth in *Amchem* and Eleventh

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 133741 Page 10
(Cite as: 1998 WL 133741 (M.D.Fla.))

Circuit precedent.

B. *The Requirements Of Rule 23(a) Are Satisfied*

42. The four prerequisites of Rule 23(a) are that:
 (1) the class be so numerous that joinder of all members is impracticable;
 (2) there be questions of law or fact common to the class;
 (3) the claims or defenses of the representative parties be typical of the claims or defenses of the class; and
 (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a); *Amchem,* 521 U.S. at ----, 117 S.Ct. at 2240.

a. *Numerosity*

43. The class must be so numerous that "joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). To meet this requirement, the class representatives need only show that it is difficult or inconvenient to join all the members of the class. *Phillips v. Joint Legis. Comm.,* 637 F.2d 1014, 1022 (5th Cir. Feb.23, 1981). [FN2]

> FN2. The decisions of the former Fifth Circuit before October 1, 1981 have been adopted as binding precedent in this Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*).

44. Here, members of the Class live nationwide and number approximately 109,000. *See* Bailey Decl. (No. 1) ¶ 10. In these circumstances, joinder is impractical and the numerosity requirement is easily satisfied. *Cox v. American Cast Iron Pipe Co.,* 784 F.2d 1546, 1553 (11th Cir.1986) (generally, more than 40 class members satisfies numerosity).

b. *Commonality*

45. There must be "questions of law *or* fact common to the class." Fed.R.Civ.P. 23(a)(2) (emphasis added). Rule 23(a) does not require that *all* questions of law or fact be common to *all* class members. "The claims actually litigated in the suit must simply be those fairly represented by the named plaintiffs." *Cox,* 784 F.2d at 1557. Accordingly, the main inquiry is whether at least one issue exists that affects all or a significant number of proposed class members. *Kreuzfeld A.G. v. Carnehammar,* 138 F.R.D. 594, 599 (S.D.Fla.1991).

*12 46. The commonality requirement is also satisfied where plaintiffs allege common or standardized conduct by the defendant directed toward members of the proposed class. *See Kennedy v. Tallant,* 710 F.2d 711, 718 (11th Cir.1983) ("a single conspiracy and fraudulent scheme against a large number of individuals is particularly appropriate for class action"). One indicia of a common scheme to deceive alleged in the Complaint is the existence of uniform written materials on which the oral representations were based. *See, e.g., Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 724-25 (11th Cir.1987) (observing that where oral communications are based on and consistent with, deceptive written materials, the fact that individual brokers provided information through oral communications does not preclude class certification). In such cases, any factual distinctions that may exist among class members are "far less important than the common issues bearing on the existence of a 'common scheme' of misrepresentations and omissions." *CV Reit, Inc. v. Levy,* 144 F.R.D. 690, 696 (S.D.Fla.1992) (citation omitted).

47. Plaintiffs allege that defendants engaged in a common course of conduct intended to defraud all Class Members through the use of substantially uniform omissions and misrepresentations. The Complaint alleges 22 common issues of fact and law, based on alleged standardized omissions and misrepresentations emanating from Equitable of Iowa. *See* Compl. ¶ 15. These common issues are susceptible to classwide proof that will not vary appreciably from one Class Member to another. The common issues include, *inter alia:*
 . Whether defendants routinely engaged in fraudulent and deceptive acts and practices and courses of business in the sale of its life insurance policies;
 . Whether defendants failed to supervise and train its agents who engaged in the schemes described in the Complaint and also failed to prevent its agents from violating uniformly applicable state insurance laws and regulations;
 . Whether defendants engaged in deceptive acts

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

and practices in the sale of "vanishing premium" policies by representing through policy illustrations, marketing materials and uniform sales presentations approved and prepared by it that the single prepayment of premiums made by Class Members at the time of purchase, or that the fixed number of premiums paid during a fixed period of years, would be sufficient to carry the cost of the policies for the life of the insured or to maturity;

. Whether defendants failed to disclose to those Class Members who believed they were purchasing "investment," "retirement" or "savings" plans, instead of life insurance, that a substantial part of their "investment" would be used to pay mortality charges for life insurance, pay agents' commissions and pay administrative charges to Equitable of Iowa and, thus, would not earn any interest or investment income whatsoever;

*13 . Whether defendants concealed from plaintiffs and Class Members that the dividends payable and excess interest crediting rates as illustrated in the uniform sales presentations and policy illustrations approved and prepared by them were not guaranteed at the illustrated levels and would likely decrease in future payment periods;

. Whether the dividend scales, excess interest crediting rates, values, assumptions, mortality experience, expenses, lapse rates, interest rate and investment return projections underlying Equitable of Iowa's policy illustrations lacked any reasonable basis in fact and were so flawed as to have an adverse impact on plaintiffs and Class Members; and

. Whether defendants failed to disclose to plaintiffs and Class Members material information concerning the impact or results of using some or all of an existing policy's cash value to purchase a new policy issued by Equitable of Iowa by means of a surrender or withdrawal/partial surrender of, or loan(s) from, the existing policy.

48. The primary theory of plaintiffs' Complaint is that defendants devised and implemented a scheme to sell, service and administer permanent life insurance policies through a nationwide common course of deceptive conduct that emanated from Equitable of Iowa's home offices in Des Moines, Iowa and was implemented through its nationwide sales force. *See* Compl. ¶¶ 24-28. Plaintiffs allege that all Class Members were injured, separately or in combination, by a broad array of centrally-orchestrated deceptive practices that permeated Equitable of Iowa's marketing and sales presentations (Compl.¶¶ 4, 24-25), agent training and supervision (Compl.¶ 28), illustration, dividend and interest crediting practices (Compl.¶¶ 26, 34) and investment strategies (Compl.¶ 34).

49. As alleged by plaintiffs, all of these practices and policies allegedly were determined and implemented in a uniform fashion by Equitable of Iowa's home office management and would be proven at trial through common evidence. All Class Members thus share a common interest in establishing that defendants knew that deceptive sales practices were being utilized, and that Class Members suffered losses as a consequence of that conduct. In sum, the Complaint's allegations of a centralized scheme raise issues common to every Class Member, amply satisfying the commonality requirement of Rule 23(a)(2).

C. *Typicality*

50. The typicality requirement of Rule 23(a) is satisfied where the claims of the class representatives arise from the same broad course of conduct that gives rise to the claims of the other class members and are based on the same legal theory. *Appleyard v. Wallace,* 754 F.2d 955, 958 (11th Cir.1985) (typicality requirement met where named plaintiffs' claims have same essential characteristics as claims of class even if there are factual distinctions among the claims of the plaintiffs of the class); *Powers v. Stuart-James Co.,* 707 F.Supp. 499, 503 (M.D.Fla.1989) (Kovachevich, J.) ("The reasoning behind this requirement is that where all interests are sufficiently parallel, all interests will enjoy vigorous and full presentation."). Here, Ms. Elkins and Mr. Bedenbaugh are representative of both current and former Equitable of Iowa policyowners allegedly defrauded by the same deceptive sales practices and schemes allegedly utilized by defendants against other Class Members. *See* Miller Decl. ¶ 13 ("The claims of the representative class plaintiffs are typical of those of the Class as a whole."). Any slight factual differences that may exist between the named class representatives and other Class Members will not defeat typicality. *Appleyard,* 754 F.2d at 958.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

d. *Adequacy Of Representation*

*14 51. Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This requirement serves to protect the legal rights of absent class members. As the Supreme Court recently observed in *Amchem,* the adequacy "inquiry [under Rule 23(a)(4) ] serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem,* 521 U.S. at ----, 117 S.Ct. at 2236. The adequacy-of-representation requirement under Rule 23 is a two- prong test. First, the named class representatives must appear to be capable of prosecuting the actions through qualified, experienced and competent counsel. Second, there can be no antagonism or disabling conflict between the interests of the named class representatives and the interests of the members of the class. *See, e.g., Kirkpatrick,* 827 F.2d at 726, (citing *Griffin v. Carlin,* 755 F.2d 1516, 1532 (11th Cir.1985)).

52. This action meets both prongs of the "adequacy" test. First, plaintiffs' counsel are well-qualified to prosecute this litigation effectively and efficiently on behalf of plaintiffs and the Class. *See, e.g., In re Prudential,* 962 F.Supp. at 519-20 (finding the same legal counsel "extremely qualified" and "extremely committed to the class"); *Willson,* 1995 N.Y.Misc. LEXIS 652, at *28 (finding the same legal counsel competent and zealous, in a "vanishing premium" case that produced settlement for policyowners conservatively valued in excess of $300 million) (Weiss/Stoia Aff.Ex. 1); *In re Prudential Sec. Inc. Ltd. Partnerships Litig.,* 163 F.R.D. 200, 208 (S.D.N.Y.1995) (finding the same legal counsel "have successfully conducted numerous class actions, including class actions under the federal securities laws and RICO, in this Court and in federal district courts throughout the United States").

53. Second, there are no conflicts or antagonisms here between the named plaintiffs and the Class Members. All Class Members can claim to be harmed by defendants' alleged misconduct and all Class Members have the mutual incentive to establish the alleged fraudulent scheme. Consequently, plaintiffs' interests are co-extensive with those of other Class Members, and thus plaintiffs have every incentive to vigorously pursue these claims as representatives of the Class. *See In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 208 (5th Cir. Apr.1981) (" 'so long as all class members are united in asserting a common right, such as achieving the maximum possible recovery for the class, the class interests are not antagonistic for representation purposes' ") (citation omitted).

54. Furthermore, unlike personal injury actions, here the restitution and/or money damages sought are subject to objective quantification and are reasonably calculable without speculation. [FN3]

FN3. Unlike *Amchem,* this case presents no set of class members comparable to the "exposure only" plaintiffs who "claimed no damages and no present injury." *Amchem,* 521 U.S. at ---- - ----, 117 S.Ct. at 2240- 43. Here all Class Members can claim to have suffered a quantifiable, existing injury from defendants' alleged practices, as typified by the named plaintiffs. *See* Miller Decl. ¶ 15 ("All class members [here] suffered pecuniary and financial injury, in contrast to the diverse and complex individual medical conditions for which recovery was sought in *Amchem.* There are no significant fissures in this class, much less the chasm which was presented in *Amchem* between present and future claimants.").

*15 55. Nor is any impermissible intra-Class conflict or antagonism created by the settlement. *See Amchem,* 521 U.S. at ----, 117 S.Ct. at 2236. The settlement affords all eligible Class Members relief unfettered by monetary or numerical "caps." The settlement does not discriminate or allocate relief among different segments of the Class; every Claim Member is eligible for General Policy Relief or Individual Claim-Review Relief tailored to his or her individual circumstances. Under the settlement, Class Members are entitled to compensation based on the strength of their individual claims, and no theoretical subgroup's interest (such as Class Members with replacement claims) have been traded off to the benefit of any other theoretical subgroup (such as Class Members with vanishing premium claims). *Contrast Amchem,* 521 U.S. at ----, 117 S.Ct. at 2236 (finding interest of currently injured Class Members

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

not aligned with that of potentially injured Class Members). Nor is the settlement geared to protecting one part of the class at the expense of the other. Those were the sorts of class conflicts that alarmed the Supreme Court in *Amchem,* but they are absent here.

56. The settlement also incorporates procedural and substantive protections that virtually insure adequate representation. The settlement establishes specific and uniform criteria under which all claims for Individual Claim- Review Relief will be administered. Importantly, these criteria include rebuttable and conclusive presumptions favoring the claimants, and objective factors that operate to increase the claimants' scores in many cases. The settlement also provides individual representation to claimants through a Policyowner Representative appointed by plaintiffs' counsel and an independent, simplified appeals process. As the end product of plaintiffs' efforts on behalf of the Class, the settlement resoundingly confirms that all Class Members have been adequately represented in this litigation.

C. *The Requirements Of Rule 23(b)(3) Are Satisfied*

57. Rule 23(b)(3) authorizes certification where common questions of law or fact predominate over individual questions and the class action is superior to other available means of adjudication. *Amchem,* 521 U.S. at ---- - ----, 117 S.Ct. at 2232-35.

a. *Common Legal And Factual Questions Predominate In This Action*

58. Where confronted with a class of purchasers allegedly defrauded over a period of time by a similar common thread or scheme to which all alleged non- disclosures or misrepresentations relate, "courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit." *Blackie v. Barrack,* 524 F.2d 891, 902 (9th Cir.1975); *Kirkpatrick,* 827 F.2d at 725; *In re Prudential,* 962 F.Supp. at 510-11.

*16 59. In this case, plaintiffs and the Class have allegedly been defrauded by the same common course of conduct. Although Class Members purchased their policies separately, plaintiffs allege that defendants induced them to do so through a uniform marketing scheme that was standardized, coordinated and ultimately deceptive. First, proof of defendants' alleged common course of conduct insures that common questions would predominate over individual issues at trial. *See, e.g., Davis v. Avco Corp.,* 371 F.Supp. 782, 791-92 (N.D.Ohio 1974) (the fact that some of the class members received oral rather than written statements creates no impediment to class certification). Second, proof of defendants' alleged fraudulent concealment, the appropriateness of equitable relief and feasibility of classwide damages methodologies likewise insure predominance. *In re NASDAQ Market-Makers Antitrust Litig.,* 169 F.R.D. 493, 517 (S.D.N.Y.1996); *In re Prudential,* 962 F.Supp. at 512. Likewise, the damages issues in this case are suited for classwide resolution because Equitable of Iowa maintains computerized records of transactions with the Class Members. *In re NASDAQ,* 169 F.R.D. at 522; *see also In re Prudential,* 962 F.Supp. at 516 (use of class damage calculation methodology raised common question).

60. This is therefore not a case, as in *Amchem,* where the class members' claims vary widely in character. There, the class purported to preclude members who were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods, such that some class members suffered no physical injury, some had only asymptomatic pleural changes, others had lung cancer (some of whom were smokers), other disabling asbestosis, and still others mesothelioma--a disease with a latency period of 15 to 40 years. *Amchem,* 521 U.S. at ----, 117 S.Ct. at 2240. Indeed, as to some class members, it was unclear whether they would ever contract an asbestos-related disease and, if so, which one. *Id.*

61. Additionally, this case is distinguishable from *Motel 6,* which required individualized proof of "highly case-specific factual issues." *Jackson, et al. v. Motel 6 Multi-Purpose, Inc., et al.,* 130 F.3d 999, 1997 U.S.App. LEXIS 36132 (11th Cir.1997). There, specific fact inquiries included:
> [N]ot only whether a particular plaintiff was denied a room or was rented a substandard room, but also whether there were any rooms vacant

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 133741                                                                                        Page 14
(Cite as: 1998 WL 133741 (M.D.Fla.))

when that plaintiff inquired; whether the plaintiff had reservations; whether unclean rooms were rented to the plaintiff for reasons having nothing to do with the plaintiff's race; whether the plaintiff, at the time that he requested a room, exhibited any non-racial characteristics legitimately counseling against renting him a room; and so on.... Indeed, we expect that most, if not all, of the plaintiffs' claims will stand or fall, not on the answer to the question whether Motel 6 has a practice or policy of racial discrimination, but on the resolution of these highly case-specific factual issues.

*17 Id., at *18.

62. Here, by contrast, the Class is limited to purchasers of a particular product (a life insurance policy) from a particular company (Equitable of Iowa or Equitable American) through allegedly uniform and fraudulent sales practices, including uniform misrepresentations and omissions of material information, at the time of sale and thereafter, which was common to all Class Members. Furthermore, the Class Members are readily identifiable, and all can claim to have already suffered injury in the purchase of a product that was other than as represented. In short, defendants' alleged intentional company-wide development and implementation of fraudulent sales practices involving uniform misrepresentations and omissions of material fact provides the "single central issue" lacking in *Amchem* and avoids the predominance concerns of *Motel 6*, 1997 U.S.App. LEXIS 36132, at *15-*20. See *In re Prudential*, 962 F.Supp. at 511 n. 45. See also Miller Decl. ¶ 15 (contrasting personal injury claims in *Amchem* with economic damages here).

63. Defendants' alleged deceptive sales practices consisted, in part, of oral misrepresentations, which arguably may be susceptible to individual variation. However, these individual issues do not outweigh the substantial number of common questions, and therefore the commonality requirement has been met. See *In re Carbon Dioxide*, 149 F.R.D. 229, 234 (M.D.Fla.1993); *Walco Invs. v. Thenen*, 168 F.R.D. 315 (S.D.Fla.1996). Allegations of a common scheme of deception can establish predominance even where the scheme is implemented through oral misrepresentations by sales agents. See, e.g., *In re Prudential*, 962 F.Supp. at 512-16; *In re American Continental Corp./ Lincoln Sav. & Loan Sec. Litig.*, 140 F.R.D. 425, 430-31 (D.Ariz.1992); *Davis*, 371 F.Supp. at 792. See also *Amchem*, 521 U.S. at ----, 117 S.Ct. at 2250 ("Predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws.").

64. Predominance is not undermined by any theoretical choice of law issues that might also arise if this case were to be litigated. At the certification stage, the Court need only determine which state law is "likely" to apply. See *Randle v. SpecTran*, 129 F.R.D. 386, 393 (D.Mass.1988); *Gruber v. Price Waterhouse*, 117 F.R.D. 75, 82 (E.D.Pa.1987); *In re Pizza Time Theatre Sec. Litig.*, 112 F.R.D. 15, 19 (N.D.Cal.1986). Here, one option available to the Court, were this case to be tried, would be to apply the law of Iowa--the location of Equitable of Iowa's headquarters and principal place of business, and the source of the challenged marketing policies. See, e.g., *Randle*, 129 F.R.D. at 393 ("high likelihood" that law of state where defendant's offices located and in which decisions regarding the timing and context of corporate disclosures were made would apply). [FN4] Iowa is the state from which Equitable of Iowa conducted its nationwide activities and from which its alleged campaign of fraud emanated. [FN5] The relationship of other states, by contrast, is limited to protecting the interests of policyowners residing in those states--interests that would be served by application of Iowa law.

FN4. See also *Fry v. UAL Corp.*, 136 F.R.D. 626, 631 (N.D.Ill.1991) (choice of law no obstacle to certification of class claims where law of state in which defendant maintained its corporate offices and from which alleged misrepresentations issued would be applied); *Kirschner*, 139 F.R.D. at 84 (law of the state of defendant's principal place of business and from which many of the allegedly false statements were made may apply); *Martin v. Heinold Commodities, Inc.*, 117 Ill.2d 67, 109 Ill.Dec. 772, 510 N.E.2d 840, 847 (Ill.1987) (law of defendant's principal place of business applied); *In re ORFA Sec. Litig.*, 654 F.Supp. 1449 (D.N.J.1987).

FN5. Under *Phillips Petroleum Co. v.*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works