1998 WL 133741                                                                Page 15
(Cite as: 1998 WL 133741 (M.D.Fla.))

*Shutts,* 472 U.S. 797, 821-22, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985), Iowa law constitutionally may be applied to class members nationwide so long as Iowa has a sufficient aggregation of contacts to the class members' claims to ensure that application of Iowa law would not be arbitrary or unfair. Those conditions are satisfied when, as here, the named defendants maintain their business offices in Iowa, many of the alleged fraudulent statements emanated from that state, many Class Members are Iowa residents, and Iowa has a strong policy in preventing fraud from within its borders.

*18 65. Also, any state-by-state variations on the legal standards are neither particularly great nor insurmountable. *In re School Asbestos Litigation,* 789 F.2d 996 (3d Cir.1986); *Pizza Time,* 112 F.R.D. at 20 ("It is evident that the similarities in [the various states' common law concerning fraud] vastly outweigh any differences."). [FN6] Plaintiffs' counsel have already successfully done so in other cases involving the same legal theories asserted here. *See, e.g., In re Prudential,* 962 F.Supp. at 524-26. [FN7] *See also* Miller Decl. ¶ 27 (applicable state law can be grouped into two or three categories and is not so great as to undermine predominance of common questions of law or fact).

FN6. This is not a case, such as *Castano v. American Tobacco Co.,* 84 F.3d 734, 747-48 (5th Cir.1996), where a novel or "immature" tort is alleged. A definite "track record" exists for these types of cases against insurers. Such cases have been litigated through trial. *See, e.g., Cartwright v. The Equitable Life Assurance Society,* 276 Mont. 1, 914 P.2d 976 (Mont.1996) (vanishing premium case tried to jury and affirmed on appeal).

FN7. Any significant variations in state law encountered in a theoretical trial could be handled by the use of available management techniques. *See generally* L. Kramer, *Class Actions and Jurisdictional Boundaries: Choice of Law in Complex Litigation,* 71 N.Y.U.L.Rev. 547, 584- 585

(1996) (application of multiple states laws feasible through "sensible use of the tools available to manage litigation," including the grouping of substantive laws as in *School Asbestos,* "careful [jury] instructions and the availability of special verdicts ...").

**b.** *A Class Action Is The Superior Means To Adjudicate Plaintiffs' Claims*

66. Rule 23(b)(3) considers whether "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." [FN8] Rule 23(b)(3) lists four nonexclusive factors bearing on the superiority determination. *Amchem,* 521 U.S. at ----, 117 S.Ct. at 2246. Applied here, these factors show that a class action is the only feasible method for the fair and efficient adjudication of the claims of most Class Members.

FN8. The majority rule is that a district court should consider the settlement when evaluating the superiority of a class action under Rule 23(b)(3). *In re Asbestos Litig.,* 90 F.3d 963, 975 (5th Cir.1996); *see also In re Dennis Greenman Sec. Litig.,* 829 F.2d 1539, 1543 (11th Cir.1987).

(1) *Interest In The Case*

67. The first superiority factor identified in Rule 23(b)(3) is "the interest of members of the class in individually controlling the prosecution or defense of separate actions." This factor addresses whether the interest of most class members in conducting separate lawsuits is so strong as to require denial of class certification. *See, e.g., Bonilla v. Trebol Motors Corp.,* No. 92-1795(JP), 1993 U.S.Dist. LEXIS 5775, at *4 (D.P.R.1993) (class action superior where individual class members have no interest in controlling litigation) (Weiss/Stoia Aff.Ex. 9); *In re Prudential,* 962 F.Supp. at 523- 24 (same); *McClendon v. Continental Group, Inc.,* 113 F.R.D. 39, 45 (D.N.J.1986) (same). Considerations relevant to this inquiry include the degree of "cohesion" among class members, whether "the amounts at stake for individuals ... [are] so small that separate suits would be impracticable" and the extent to which "separate

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

suits would impose ... [burdens] on the party opposing the class, or upon the court calendars...." *Amendments to Rules of Civil Procedure,* 39 F.R.D. 69, 104 (1966) (Rule 23, Advisory Committee's Notes).

68. Most Class Members in this case have little incentive or ability to prosecute their claims against defendants in separate individual actions. The Class is estimated to encompass approximately 109,000 former and current Equitable of Iowa policyowners located throughout the United States. Unlike the personal injury claims in *Amchem,* many of the policyowners' claims present "negative value" actions, as it would not be economically feasible for them to retain attorneys to pursue individual litigation against defendants. [FN9]

> FN9. *See, e.g., In re General Motors Corp. Pick-up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 784 (3d Cir.), cert. denied, 516 U.S. 824, 116 S.Ct. 88, 133 L.Ed.2d 45 (1995) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device." (quoting *Deposit Guar. Nat'l Bank v. Roper,* 445 U.S. 326, 339, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980)).

*19 69. The likelihood that Class Members could obtain meaningful redress through individual actions is further diminished by the legal defenses available to defendants, defenses that would prevent or deter individual actions by Class Members. For example, most of the policies at issue were sold by Equitable of Iowa during the 1980s. As a consequence, should the benefits of tolling be lost upon a refusal to certify, many thousands of Class Members could find their claims time-barred by applicable statute of limitations, even if they eventually could find lawyers willing to represent them in separate lawsuits. *See General Motors Corp. v. Bloyed,* 916 S.W.2d 949, 957 (Tex.1996) ("[T]here was a strong likelihood that a large proportion of the class members' claims ... would have been barred by the statute of limitations.").

70. The relative absence of policyowner suits presently pending against Equitable of Iowa compared to complaints lodged by policyowners with the Company confirms that individual Class Members lack any compelling interest to control the prosecution of separate actions. *See, e.g., Basile v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 105 F.R.D. 506, 510 (S.D.Ohio 1985) (finding that existence of small number of suits pending in other courts as a result of same underlying action represented that individual investors were not interested in pursuing suit alone).

### (2) *Other Pending Proceedings*

71. In determining the superiority issue, the Court should also consider "the extent and nature of any litigation concerning the controversy already commenced by or against members of the class." The existence of other litigation may either indicate the availability of other methods to adjudicate the controversy or the superiority of class certification. 1 Herbert B. Newberg & Alba Conte *Newberg on Class Actions* § 4.30 at 4-121 (3d Ed.1992). In addition to the companion action in Arizona, two other class action lawsuits were filed against defendants seeking to recover damages for putative classes similar to the Class in this case. *See* Weiss/Stoia Aff. ¶ 48. These two class actions, filed substantially *after* this case, have been resolved as part of this settlement. As a result, the existence of these suits does not undermine the propriety of class certification in this litigation.

72. The several individual actions pending against defendants will not, separately or collectively, "adjudicate ... the controversy" that underlies this class action litigation. Traditional alternatives to the class action device--joinder, intervention and consolidation--are not feasible and in any event would not permit resolution of the entire controversy.

### c. *Manageability In This Forum*

73. Another factor set forth on Rule 23(b)(3) is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum." However, this factor is not significant and is conceptually irrelevant in the context of settlement. *See Amchem,* 521 U.S. at ----, 117 S.Ct. at 2248 ("Confronted with a request for settlement-only class certification, a district court need not inquire

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

whether the case, if tried, would present intractable management problems ... for the proposal is that there be no trial.").

*20 74. With the settlement in hand, the desirability of concentrating the litigation in one forum is obvious; and for this purpose this forum is as good or better than any other, given the parties' and many of the Class Members' close ties to the forum. Without a settlement, the issue might be closer, but not controlling, in the Court's view, with other weightier factors all favoring certification.

75. Even if considered, however, the inquiry is whether reasonably foreseeable difficulties render some other method of adjudication superior to class certification. *In re Prudential,* 962 F.Supp. at 524-26; *In re Antibiotic Antitrust Actions,* 333 F.Supp. 278, 282 (S.D.N.Y.1971) ("defendants, after reciting potential manageability problems, seem to conclude that no remedy is better than an imperfect one"); *see also In re NASDAQ* 169 F.R.D. at 527 ("Manageability problems are significant only if they create a situation that is less fair and efficient than other available techniques.") (citation omitted). Because the Class includes only current or former Equitable of Iowa policyowners, identifying the Class Members and providing them with notice has not proved difficult.

## IV. NOTICE AND JURISDICTION

### A. The Settlement Notice

76. Upon consideration of the extensive record concerning the manner in which notice was provided to the Class, the Court reiterates its earlier findings (Hearing Order ¶ 7) and concludes that the form and methodology of notice in this case satisfied the requirements of applicable law, the rules of this Court, and due process under the federal constitution.

### 1. Content of Notice

77. The notice package mailed to each Class Member included at least one 31- page Class Notice (entitled "Notice of Class Action, Proposed Settlement, Fairness Hearing and Right to Appear"), at least one two-page cover letter and six-page question-and-answer brochure, and at least one customized Policy Information Statement, all as specified and required in paragraph 6(a) of the

Hearing Order and §§ VI.A through VI.D of the Stipulation of Settlement. *See* Dahl Decl. ¶ 11 and Ex. A.

78. The 31-page Class Notice included (i) the case caption; (ii) a description of the litigation; (iii) a description of the Class; (iv) identification of Co-Lead Counsel for the Class; (v) a description of the proposed settlement, including the relief available to the Class Members and the Release to be given to defendants; (vi) the date and time of the Fairness Hearing; (vii) information about how Class Members could appear at the Fairness Hearing, individually or through counsel; (viii) the procedure and deadline for filing objections to any aspect of the proposed settlement; (ix) the manner in which Class Members could obtain access to discovery materials produced in this action and companion litigation; (x) information about obtaining a complete copy of the Stipulation of Settlement; (xi) the procedure and deadline for filing requests for exclusion from the Class; (xii) the consequences of being excluded from the Class; (xiii) the consequences of remaining in the Class; (xiv) a description of Equitable of Iowa's responsibility for plaintiffs' attorneys' fees and expenses, and of its agreement to pay attorneys' fees and expenses awarded by the Court up to a maximum of $5 million; (xv) a description of the preliminary injunction issued by the Court in the Hearing Order; and (xvi) the procedure for obtaining additional information, including the toll-free number established to respond to Class Member inquiries. *See* Dahl Decl.Ex. A.

*21 79. The individual notice materials provided to Class Members are clear and comprehensive documents that presented, in plain language and a reader- friendly format, detailed and accurate information about this action, the proposed settlement and the options available to Class Members. *See* Priest Decl. ¶ 25.

80. Individual notice of the settlement was supplemented by publication notice. This plain-language publication notice (called the "Summary Notice" in the Stipulation of Settlement and the Hearing Order) included (i) the case caption; (ii) a description of the Class; (iii) a brief description of the proposed settlement, including Individual Claim-Review Relief through the Claim-Review Process and General Policy Relief; (iv) identification of Co-Lead Counsel for the Class;

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 133741
(Cite as: 1998 WL 133741 (M.D.Fla.))

(v) the date, time and location of the Fairness Hearing; (vi) information about appearing at the Fairness Hearing; (vii) information about and the deadline for filing objections to the settlement; (viii) information about and the deadline for filing requests for exclusion from the Class; (ix) the consequences of exclusion from the Class; (x) the consequences of remaining in the Class; (xi) a description of Equitable of Iowa's responsibility for plaintiffs' attorneys' fees and expenses, and of its agreement to pay attorneys' fees and expenses awarded by the Court up to a maximum of $5 million; (xii) a description of the preliminary injunction issued by the Court in the Hearing Order; (xiii) the procedure for obtaining additional information, including the toll-free number established to respond to Class Member inquiries; and (xiv) the manner in which Class Members could secure the notice package (individual notice materials) described above. *See* Dahl Decl.Ex. B.

81. Based on its review of the individual and publication notice materials and the expert testimony concerning those materials, the Court concludes that the notices provided to the Class were more than adequate, equalling or exceeding the requirements of Federal Rule of Civil Procedure 23 and due process. The individual and publication notices fairly apprised Class Members of the existence of this action, the terms of the proposed settlement and the three options available to Class Members, *i.e.,* remaining in the Class and not objecting to the proposed settlement, remaining in the Class and objecting to the settlement and electing out of the Class. The notices also set forth, in clear, precise and neutral language, all information material to making an informed and intelligent decision respecting the Class Members' three options, how to elect each of the options, and the effect of each option on electing Class Members. Fed.R.Civ.P. 23(c)(2); *In Re Prudential,* 962 F.Supp. at 526-29; *Mendoza v. United States,* 623 F.2d 1338, 1351-52 (9th Cir.1980); see also Priest Decl. ¶ 25.

2. *Form Of Notice*

82. The Hearing Order (as corrected *nunc pro tunc* ) required that individual notice be sent, by first-class mail, postage prepaid at Equitable of Iowa's expense, no later than 60 days before the Fairness Hearing, to the last known address of each reasonably identifiable Class Member. Hearing

Order ¶ 6(a). In accordance with the Hearing Order, approximately 133,000 notice packages (containing the individual notice materials described above) were mailed to the approximately 109,000 Class Members (respecting the approximately 130,000 separate policies involved in this action) by Rust Consulting, Inc., the Class Action Administrator, prior to October 20, 1997. In fact, almost all of these notice packages were mailed by September 10, 1997. Approximately 2,300 notice packages were mailed on or before October 3, 1997, and the final 116 notice packages were mailed on October 15, 1997. Dahl Decl. ¶¶ 10-16. In addition, Rust Consulting mailed additional notice packages to Class Members who requested them by mail or through telephone calls to the policyowner hotline. Dahl Decl. ¶ 22.

*22 83. Also in accordance with the Hearing Order (¶¶ 6(c) and 6(d)), Rust Consulting caused notice packages that were returned by the United States Postal Service to be remailed to Class Members.

a. Approximately 491 notice packages were returned to Rust Consulting, Inc. by the United States Postal Service with forwarding addresses. These notice packages were promptly remailed in accordance with the Hearing Order. Dahl Decl. ¶ 19.

b. Approximately 16,804 notice packages were returned by the Postal Service without forwarding addresses. In accordance with the Hearing Order, Rust Consulting, Inc. caused the addresses for these notice packages to be researched, and new addresses were found for 9,464 of them; and they were remailed to the new addresses at least 40 days prior to the Fairness Hearing, as required in the Hearing Order. The balance of the returned notice packages (many of them duplicates) did not have reasonably obtainable forwarding addresses. Dahl Decl. ¶¶ 20, 21.

84. The Hearing Order further provided that the publication notice be published in certain newspapers at Equitable of Iowa's expense no later than 50 days before the Fairness Hearing. Hearing Order ¶ 6(b). In accordance with the Hearing Order, Equitable of Iowa published the publication notice on September 16, 1997 in the national editions of *The Wall Street Journal, USA Today,* and the *Chicago Tribune;* and also *The Tampa Tribune, The Arizona Daily Star* and *The Arizona*

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 133741                                                                                              Page 19
**(Cite as: 1998 WL 133741 (M.D.Fla.))**

*Citizen.* These newspapers had a combined average daily circulation of approximately 4.9 million. Dahl Decl. ¶ 24.

85. As contemplated by the Stipulation of Settlement, Rust Consulting, Inc. also established and maintained a toll-free information hotline for Class Members to call for further information about the proposed settlement. The hotline was available Monday through Friday, from 8:00 a.m. to 10:00 p.m. Central Time, beginning on September 8, 1997. The telephone number for the hotline was included in the individual notice materials and publication notice. As of the close of business on November 21, 1997, Rust Consulting, Inc. had received 6,627 calls on the hotline. Hotline calls were monitored both on-site and off-site by plaintiffs' counsel, and Class Members using the hotline were given the opportunity to speak to Class Counsel. Dahl Decl. ¶¶ 26-37; Weiss/Stoia Aff. ¶ 30.

86. Notice of a proposed class action settlement is adequate when it is the best notice practicable, reasonably calculated, under the circumstances, to reach absent class members. Fed.R.Civ.P. 23(c)(2); *see also Phillips Petroleum,* 472 U.S. at 812; *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 173-77, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314-15, 318, 70 S.Ct. 652, 94 L.Ed. 865 (1950); and *Mendoza,* 623 F.2d at 1351. Here the court finds that the combination of the individual and publication notices described above clearly satisfied this standard.

*\*23* 87. A small percentage of the Class could not be located through reasonable effort, and for various reasons some individual notices that were mailed may not have been received. Supplementing individual notice with publication notice represents an appropriate balance between protecting Class Members and making class actions workable. *See Gross v. Barnett Banks, Inc.,* 934 F.Supp. 1340, 1345 (M.D.Fla.1995).

88. As a result of the parties' efforts, extensive and comprehensive notice of the proposed settlement was provided to the Class. This notice not only complied in full with the terms of the Hearing Order, but was the most effective and best practicable notice, reasonably calculated, under all the circumstances, to apprise Class Members of the pendency of this action, the issues before the parties, the terms of the proposed settlement, the effects of staying in the Class and the options available to Class Members, including their right to exclude themselves from the Class, object to any aspect of the proposed settlement, participate in the action *pro se* or through counsel, and appear at the Fairness Hearing. Accordingly, the notice provided to the Class constituted due, adequate and sufficient notice to all persons entitled to be provided with notice, and it exceeded the requirements of applicable law, the rules of this Court, and due process under the federal constitution.

89. In the course of implementing the settlement, the parties will provide an extensive second round of notice to Class Members, informing them of their options under the settlement and enabling them to take advantage of those options. Stipulation of Settlement, §§ VI.G-VI.I and Exs. C, G, H & I. The Court finds that the materials to be provided to the Class in the implementation of the settlement (the Post-Settlement Notice, the Post- Settlement Summary Notice, the Election Forms and the Claim Forms), together with the post-settlement notice methodology set forth in the Stipulation of Settlement, are reasonably calculated, under all the circumstances, to apprise Class Members of their rights pursuant to the settlement; constitute due, adequate and reasonable notice to all Class Members; and otherwise satisfy the requirements of applicable law, the rules of this Court, and due process under the federal constitution.

3. *Exclusion Requests*

90. As of November 19, 1997, the deadline for exclusions, only 191 Class Members, respecting only 260 separate life insurance policies, had timely excluded themselves from the Class. [FN10] See Dahl Decl. ¶¶ 38-40 and Exs. A-D thereto. The Court finds that the individuals and entities listed on Exhibit C to the Declaration of Jeffrey D. Dahl are excluded from the Class, and from this date forward are no longer bound by prior orders of the Court in this action and, unless otherwise ordered, will not be bound by the Final Order and Judgment (or any further orders in this action). Any other requests for exclusion are denied as untimely or improperly made.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Case 5:02-cv-00273-C   Document 66-2   Filed 01/16/04   Page 6 of 21

1998 WL 133741
(Cite as: 1998 WL 133741 (M.D.Fla.))

Page 20

FN10. The procedures for a current or former policyowner excluding himself or herself from the Class were set out in the Hearing Order and the individual and publication notices discussed above. Hearing Order ¶ 10; Dahl Decl.Exs. A-B thereto.

*24 91. The Court has reviewed the exclusion requests and cannot infer from them a general dissatisfaction with the proposed settlement. They cover less than one-fifth of one percent of the life insurance policies covered by the settlement. Also, 21 of the 260 policies covered by the exclusion requests were owned by insurance companies (competitors of Equitable of Iowa), and 84 of the policies were owned by persons represented by several Alabama lawyer groups.

4. *Objections*

92. Not including any of the exclusion requests described above, a total of only six written communications were served upon counsel and/or filed with the Court in compliance with, or in an apparent attempt to comply with, the procedures for objecting to the proposed settlement. [FN11] Of these six communications, only four are proper objections, since two of the objections were not properly made. *See* Plaintiffs' Mem. pp. 58-63. The communication from Class Member David H. Fleck was by far the lengthiest and most detailed objection filed. *See id.* As discussed in detail in Part V.F. below, the objections, including the objection of Mr. Fleck, do not warrant disapproval of the settlement.

FN11. These objection procedures were established in the Hearing Order and communicated to the Class, in clear and precise language, in the individual and publication notices discussed above. Hearing Order ¶ 11; Dahl Decl.Exs. A-B thereto.

B. *Jurisdiction*

1. *This Court Has Original Jurisdiction To Implement The Settlement*

93. This Court has diversity jurisdiction under 28 U.S.C. § 1332. First, complete diversity exists between the named plaintiffs and defendants. *See* Compl. ¶¶ 8, 10, 11. Second, plaintiffs have alleged in good faith damages in excess of the $50,000 amount in controversy requirement in effect at the time the original pleadings were filed. [FN12] *See* Compl. ¶ 8 and pp. 45-57; *see generally St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288-89, 58 S.Ct. 586, 82 L.Ed. 845 (1938) (the sum claimed by the plaintiff controls if the claim is apparently made in good faith). [FN13]

FN12. Because the original federal Complaint was filed in this Court on February 14, 1996, when jurisdiction is measured, the new amount in controversy threshold of $75,000 effective as of January 17, 1997 is inapplicable. *See* 28 U.S.C.A. § 1332 (1997 Supp.), Historical and Statutory Notes.

FN13. The question whether the jurisdictional amount is satisfied is answered by referring to the complaint, not to the ultimate outcome of the case. *Suber v. Chrysler Corp.,* 104 F.3d 578, 583 (3d Cir.1997) ("Once a good faith pleading of the amount in controversy vests the district court with diversity jurisdiction, the court retains jurisdiction even if the plaintiff cannot ultimately prove all of the counts of the complaint or does not actually recover damages in excess of $50,000.") (citing *St. Paul,* 303 U.S. at 288); *In re Prudential,* 962 F.Supp. at 502-03.

94. With complete diversity and the requisite amount in controversy established among the named parties, subject matter jurisdiction extends to the balance of the Class Members' claims under 28 U.S.C. § 1367. *See In re Brand Name Prescription Drugs Antitrust Litig.,* 123 F.3d 599, 607 (7th Cir.1997); *Stromberg Metal Works, Inc. v. Press Mechanical, Inc.,* 77 F.3d 928, 931 (7th Cir.1996); *In re Abbott Labs.,* 51 F.3d 524, 528-29 (5th Cir.1995); *In re Prudential,* 962 F.Supp. at 503-05 (and authorities cited therein). With the enactment of § 1367, in the diversity jurisdiction context, there

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 133741
**(Cite as: 1998 WL 133741 (M.D.Fla.))**

Page 21

is no need for each Class Member to meet the required jurisdictional amount individually so long as there is complete diversity among the named parties, and the named plaintiffs have alleged claims that exceed the requisite amount in controversy. *Id.* That is the case here. [FN14]

> FN14. The amount in controversy requirement is also met in this case by aggregating the Class Members' punitive damages claims in the Complaint. *See Tapscott v. MS Dealer Serv. Corp.,* 77 F.3d 1353, 1357 (11th Cir.1996).

*2. The Court Has Personal Jurisdiction Over The Class Members*

**\*25** 95. The court acquires personal jurisdiction over present and absent class members so long as class members have been afforded, through adequate notice, the right to exclude themselves from the class. *See Phillips Petroleum,* 472 U.S. at 811-12. As described above, notice to the Class has been more than adequate. Accordingly, this Court has acquired personal jurisdiction over present and absent Class Members who have not opted out of the Class. *See In re Prudential,* 962 F.Supp. at 507.

**V. THE SETTLEMENT IS FAIR, ADEQUATE AND REASONABLE AND SATISFIES CRITERIA APPLIED BY THE ELEVENTH CIRCUIT AND THIS COURT**

96. The Eleventh Circuit and this Court consider seven factors in determining whether to approve settlements of class actions:
  a. The likelihood of success at trial and potential recovery;
  b. The complexity, expense and duration of litigation;
  c. The terms of the settlement;
  d. The procedures afforded to notify the class members of the proposed settlement, and to allow them to present their views;
  e. The judgment of experienced counsel for the plaintiff class;
  f. The substance and amount of opposition to the settlement; and
  g. The stage of the proceedings at which the settlement was achieved.

*Warren v. City of Tampa,* 693 F.Supp. 1051, 1055 (M.D.Fla.1988); *In re Corrugated Container,* 643 F.2d at 212. Application of these criteria to the instant settlement compels the conclusion that the proposed Settlement is fair, adequate and reasonable.

A. *The Likelihood Of Success At Trial And Potential Recovery*

97. It is not necessary to try the merits of the case in connection with reviewing the settlement. *In re Corrugated Container,* 643 F.2d at 212; *Meyer v. Citizens & Southern Nat'l Bank,* 677 F.Supp. 1196, 1201 (M.D.Ga.1988). Thus, the Court can limit its inquiry to determining "whether the possible rewards of continued litigation with its risks and costs are outweighed by the benefits of the settlement." *Ressler v. Jacobson,* 822 F.Supp. 1551, 1553 (M.D.Fla.1992); *see also Mashburn v. National Healthcare, Inc.,* 684 F.Supp. 660, 670 (M.D.Ala.1988) (in the class action settlement context, courts do not decide the merits of the case or resolve unsettled legal questions). This inquiry is premised upon "balancing the probabilities, not assuring that the plaintiff class receives every benefit that might have been won after a full trial." *In re Chicken Antitrust Litig.,* 560 F.Supp. 957, 960 (N.D.Ga.1980) The expense of achieving a more favorable result for the class at trial must be considered. *Ressler,* 822 F.Supp. at 1555; *Young v. Katz,* 447 F.2d 431, 433 (5th Cir.1971). Factually, this was a complicated case. Plaintiffs and their counsel believe that their case was exceedingly strong; however, defendants nevertheless had a number of potentially strong defenses.

**\*26** 98. Plaintiffs are not required to justify the terms of their settlement based on speculation of what they might have obtained. " '[I]nherent in compromise is a yielding of absolutes and an abandoning of highest hopes.' " *Cotton v. Hinton,* 559 F.2d 1326, 1330 (5th Cir.1977) (citation omitted); *Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir.1984). The risks of maintaining this litigation as a class action through trial and appeal weigh in favor of approving this settlement with its certain outcome, especially where, as here, the Class Members' individual claims are relatively small, and where Class Members have the right to opt-out and pursue their own remedy, if they so desire.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

99. As for risks attendant to litigation, the following are examples of issues that could potentially present obstacles to plaintiffs' success at trial, if this case were not settled:

a. Proving that the practices complained of were systemic in nature;

b. Establishing the elements of the various causes of action and, in particular, overcoming defendants' contentions, among others, that: (i) the contract rights that plaintiffs assert are contradicted by the plain and unambiguous language of the policies that constitute their contracts with Equitable of Iowa, and thus are barred by the parol evidence rule and the contract merger doctrine; (ii) the fraud, negligent misrepresentation and other fraud-related claims asserted by plaintiffs are not tenable because (a) plaintiffs would not be able to establish actual, reasonable or justifiable reliance on the alleged misrepresentations, and (b) plaintiffs have alleged promises of future conduct or opinions rather than misrepresentations of existing fact; (iii) plaintiffs' cause of action for breach of fiduciary duty is defective because plaintiffs cannot show that Equitable of Iowa is a fiduciary to its insureds; and (iv) plaintiffs' cause of action for breach of the implied covenant of good faith and fair dealing is defective because the precontractual conduct alleged by the plaintiffs cannot provide the basis for such a claim;

c. Establishing that Class Members' claims are timely under applicable statutes of limitation;

d. Proving that Class Members were unaware that dividend scales, interest crediting rates or monthly deduction rates could fluctuate, and that such fluctuations would affect planned premium amounts, and the number of out-of-pocket premiums needed to maintain policy values;

e. Proving that Class Members were unaware of the economic effects of using existing policy values to fund the purchase of new insurance policies;

f. Proving that Class Members were unaware that they had purchased life insurance or that, because of the costs associated with providing the guaranteed benefits of life insurance, their cash values would not accumulate at the rates they might accumulate in other investment vehicles;

g. Proving that Equitable of Iowa's decision to reduce dividends or interest credits on certain policies due to the so-called "DAC Tax" was improper in light of the written provisions of those policies; and

*27 h. Proving that Equitable of Iowa's "direct recognition practices" were improper or contrary to express policy language.

B. *The Complexity, Expense And Duration Of Litigation*

100. The federal courts have long recognized that "[c]ompromises of disputed claims are favored by the courts." *Williams v. First Nat'l Bank,* 216 U.S. 582, 595, 30 S.Ct. 441, 54 L.Ed. 625 (1910). "Particularly in class action suits, there is an overriding public interest in favor of settlement." *Cotton,* 559 F.2d at 1331.

101. This litigation involves the marketing and sale of a variety of Equitable of Iowa life insurance products over a 13-year period of time involving approximately 130,000 insurance policies. Among other things, plaintiffs challenge the methods used to market Equitable of Iowa's products to consumers, the adequacy of its disclosures, and the training and supervision of its agents. The work necessary to prepare this case for trial would be complicated, enormous in scope, logistically difficult, time-consuming and expensive. Continued litigation, just to the point of trial, would be lengthy, complex and expensive.

102. In addition, the life insurance policies at issue in this case are complex and would require extensive actuarial and financial expert testimony to evaluate the assumptions underlying these policies and the illustrations through which they were marketed to consumers, and also arcane actuarial standards, statutory and insurance accounting practices, and sophisticated financial theory.

103. Trial of this case, which would likely last for many months, would require additional time and expense for consultation with additional experts (whom the jury might or might not believe), preparation of trial memoranda on various legal issues, and post-trial memoranda and appeals that would inevitably follow rulings on any final judgment, which could prolong the case for many years. Judicial economy and public policy will be

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 133741
**(Cite as: 1998 WL 133741 (M.D.Fla.))**

Page 23

well served, because the settlement will result in an efficient and economical procedure for aggrieved Class Members to obtain appropriate relief.

C. *The Terms Of The Settlement*

104. The terms of the settlement need not provide the optimal relief, so long as there appears to be a genuine *quid pro quo. Warren,* 693 F.Supp. at 1059. Here, *all* Class Members have a right to multiple types of relief based upon their individual circumstances. Additionally, the terms of the settlement were carefully crafted to tailor relief for those Class Members who felt they were harmed by defendants. Finally, this result was achieved through extensive negotiation by experienced and capable attorneys. Weiss/Stoia Aff. at §§ I-III.

D. *The Procedures Afforded To Notify The Class Members Of The Proposed Settlement, And To Allow Them To Present Their Views*

105. As discussed in detail in § IV.A. above, the procedures afforded to notify the Class of the proposed settlement and of the opportunity to exclude themselves and present their views have been more than adequate.

E. *Judgment Of Experienced Counsel For The Class*

**\*28** 106. Counsel for plaintiffs and the Class are experienced in this type of litigation. *See* Weiss/Stoia Aff. ¶¶ 5-7. *See also* Plaintiffs' Mem. § IV.B.4. Counsel have voiced their beliefs that the proposed settlement is fair, adequate and reasonable.

107. Even in class action contexts, "the trial court is entitled to rely upon the judgment of experienced counsel for the parties.... Indeed, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Ressler,* 822 F.Supp. at 1555 (quoting *Cotton,* 559 F.2d at 1330); *Holmes v. Continental Can Co.,* 706 F.2d 1144, 1149 (11th Cir.1983) (deference afforded to opinions of class counsel in class actions); *Behrens v. Wometco Enters.,* 118 F.R.D. 534, 539 (S.D.Fla.1988) (the court can rely upon the judgment of experienced counsel and should not substitute its judgment for that of counsel, absent fraud).

108. Absent the settlement, the plaintiffs faced a protracted, expensive, and uncertain trial. Weiss/Stoia Aff. at § V.D. Likewise, the settlement strikes a balance that protects the interests of all Class Members. Considering the wealth of experience of plaintiffs' counsel, their endorsement of the settlement strongly militates in favor of approval of the settlement.

F. *The Substance And Amount Of Opposition To The Settlement*

109. The settlement should be examined in light of the objections raised by Class Members. *Cotton,* 559 F.2d at 1331; *Meyer,* 677 F.Supp. at 1210. There have been only six objections received from a Class of approximately 109,000 policyowners, which is a *de minimus* number relative to the settlement. *Hill v. Art Rice Realty Co.,* 66 F.R.D. 449, 456 (N.D.Ala.1974) (receipt of only one objection is compelling evidence that the attitude of the overwhelming percentage of the class affected by the settlement supports the reasonableness and appropriateness of the settlement), *aff'd without op.,* 511 F.2d 1400 (5th Cir.1975).

110. The "general objection" of *Kyle Stewart* is that he does not want to "purchase" something additional from Equitable of Iowa, apparently referring to General Policy Relief. He also says he has no evidence to introduce, which may be an objection, or it may be an acknowledgement he has no claim. Whatever, the objection does not recognize that relief is available without documentary evidence, even under the Claim-Review Process, and the settlement does not require Class Members to purchase anything. Plaintiffs' counsel sent Mr. Stewart a letter offering to discuss his objection and further explain the favorable presumptions of the Claim-Review Process. Mr. Stewart did not respond and ultimately excluded himself from the Class. Therefore, Mr. Stewart's objection to the settlement also lacks standing, because only Class Members have standing to object. For all these reasons, Mr. Stewart's objection is overruled.

**\*29** 111. The objection of *Sheri Kephart* is that her options are limited to purchasing a new policy from Equitable of Iowa. Ms. Kephart's objection is an apparent reference to the types of relief available to former policyowners as General Policy Relief. This objection reflects a misunderstanding of the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 133741                                                                    Page 24
**(Cite as: 1998 WL 133741 (M.D.Fla.))**

settlement's terms. Additional purchases are not required, and aggrieved policyowners may obtain significant relief in the form of Individual Claim-Review Relief through the Claim-Review Process. Weiss/Stoia Aff. ¶ 12. As with Mr. Kyle, plaintiffs' counsel wrote Ms. Kephart to offer to clarify and discuss the options available to her under the Claim-Review Process, but she did not respond to the offer. Weiss/Stoia Aff. ¶ 64. Accordingly, Ms. Kephart's objection is overruled.

112. The objection of *Patrick A. Staloch* concerns a policy purchased in 1981, *before* the Class Period. Therefore, because Mr. Staloch is not a Class Member with respect to this policy, he does not have standing to object. Moreover, the Class Period was determined based upon plaintiffs' investigation, discovery and conclusion that the alleged wrongdoing did not occur on a classwide basis before that time. Weiss/Stoia Aff. ¶¶ 44-47. Mr. Staloch's objection is overruled.

113. The objection of *Tom Kluzak* is that he feels it is "distasteful" that someone would "file a lawsuit on his behalf without [his] knowledge." Mr. Kluzak's objection is not an objection to the settlement itself, but to the class action device generally. The benefits of the settlement--obtained at no out-of-pocket expense to any policyowner--should not be denied to those policyowners who wish to participate, and, of course, Mr. Kluzak had the opportunity to opt-out. Mr. Kluzak's objection is overruled.

114. The objection of *John Hoppey, Jr.* does not appear to be an objection at all, but an "object[ion] to making any more premium payments." Like other Class Members, Mr. Hoppey will have an opportunity to submit a claim in the Claim-Review Process and support his contention that he should not have to make any more premium payments. Accordingly, Mr. Hoppey's objection is also overruled.

115. The sixth objection, that of David D. Fleck, is more substantial than the others, in size and in effort, and has received the Court's careful consideration. Mr. Fleck's objection is also an endorsement of the proposed settlement. He states on page two of his objection:

I wish to compliment the parties and their attorneys for bringing these actions to this point and fashioning a Settlement Agreement under

which the defendants offer the whole class member group benefits sufficient to merit the conclusion that, as to such group as a whole, the settlement is fair, adequate and reasonable.

116. Mr. Fleck does not complain about what is arguably the most important, at least most valuable, aspect of the proposed settlement, that being Individual Claim-Review Relief through the Claim-Review Process. His objection is only to General Policy Relief.

*30 117. Mr. Fleck's objection to General Policy Relief is twofold--General Policy Relief should be different or more valuable, and it discriminates between Class Members. To correct these perceived problems, Mr. Fleck has drafted, and proposes to the Court for its consideration, a number of material changes to the Stipulation of Settlement.

118. Like the Court, the parties did not take Mr. Fleck's objection lightly. In their point-by-point responses they dealt with his objection, including his proposed modifications, explaining in reasonable and persuasive terms why, for practical, financial, and legal reasons, they could not or would not change the settlement to meet his specifications. Several of Mr. Fleck's proposed changes would have made General Policy Relief more like Individual Claim-Review Relief, in relief to Class Members and in expense to Equitable of Iowa, even though Class Members electing General Policy Relief would not have to demonstrate any wrongdoing by defendants or any harm to themselves. It is understandable why the parties would not agree to these changes. Also, his personal claim of prejudice for not being eligible for Optional Premium Loans ignores the purpose of that particular type of General Policy Relief. Optional Premium Loans are to provide policyowners, whose policies have required modal premium, with special low interest loans to assist them in making out-of-pocket premium payments beyond those originally anticipated. However, Mr. Fleck's policy is a flexible premium universal life insurance policy. It does not have required premiums, and he can withdraw cash value from the policy without having to make a policy loan. Plaintiffs' Mem. pp. 59-62; Defendants' Mem. pp. 45-51.

119. It is not appropriate that the settlement be

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

restructured to fit Mr. Fleck's real or perceived personal circumstances, and his proposed changes are not necessary to make the settlement fair, adequate and reasonable as to the Class. Mr. Fleck had the option to elect out of the Class, and he still has the option to elect Individual Claim-Review Relief and pursue a claim through the Claim-Review Process, if he believes he has been harmed by wrongdoings in connection with his policy. Class certification and approval of the proposed settlement cannot be denied on the strength of Mr. Fleck's objection. It is therefore overruled.

120. The Court finds that there is a rational basis for the parties' allocation of General Policy Relief. It is not discriminatory, in design or effect. *See Holmes,* 706 F.2d at 1148 (allocation permissible if "rationally based on legitimate considerations"; to provide different relief for different claims/needs).

121. Likewise, the issue here is whether the relief provided in the settlement, taken as a whole, is adequate and reasonable, not whether something more lucrative might make the settlement more favorable to Class Members or certain Class Members. *See In re Warner Communications Sec. Litig.,* 798 F.2d 35, 37 (2d Cir.1986) ("it is not a district judge's job to dictate the terms of a class settlement; he should approve or disapprove a proposed agreement as it is placed before him and should not take it upon himself to modify its terms"); *Cotton,* 559 F.2d at 1333 ("the settlement must stand or fall as a whole"); *Jeff D. v. Andrus,* 899 F.2d 753, 758 (9th Cir.1989) ( "[C]ourts are not permitted to modify settlement terms or in any manner to rewrite agreements reached by parties."); *In re Domestic Air Trans. Antitrust Litig.,* 148 F.R.D. 297, 305 (N.D.Ga.1993) ("Court may only approve or disapprove the settlement as presented ... [i]t [ ] may not rewrite the settlement as requested by numerous objectors.").

**\*31** 122. Here, the settlement offers a range of valuable and innovative relief that corresponds to the allegations and claims asserted in the Complaint and to the separate needs of the individual Class Members. *See In re Xoma Corp. Sec. Litig.,* Master File No. C-91-2252 TEH, 1992 U.S.Dist. LEXIS 10502, at \*10 (N .D.Cal. July 10, 1992) ("The Court must be concerned with ensuring fairness to the class as a whole, rather than with satisfying any particular plaintiffs' demands.")

(Weiss/Stoia Aff. Ex. 11).

123. Finally, the Court finds the fact that so very few objections--only four with legal standing--were received from approximately 109,000 Class Members demonstrates that the response of the Class to the proposed settlement has been overwhelmingly positive.

124. The Court also notes that no governmental entities have appeared in this litigation. Before notifying Class Members of the proposed settlement, Equitable of Iowa met with staff insurance officials in Iowa, its state of domicile, and briefed them on this action and proposed settlement. Equitable of Iowa characterizes the Iowa Insurance Department's reception to the settlement as positive. Equitable of Iowa also notified the insurance departments in the other states in which it does business of this action and the proposed settlement by mail, and none of these departments expressed reservations about the settlement to Equitable of Iowa or the Court. These reactions by the state insurance departments, although not essential, favor approval of the settlement.

G. *The Stage Of Proceedings At Which This Settlement Was Achieved*

125. This litigation had reached the stage at which "the parties certainly ha [d] a clear view of the strengths and weaknesses of their cases." *In re Warner Communications Sec. Litig.,* 618 F.Supp. 735, 745 (S.D.N.Y.1985), *aff'd* 798 F.2d 35 (2d Cir.1986).

126. "[P]laintiffs have conducted sufficient discovery to be able to determine the probability of their success on the merits, the possible range of recovery, and the likely expense and duration of the litigation." *Ressler,* 822 F.Supp. at 1554-55; *Mashburn,* 684 F.Supp. at 669. This is particularly true when it is remembered that settlements are strongly encouraged. *Id.* Since settlements are to be encouraged, it follows that "only some reasonable amount of discovery should be required to make these determinations." *Ressler,* 822 F.Supp. at 1555; *Mashburn,* 684 F.Supp. at 669; *In re Corrugated Container,* 643 F.2d at 211 (lack of presettlement discovery does not in itself invalidate settlement, since plaintiffs' negotiators had access to a plethora of information regarding the facts of their case); *Cotton,* 559 F.2d at 1332.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

*32 127. The investigation and thorough discovery undertaken by plaintiffs' counsel in this case illuminated the strengths and weaknesses of both claims and defenses. The benefits achieved by plaintiffs' counsel's investigation and discovery will also accrue to Class Members during the administration phase of the settlement. Significantly, the fruits of plaintiffs' counsel's investigation, discovery and analysis will benefit Class Members who elect to participate in the Claim-Review Process.

VI. *VALUATION OF THE SETTLEMENT*

128. The value of the settlement consists of the following elements: (i) the value of the Claim-Review Process, including the value of the process itself and the value of the uncapped, aggregate relief to be paid successful claimants; (ii) the value of the General Policy Relief; (iii) the attorneys' fees and expenses that Equitable of Iowa will pay to plaintiffs' counsel, which will not reduce the amount of relief being made available to the Class; and (iv) the substantial amounts that Equitable of Iowa has paid and expects to pay in settlement and administrative expenses for the benefit of the Class.

129. Although the innovative nature of the settlement makes it difficult to put a maximum value on the benefits to be provided to the Class, it is clear that the value of those benefits is substantial, and the Court so finds.

A. *Claim-Review Process*

130. Defendants' actuarial experts, Milliman & Robertson, have analyzed the potential recoveries under the Claim-Review Process for three hypothetical Class Members (claimants), each a male nonsmoker, age 40, and each owning a different one of Equitable of Iowa's more popular life insurance policies, all with $100,000 face amounts. Assuming scores of 4 (the highest available under the process), and depending on the age of the policy, the type of claim (performance, replacement or retirement/investment) and other factors that vary among claimants, Milliman & Robertson valued Individual Claim-Review Relief for these hypothetical claimants from a minimum of $3,990 up to a maximum of $23,554. M & R Report § III. Lewis & Ellis, Inc., plaintiffs' actuarial experts, have reviewed Milliman & Robertson's

valuations and found them to be reasonable. Long Aff. ¶ 8.

131. Using Milliman & Robertson's analysis as a starting point, Lewis & Ellis, Inc., plaintiffs' experts, have estimated the potential value of relief awarded through the Claim-Review Process to a sample of one percent of Class Members who submit claims and whose scores exceed a "1." Depending on the distribution of the types of claims submitted and the scores awarded on those claims, Lewis & Ellis have determined that the value of Claim-Review Process awards to the one-percent sample would range from $2.8 million to $4 .1 million. Long Aff. ¶ 9 and App. 2 thereto.

B. *General Policy Relief*

132. Milliman & Robertson and Lewis & Ellis have both estimated that the General Policy Relief will make in excess of $271 million in economic value available to the Class. M & R Report p. 11; Long Aff. ¶ 6. Milliman & Robertson further estimated that, based on utilization rates consistent with historical marketing results for each form of General Policy Relief, it is likely that the total value of General Policy Relief that will actually be realized by the Class is $22.9 million. M & R Report p. 24. Lewis & Ellis has determined that "the best estimate of the economic value of the benefits that are likely to be utilized by Class Members under General Policy Relief" is $28.9 million. Long Aff. ¶ 7.

*33 133. The Court finds these expert analyses credible and well-reasoned. No opponent of the settlement has proffered evidence disputing these analyses.

134. Without adopting any of the particular value estimates provided by these experts, the Court finds that the parties have established that significant and substantial value will be provided to the Class through this settlement. Although the actual amount of value that will be realized by the Class cannot be foretold with precision, the Court finds that it is reasonable to expect that as much as $28.9 million in economic value will actually be realized by the Class through General Policy Relief alone, plus the value of relief to be provided through the Claim-Review Process, for which Equitable of Iowa's aggregate liability is unlimited.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 133741                                                                    Page 27
**(Cite as: 1998 WL 133741 (M.D.Fla.))**

135. The Court notes several other factors that enhance the value of the settlement for the Class.

a. The Claim-Review Process provides every Class Member with an opportunity to have his or her individual claim reviewed in a timely, cost-free manner, with an assurance that claims will be evaluated in accordance with fair and objective evidentiary and relief criteria that have been agreed upon by the parties and approved by this Court. The involvement of a Policyowner Representative throughout the process and the right to appeal initial determinations to independent arbitrators enhance the fairness of the Claim- Review Process. Because every Class Member has access to the Claim-Review Process, every class Member therefore receives value from the settlement.

b. There is no cap on the aggregate value of the relief to be afforded claimants in the Claim-Review Process. Thus, every claimant who demonstrates his or her claim will receive the full relief to which he or she is entitled, as determined by the criteria specified in the Stipulation of Settlement, without regard to the value of relief provided to other Class Members. This aspect of the settlement distinguishes it from the usual class action settlement, in which a defendant agrees to pay a fixed sum of money that is then allocated among members of the class, and renders the settlement "a far superior approach to that taken in most fraud class action settlements." *Connecticut General,* MDL No. 1136, Order p. 3 (Weiss/Stoia Aff. Ex. 4); *see also* Tew Decl. ¶ 10; Priest Decl. ¶ 35.

C. Unlike class action settlements where the value of the relief provided depends entirely on future purchases that are highly contingent in nature and suspect in value, the General Policy Relief here is tailored to meet the allegations of the Complaint and the specific insurance and investment needs of the Class Members. *See* Priest Decl. ¶¶ 29-34; Tew Decl. ¶ 9.a.

136. The Court hereby approves the settlement and finds that it is fair, adequate and reasonable, in the best interests of the Class, and fully in accord with constitutional dictates.

VII. *FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO PLAINTIFFS' ATTORNEYS' FEES AND EXPENSES*

A. *Overview*

**\*34** 137. Only after all substantive terms of the proposed settlement were agreed upon, counsel for the parties negotiated terms under which Equitable of Iowa agreed to pay plaintiffs' counsel's fees and to reimburse plaintiffs' counsel's expenses up to a total of $5 million, subject to approval by the Court. *See* Weiss/Stoia Aff. ¶¶ 54, 56, 76; Bailey Decl. (No. 2) ¶ 21. The particulars of the fee agreement are set out in § X of the Stipulation of Settlement.

138. In accordance with the Stipulation of Settlement, plaintiffs' counsel have requested attorneys' fees and expenses in the total aggregate amount of $5 million. *See* Weiss/Stoia Aff. ¶¶ 56, 75.

139. The Court finds that the fee negotiations in this case were conducted at arm's-length, and only after all material terms of the settlement had been agreed upon. Weiss/Stoia Aff. ¶ 56. Because the previously negotiated settlement structure provided that the fee awarded would be paid by Equitable of Iowa, separate and apart from any recovery to the Class, Equitable of Iowa had a particular incentive to bargain strenuously to keep the fee as low as possible. There is absolutely no evidence in this case that the settlement was in any way collusive.

140. Under these circumstances, the Court gives great weight to the negotiated fee in considering the fee request. *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 720 (5th Cir.1974) ("In cases of this kind, we encourage counsel on both sides to utilize their best efforts to understandingly, sympathetically, and professionally arrive at a settlement as to attorney's fees."); *In re First Capital Holdings Corp. Fin.Prods.Sec.Litig.,* [1992 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,937, at 93,969 (C.D.Cal. June 10, 1992).

B. *The "Percentage of Recovery" or "Common Fund" Method*

141. The approach to determining an appropriate fee award in the Eleventh Circuit is the percentage of recovery approach. In *Camden I Condominium Ass'n v. Dunkle,* 946 F.2d 768 (11th Cir.1991), the Eleventh Circuit observed:
   The majority of common fund fee awards fall between 20% to 30% of the fund.... [A]n upper

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

1998 WL 133741                                                              Page 28
**(Cite as: 1998 WL 133741 (M.D.Fla.))**

limit of 50% of the fund may be stated as a general rule, although even larger percentages have been awarded.

*Id.* at 774-75 (citations omitted). Even though the fees sought in this case are are less than 1.7% of the estimated total values of the settlement and less than 14.5% of the utilization value of GPR, they are well *below* the range of reasonableness set forth in *Camden I*, where the court recognizes that "[t]here is no hard and fast rule mandating a certain percentage of a common fund which may reasonably be awarded as a fee because the amount of any fee must be determined upon the facts of each case." *Id.* at 774.

142. The court in *Camden I* enumerated the "*Johnson* factors" (established in *Johnson*, 488 F.2d 714) that the court may consider in determining the appropriate percentage of the fund to be applied to each case. In the instant case, a very favorable result was obtained as the result of the intensive, yet efficient, efforts of plaintiffs' counsel.

### 1. *The Results Obtained*

**\*35** 143. This settlement involves a creative and innovative two-part settlement structure to carefully craft relief for Class Members, tailored to the particular and complex facts of this action. Weiss/Stoia Aff. ¶ 17. Plaintiffs' counsel have carefully assessed the strengths and weaknesses of their case. Weiss/Stoia Aff. ¶¶ 44-47. Plaintiffs and their counsel felt that, based on their investigation, they could prove their case at trial--but a host of risks were involved, including the substantial risk of *no relief* for the Class. Weiss/Stoia Aff. ¶¶ 65-69. When all these factors are weighed, plaintiffs' counsel have obtained a very good result for the Class. These factors support the fee requested. [FN15]

> FN15. While the requested fee would, at this point in time, represent a modest multiplier over the lodestar, that multiplier is justified by the substantial settlement benefits obtained, efficiency in achieving them, and concerted effort by all counsel to avoid wasted time and expense. Plaintiffs' counsel in this case sought to achieve a good result for the Class, irrespective of how much, or how little,

time it took.

### 2. *Economics Involved In The Prosecution Of The Class Action And The Experience Of Counsel*

144. "[T]he economics involved in prosecuting a class action" is one of the factors to be considered by the court in determining a fee. *Camden I*, 946 F.2d at 775. This action was prosecuted by plaintiffs' counsel on an "at-risk" contingent fee basis. Weiss/Stoia Aff. ¶ 85. Counsel would be paid only if they achieved a successful result for the Class. Courts have long recognized, particularly in this Circuit, that the attorneys' contingent risk is an important factor in determining the fee award. *See Jones v. Central Soya Co.,* 748 F.2d 586, 591 (11th Cir.1984); *see also Ressler,* 149 F.R.D. at 656.

145. Plaintiffs' counsel in this case are experienced class action and complex action attorneys, including extensive class action experience relating to life insurance company deceptive sales practices. Weiss/Stoia Aff. ¶ 5. Courts have recognized the importance of providing incentives to experienced counsel who take on complex litigation cases on a contingent fee basis so those cases can be prosecuted effectively. Weiss/Stoia Aff. ¶¶ 4-9. Conversely, defendants' counsel in this case are highly respected in the area of class action life insurance litigation, and were paid on a current basis. Plaintiffs' counsel, who assumed the risk of a successful result, should likewise be compensated for their efforts by a premium above their hourly rates. *See Ressler,* 149 F.R.D. at 654 (competence of opposing counsel is a factor in establishing plaintiff's counsel's fee award).

### 3. *The Customary Fee For Similar Cases*

146. The requested fee is below the typical range of common fund awards to counsel in other class actions in the Southern and Middle Districts of Florida since the percentage-of-fund approach was adopted by the Eleventh Circuit in *Camden I. See, e.g., Lopez v. Checkers Drive-In Restaurants, Inc.,* 94-282-CIV- T-17C (M.D.Fla.1996) (awarding 30%) (Weiss/Stoia Aff. Ex. 13); *Minnick v.. Pages, Inc.,* 95-277-CIV-T-21C (M.D.Fla.1996) (awarding 30%) (Weiss/Stoia Aff. Ex. 14); *In Re: Belmac Corp. Sec. Litig.,* 92-1814-CIV-T-23- (C) (M.D.Fla.1994) (awarding 31%) (Weiss/Stoia Aff. Ex. 15); and *Ressler,* 149 F.R.D. at 653 (awarding

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

30%). Thus, this Court on at least four prior occasions awarded a percentage fee in a common fund case in excess of 30%--far more than counsel are seeking here.

4. *The Time And Labor Required*

\*36 147. The hours expended by plaintiffs' counsel in this litigation are set forth in the Affidavit of Melvyn I. Weiss and John J. Stoia, Jr. and Plaintiffs' Counsel Declarations. The total amount of time expended-- particularly with regard to investigation and settlement negotiations--reflects the complexity of this action. Administration of the settlement will require additional time and expense. Under regular hourly rates the "lodestar" of plaintiffs' counsel in this action totals $2,038,170.13. Thus, even under the lodestar method, the fee requested would result in a multiplier much lower than the midrange of the multipliers in contingent fee awards in such cases. The multiplier here would be only 2.34, not including the extensive future work required by plaintiffs' counsel. *See* Weiss/Stoia Aff. ¶ 73. *See also Behrens* 118 F.R.D. at 548 ("the range of lodestar multipliers in large and complicated class actions runs from a *low* of 2.26 ... to a *high* of 4.5") (citations omitted, emphasis added).

148. Plaintiffs' counsel seek reimbursement of $227,513.13 in expenses incurred in this action as part of the entire $5 million negotiated fee and expense payment. Plaintiffs' counsel's expenses incurred to date for which reimbursement is sought appear reasonable.

5. *The Reaction Of The Class Confirms That The Requested Fee Is Reasonable*

149. The individual notice mailed to approximately 109,000 Class Members and the publication notice published in national newspapers across the country advised Class Members that counsel would apply for an award of fees and expenses not to exceed $5 million and that Class Members could object to the fee and expense application. Only *one* objection to the fee request has been made. [FN16] The lack of objections is itself important evidence that the requested fees are fair. *See, e.g., Ressler,* 149 F.R.D. at 656 (noting that the lack of objections is "strong evidence of the propriety and acceptability" of fee request); *Mashburn,* 684 F.Supp. at 695.

FN16. David H. Fleck objects to "the provisions of the proposed settlement under which the Defendants abandon responsibility for policing the amount of plaintiff attorney's fees and disbursements and impose the entire burden upon the Courts." Such a "policing by defendants" is not necessary--this Court may act as expert in such matters. *See Loranger v. Stierheim,* 10 F.3d 776, 781 (11th Cir.1994) (noting that court is expert in such matters and may use own judgment and experience in determining reasonable fees (citing *Norman v. Housing Auth. of City of Montgomery,* 836 F.2d 1292, 1303 (11th Cir.1988)). Also, the amount of attorneys' fees that the Court ultimately awards to plaintiffs' counsel does not affect whether the Court should approve the settlement and the fees and expenses paid to plaintiffs' counsel will *not* reduce or otherwise affect the relief available to Class Members.

150. The evidence in this case, including the expert affidavits and declarations submitted by the parties, establishes that the General Policy Relief will make in excess of $271 million in economic value available to the Class. *See* Long Aff. ¶ 6; M & R Report p. 11. Milliman & Robertson estimate that the economic value of the General Policy Relief likely to be utilized by the Class will be $22.9 million. M & R Report p. 24. Lewis & Ellis further estimate that the economic value of the General Policy Relief likely to be utilized by the Class will be $28.9 million. Long Aff. ¶ 7. These estimates do not include the benefits conferred under the uncapped Claim- Review Process, estimated by Lewis & Ellis at between $2.8 million and $4.1 million per one percent of Class Members who participate in the process and obtain a score higher than "1." *Id.* at ¶ 9. They also do not include certain other substantial benefits to the Class, including the costs Equitable of Iowa has incurred and will continue to incur in providing notice to the Class, a cost which is ordinarily borne by plaintiffs; administering the class action information center; and implementing and administering the settlement. Moreover, it is important to note that the amount of fees and expenses to be paid by Equitable of Iowa are separate and apart from any recovery by the Class,

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

and will in no way diminish the value of settlement benefits to be provided to the Class. *See* Weiss/Stoia Aff. ¶ 57.

**\*37** 151. Accordingly, the Court overrules the one objection to plaintiffs' request for $5 million in attorneys' fees and expenses, and hereby grants that request, with the fees and expenses to be paid in accordance with the Stipulation of Settlement. Furthermore, the Court hereby authorizes Milberg Weiss Bershad Hynes & Lerach LLP, Co-Lead Counsel herein and the primary law firm responsible for prosecution, coordination and oversight of this lawsuit and settlement, to allocate, in its sole discretion, the award of attorneys' fees and expenses.

The foregoing being the findings of fact and conclusions of law of this Court,

IT IS SO ORDERED.

1998 WL 133741, 1998 WL 133741 (M.D.Fla.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                                      Page 1
(Cite as: 1990 WL 58708 (D.Kan.))

**H**
Only the Westlaw citation is currently available.

United States District Court, D. Kansas.

Catherine E. SMITH, Plaintiff,
v.
MCI TELECOMMUNICATIONS
CORPORATION, Defendant.

**CIV. A. No. 87-2110-0.**

April 9, 1990.

Robert P. Numrich, Martha Madden Weast, Field, Gentry, Benjamin & Robertson, P.C., Overland Park, Kan., Steven G. Piland, William G. Beck, Field, Gentry, Banjamin & Robertson, P.C., Kansas City, Mo., for plaintiff.

Roger D. Stanton/Mark D. Hinderks, Stinson, Mag & Fizzell, Overland Park, Kan., Robert L. Driscoll, Christopher F. Pickering, Stinson, Mag & Fizzell, Kansas City, Mo., Marianne Geeker, MCI Telecommunications, Washington, D.C., for defendant.

### MEMORANDUM AND ORDER

EARL E. O'CONNOR, Chief Judge.

*1 This matter is before the court on plaintiff's motion for (1) leave to file a third amended complaint and (2) to recertify a class under Counts I, II and III of the third amended complaint. Plaintiff originally filed this action against her former employer claiming damages for fraud related to the payment of sales commissions. For the following reasons, the court grants plaintiff's motions.

### Procedural History

On June 18, 1987, plaintiff, Catherine Smith (Smith), filed her First Amended Complaint alleging defendant, MCI Communications Corp. (MCI), defrauded its salespersons by failing to pay them proper commissions pursuant to compensation plans promulgated by defendant. The First Amended Complaint included causes of action for

(1) violations of the Racketeer Influenced and Corrupt Organizations Act (RICO); (2) common law fraud as the basis for the RICO claim; (3) breach of contract based on defendant's failure to pay salespersons' commissions; (4) common law fraud based on MCI's employment contracts; and (5) a breach of contract claim based on employment contracts. On December 17, 1987, the court dismissed court 4 for failure to state a claim upon which relief may be granted. On February 23, 1989, the court granted plaintiff's motion to certify a class as to counts 1, 2, 3, and 5. On April 12, 1989, we dismissed count 1, the RICO claim for failure to state a claim and dismissed counts 3 and 5, since the basis for these claims was pendent jurisdiction. On June 7, 1989, the court granted plaintiff leave to file a second amended complaint reasserting the claims included in counts 3 and 5 of her first amended complaint under the court's diversity jurisdiction and also granted plaintiff's motion to recertify a class as to those claims.

### Motion to Amend

Plaintiff filed the instant motion on September 5, 1989, for leave to file a third amended complaint. Plaintiff claims that recent depositions taken by defendant of various class members have necessitated the additional allegation in paragraph 18, Count 1 (the fraud claim) that:

As part of its scheme, defendant, through a standard 'sales pitch' consisting of videotaped, written and oral statements, represented to all members of the plaintiff class that average sales persons would receive commissions equal to or exceeding their $13,000 annual salary, and above average sales persons would receive more than that, even though defendant planned not to pay such commissions.

The original paragraph 18 of plaintiff's second amended complaint had alleged solely that "[d]efendant represented in writing to all members of the plaintiff class that it would pay them usage commissions according to the Plan Documents." [FN1] Plaintiff also moves to modify the prayer for relief in counts I (fraud) and II (breach of contract based on failure to pay commissions) for actual damages to seek damages equal to the difference between what defendant promised and what defendant actually paid to class members, with interest. [FN2]

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                                                                              Page 2
(Cite as: 1990 WL 58708 (D.Kan.))

**\*2** Rule 15(a) of the Federal Rules of Civil Procedure provides that "a party may amend his pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires...." Although the granting of such a motion is within the discretion of the court, the United States Supreme Court has indicated that the provision "leave shall be freely given" is a "mandate ... to be heeded." *Foman v. Davis,* 371 U.S. 178, 812 (1962). In determining whether to grant leave to amend, the court may consider such factors as undue delay, the moving party's bad faith or dilatory motive, the prejudice an amendment may cause the opposing party, and the futility of amendment. *Id.*

MCI claims that leave to amend should be denied due to undue delay, futility and excessive prejudice. Before discussing MCI's claims individually, we observe that each claim is grounded on MCI's assertion that the proposed amendment seeks to add a "new fraud claim based primarily on oral rather than written misrepresentations" and constitutes a "complete reversal of the position which plaintiff presented to this court in support of class certification." The court is not persuaded by MCI's characterization of the proposed amendment. Instead, the court regards the amendment as elaborating upon the original fraud claim by more specifically alleging that MCI's fraudulent activities included a common scheme or standard "sales pitch" to misrepresent the specific amounts above base salary which salespersons were told they could be expected to receive under the commission plan documents.

We turn now to MCI's claim that the court should deny leave to amend on the basis of inexcusable delay. We note that unexcused untimeliness and truly inordinate and undue delay alone may be a sufficient basis for denial of leave to amend. *See First City Bank N.A. v. Air Capitol Aircraft Sales Inc.,* 820 F.2d 1127, 1133 (10th Cir.1987). Moreover, where a party knows or should have known of the facts upon which the proposed amendment is based, but failed to include them earlier, the motion to amend is subject to denial. *See Las Vegas Ice and Cold Storage Co. v. Far West Bank,* 893 F.2d 1182 (10th Cir.1990). Here, however, the court must reject MCI's assertion that the plaintiff's delay in amending the fraud count is inexcusable. Although plaintiff may have had knowledge early in the course of litigation that the

alleged standard sales pitch was used in her case as well as in the case of some other employees, it was not until the deposition of witness Pappenfort on July 13 and 14, 1989, that plaintiff become aware that the sales pitch was made uniformly to all members of the class. Moreover, plaintiff states that it was not until July, 1989, through a document (an internal MCI budget memo) produced at the Pappenfort deposition, that it was learned that MCI uniformly did not intend to pay these commissions. [FN3]

Next, MCI contends the court should deny the amendment on the basis of futility arguing it will not survive a motion to dismiss because the amendment (1) is barred by the statute of limitations; (2) is not alleged with sufficient particularity; and (3) would not support a claim under Kansas law.

**\*3** Regarding the statute of limitations, it is undisputed that the fraud claim is governed by the two-year limitations period provided by K.S.A. 60-513(a)(3). Under the doctrine of relation back, however, an otherwise-barred amendment will relate back to the date of the original pleading if "the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading...." Rule 15(c), Fed.R.Civ.P. The principal inquiry under Rule 15(c) is whether adequate notice has been given to the opposing party by the "general fact situation alleged in the original pleading." *Schiavone v. Fortune,* 477 U.S. 21, 31 (1986); Another formulation of the analysis under Rule 15(c) is whether "the adverse party viewed as a reasonably prudent man, ought to have expected that the character of the original pleaded claim might be altered or that other aspects of the conduct, transaction, or occurrence set forth in the original pleading might be called into question. 6 Wright & Miller, *Federal Practice and Procedure,* 1989 Supp., § 1497, p. 270.

Initially, we reject MCI's assertion that it did not receive adequate notice that other aspects of the misrepresentation set forth in the original pleading would be called into question. In fact, in its earlier motion to dismiss and in support of its argument against class certification, MCI contended that the evidence at trial would be likely to include numerous alleged oral misrepresentations made by MCI management to the salespersons indicating that

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                              Page 3
(Cite as: 1990 WL 58708 (D.Kan.))

the salespersons would be paid the commissions due them under the plans.

Next, the court disagrees that the new allegations would be subject to a motion to dismiss due to Kansas' failure to recognize a claim based on oral representations of future income. First, the new allegations are not based solely on oral misrepresentations, but on oral, written and videotaped statements. Second, under Kansas law "[w]hen alleged fraud relates to promises or statements concerning future events, the gravamen of such a claim is not the breach of the agreement to perform, but the fraudulent representation concerning a present, existing intention to perform, when such intention is in fact nonexistent." *See K-B Trucking Co. v. Riss Intern. Corp.,* 763 F.2d 1148, 1156 (1985), quoting *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70, 596 P.2d 816, 824 (1979). Here, the allegation that MCI never intended to pay the commission promised would clearly be sufficient to survive a motion to dismiss. Finally, we conclude that the proposed amendment satisfies the requirements of Rule 9(b) and states the additional allegations with sufficient particularity.

Finally, MCI argues that it will suffer prejudice since the proposed amend will necessitate additional discovery. In the absence of a specific factor such as flagrant abuse, bad faith, futility of amendment, or truly inordinate and unexplained delay, prejudice to the opposing party is the key factor to be evaluated in deciding a motion to amend. *Dunn v. Kaaz Holding Co.,* No. 83-2375 (D.Kan., *unpublished,* July 2, 1985). Prejudice under Rule 15 "means undue difficulty in prosecuting [or defending] a lawsuit as a result of a change of tactics or theories on the part of the other party." *Deakyne v. Commissioners of Lewes,* 416 F.2d 290, 300 (3d Cir.1969); *see also LeaseAmerica Corp. v. Eckel,* 710 F.2d 1470, 1474 (10th Cir.1983). The party opposing the amendment of the pleadings has the burden of showing prejudice. *Beeck v. Aquaslide 'N' Dive Corp.,* 562 F.2d 537, 540 (8th Cir.1977). One factor which may be considered is whether the proposed amendment will necessitate additional discovery. Leave to amend may properly be denied when discovery is completed, *Hayes v. New England Millwork Distributors, Inc,* 602 F.2d 15, 19-20 (1st Cir.1979)

*4 The court agrees with MCI that considerable time has elapsed since the initial filing of the complaint and, further, that considerable discovery has already taken place. However, the court notes that, even if MCI is correct in its contention that the proposed amendment will necessitate additional discovery, ample time remains following the court's ruling on the instant motions. [FN4] On this basis, the court finds that MCI has failed to carry its burden to demonstrate prejudice and concludes plaintiff's motion to amend should be granted. Accordingly, the court grants plaintiff's motion to amend Counts I and II as proposed.

*Class Recertification*

In our February 23, 1989, order, the court granted class certification pursuant to Rule 23, Fed.R.Civ.P ., as to the following class:

All persons employed by MCI Telecommunications Corporation in its Overland Park, Kansas office (within its Mid America Region and, later, also within its Southwest Division) to sell commercial long-distance communication services and products from the adoption of MCI Telecommunications Corporation's "Commercial Sales Force Compensation Plan" from May 1, 1984 through December 31, 1986, excluding persons employed *solely* to sell corporate account services and products.

Smith now moves for recertification of the class as to all counts of the third amended complaint. The requirements for class certification set forth in Rule 23, Fed.R.Civ.P. are generally referred to as numerosity, commonality, typicality and adequacy of representation. *See Smith v. MCI Communications Corp.,* (D.Kan. *unpublished,* February 23, 1989). [FN5] In addition, a class action must also meet one of the categories of Rule 23(b), in this case Rule 23(b)(3), which requires predominance and superiority. [FN6] Plaintiff bears the burden of establishing that all of the prerequisites contained in Rule 23(a) and (b) have been satisfied. *Peterson v. Oklahoma City Housing Authority,* 545 F.2d 1270, 1273 (10th Cir.1976).

MCI opposes recertification on the ground that if leave to amend is granted (1) plaintiff no longer can typically or adequately represent the class, Rule 23(a)(3)(4); and (2) individual rather common issues predominate, Rule 23(b)(3). [FN7]

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                                    Page 4
(Cite as: 1990 WL 58708 (D.Kan.))

Defendant's first argument regarding typicality and adequacy of representation is based on the contention, discussed above, that plaintiff is subject to the statute of limitation defense not common to other class members. Since the court has held the proposed amendment to relate back to the date of the filing of the original complaint under Fed.R.Civ.P. 15(c), the court rejects MCI's argument and holds that both typicality and adequacy of representation have been satisfied.

The court also rejects MCI's contention that the proposed amendment destroys the requirement that common issues of law or fact predominate over individual ones. The court agrees that as a general rule, an action based *substantially or primarily* on oral rather than written communications is inappropriate for treatment as a class action, *see e.g. McHan v. Granbouche,* 99 F.R.D. 260, 266 (D.Kan.1983). Here, however, the alleged fraudulent acts are not primarily or substantially oral, but are composed of written, videotaped (standard therefore, more like written) and also oral representations. The Advisory Committee Notes to the 1966 Amendments to Rule 23 address whether cases similar to this one are appropriate for class-action treatment:

*5 a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action.... On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was *material* variation in the kinds of representation made or in the kinds or degrees of reliance by the persons to whom they were addressed.

Here, at the present stage of the litigation, plaintiff has alleged that the basis for the fraudulent representation is a common "sales pitch" including a common core of written documents, a videotape and certain standard oral representations. On the basis of the present record, the alleged misrepresentations appear to be if not uniform, at least similar in the case of each salesperson. Although further discovery may reveal material variation in the representations or the necessity of extensive individualized proof, at this time, we conclude that, despite the possible existence of certain individual questions of fact, these variations are not sufficiently material to warrant denial of class certification. *See McMahon Books Inc. v.*

*Willow Grove Assoc.,* 108 F.R.D. 32 (E.D.Pa.1985) (granting class certification where plaintiff alleged a fraudulent scheme to rent space in a mall which included a standard written prospectus as well as oral statements by the owner and operator); *see also Tedesco v. Mishkin,* 689 F.Supp. 1327 (S.D.N.Y.1988) (when the oral misrepresentations are alleged to be only "one aspect of an entire scheme to defraud," common questions sufficiently predominate over individual questions) (citation omitted).

Nor can we accept MCI's argument that the proposed amendment has individualized the reliance inquiry required in the fraud claim, thereby precluding certification. We rejected this contention in our initial order granting class certification, because we found that the salespersons' reliance on the alleged misrepresentations was demonstrated by their acceptance of employment with MCI. The fact that the amendment expands the core of the alleged fraudulent misrepresentations to include a videotape and certain oral statements has not altered our view on this issue. Further, as we stated, whether the reliance was reasonable is an objective inquiry common to the entire proposed class.

In sum, the court finds questions of law and fact common to the class members continue to predominate over any questions affecting only individual members and that a class action is the superior method for a fair and efficient adjudication of the instant controversy. Therefore, the court concludes that as to the proposed amendment, the requirements of Rule 23 are satisfied and accordingly, certifies the class on counts I, II and III of plaintiff's third amended complaint.

IT IS THEREFORE ORDERED that plaintiff's motion for leave to amend is granted.

IT IS FURTHER ORDERED that plaintiff's motion to certify the class as to Counts I, II, and III of the third amended complaint is granted.

FN1. Plaintiff has also amended Count I to add representative examples supporting her allegation of fraud.

FN2. In Count III, plaintiff reasserts the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

breach of contract claim based on an allegedly unlawful provision in the employment contract.

FN3. Since the representation related to future events, and amounted to a promise, proof that defendant had no intent to perform was essential. *K-B Trucking v. Riss International Corp.*, 763 F.2d 1148, 1156 (10th Cir.1985).

FN4. MCI states that the present discovery order permits discovery for up to ninety (90) days following the conclusion of the period for opting out of the class under Rule 23(b)(3), which will follow notice to class members subsequent to the court's ruling on the instant motion.

FN5. Rule 23, Fed.R.Civ.P. provides: One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

FN6. Rule 23(b)(3), Fed.R.Civ.P. provides in part that the court must find that: the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

FN7. Although MCI does not dispute that the requirements of numerosity and commonality are met, the court finds that, for the reasons stated in our February 23, 1989, order both these requirements have been met as to the proposed amendment.

1990 WL 58708 (D.Kan.)

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works