Defendants Pre-Paid Legal Services, Inc., ("Pre-Paid" or "the Company"), Harland C. Stonecipher and Wilburn L. Smith submit this Memorandum of Law and the accompanying Appendices in opposition to plaintiffs' motion and brief for class certification (the "Motion").

## INTRODUCTION AND OVERVIEW OF ARGUMENT

The notion that Pre-Paid's sales associates were recruited at meetings organized by defendants, or through the reading of uniform scripts, is demolished by the record now before the Court. In sharp contrast to the paradigm posited in the Complaint and relied upon in the Motion, the "solicitations" that constitute the linchpin of plaintiffs' claims are anything but uniform, and the aspirations, efforts, rewards and economic interests of the individuals that make up the proposed class are equally diverse. Adjudication of plaintiffs' claims depends on a multifaceted mosaic of core facts that vary across the length and breadth of the claims, the class and the class period at issue.

As this Court emphasized in *Meyers v. Southwestern Bell Tel. Co.*, 181 F.R.D. 499 (W.D. Okla. 1997), the question whether "'a case should be allowed to proceed as a class action involves intensely practical considerations, most of which are purely factual or fact intensive.'"[1] Moreover, the "plaintiff is 'under a strict burden of proof, that all the requirements of [Rule 23] are clearly met.'"[2] The <u>facts</u> now before the Court in this case demonstrate that classwide adjudication is not merely impractical, it is impossible. Most importantly, the recruiting communications upon which plaintiffs' claims are based went back and forth among hundreds of thousands of purported class members through a multitude of channels, and varied widely in their subject matter, content and emphasis.

*Meyers* synthesizes the applicable Tenth Circuit law and provides the core of the analytical framework that is decisive here. *Coe v. National Safety Assocs., Inc.*, 137 F.R.D. 252 (N.D. Ill. 1991) -- a case that applies the *Meyers* analysis in the context of securities claims based on allegations of a pyramid scheme -- underscores the fact that *Meyers* is controlling. Together,

---
[1] 181 F.R.D. at 501 (quoting *Reed v. Bowen*, 849 F.2d 1307, 1309-10 (10th Cir. 1988))
[2] *Id.* (quoting *Rex v. Owens*, 585 F.2d 432, 435 (10th Cir. 1978)).

*Meyers* and *Coe* provide a road map to the key arguments that follow, and demonstrate some of the many reasons why plaintiffs' motion must be denied.

In *Meyers,* this Court held that it is plaintiffs' burden to demonstrate that the alleged misrepresentations underlying their legal theories were uniform and reasonably susceptible of classwide adjudication. Although the complaint asserted a number of claims, the opinion noted that, as in this case, "the central issue in all of plaintiff's legal theories of relief is the nature of defendant's communication with its customers ...." *Id.* at 502. *Meyers* then proceeded with the analysis that governs the outcome of this motion.

Although -- as is manifestly not the case here -- in *Meyers* a "script" and "sample verbiage" represented "some common core of representations," this Court held that class certification was not appropriate because plaintiffs "failed to assure the Court that there were no material variations in the representations or degrees of reliance by the customers." *Id.* at 504. Similarly, "[a]lthough the core representation in all of [the] documents remain[ed] the same," this Court ruled that certification was impractical because "substantive difference in the disclaimers" would require "countless subclasses." *Id.*

The opinion further noted that, as in this case, the sales presentations were made through several different channels, that customers had been exposed to different marketing techniques, and that oral presentations appeared to be more important to plaintiff's claims than the written materials. *Id.* at 505. Accordingly, common issues did not predominate, and "plaintiff's allegations regarding the uniformity of [the defendant's] representations [were] insufficient to support class certification." *Id.*

*Coe* applied the same essential analysis and approach in denying class certification of securities claims asserted under Section 12 of the 1933 Act, Section 10 of the 1934 Act, RICO, Illinois' version of the Oklahoma Consumer Protection Act, and for common law negligence -- all of which were based on allegations that the defendant company was a pyramid scheme. After several rounds of voluminous briefing and full consideration of the issues (*see* 137 F.R.D. at 253), the court held that certification was precluded by variations in the communications and

2

speakers that pale in comparison to those at issue here. Moreover, *Coe* ruled that certification was inappropriate irrespective of whether the claims required proof of reliance or causation. Just as in *Meyers* and the present case, plaintiffs "<u>alleged</u> that defendants used a standard 'script' when making their presentations," but the <u>evidence</u> submitted on the motion indicated "that the presentations varied in a number of material respects with the presenter." *Id.* at 254. (Emphasis added). Accordingly, *Coe* denied class certification because "the misrepresentations which plaintiffs allege do not appear to be common to the proposed class." *Id.*

Although the Section 12 claims did not require reliance, transaction causation or loss causation, *Coe* applied the rationale employed by this Court and held that classwide adjudication was barred by the fact that they require "proof of the particular misrepresentation made by the particular offeror or seller to the purchaser." *Id.* Because -- as in this case -- the representations "varied in material respects" and "were made by a variety of people," class certification of the Section 12 claim was denied. *Id.*

<u>First and foremost, certification is improper because plaintiffs cannot satisfy their burden of demonstrating that the recruiting communications at issue were sufficiently uniform to permit classwide adjudication</u>. Indeed, plaintiffs' <u>own</u> depositions reveal a nearly unbounded universe of highly variable, one-on-one, oral, written and electronic communications that <u>dwarfs</u> the diversity and scope this Court found preclusive in *Meyers*.

The factual variations, individualized issues and practical problems that rendered class certification inappropriate in *Meyers* and *Coe* are <u>far</u> more imposing here. This is not a case in which different representatives of a defendant company made sales pitches that varied somewhat in their form or content. The "pitches" were made by many thousands of purported <u>class members</u>, not by defendants. They varied across the entire spectrum of form, subject matter, content and emphasis, and were made <u>to</u> many thousands of individuals who are also within the proposed class.

The deposition testimony of the five named plaintiffs provides but a small taste of the problems that would be encountered on a massive scale if this motion were granted. The named

plaintiffs had very different recruiting experiences, and do not recall the details of what was said to them when they were recruited (by other associates). Two of the five <u>did not even make their decisions on the basis of what was said</u>. Rather, they signed up as associates to help their friends. The three who recruited other associates did so in widely disparate ways, mostly through oral communications. It is thus difficult to discern a sound basis for common adjudication of the claims asserted by the <u>five</u> named plaintiffs (who also differed widely in the strategies they pursued as associates, the level of efforts exerted and the results they obtained), much less the more than <u>550,000</u> individuals included in the proposed class.

Each of the associates included in the proposed class was recruited by another associate. Associates who chose to recruit did so primarily through individualized oral communications -- which predominated even when group meetings, written materials or tapes were also involved. The recruiting communications: (1) were transmitted to members of the putative class by other class members, (2) in accordance with their own judgments about approaches that might be appropriate or effective, (3) in various forms, (4) through a wide variety of channels, (5) via a nearly infinite combination of oral, written, telephonic, electronic and taped communications, (6) that varied widely in their focus, emphasis, subject matter and content.

Furthermore, the same type of individualized variation is found on the <u>other side</u> of the solicitations -- i.e., among the many thousands of purported class members, each of whom <u>received</u> recruitment communications. The individual associates who listened to, and ultimately were persuaded by, recruiting communications did so in varying circumstances, and against the backdrop of disparate skills, expectations and objectives. They decided to become associates for many different reasons, including reasons that had nothing to do with the substance of the solicitation. Even if the solicitations had been relatively uniform (and they were not), there would still be major differences "in the kinds and degrees" of importance individual associates attached to them, and the nature and extent of their reliance. *See Meyers*, 181 F.R.D. at 502 (citing Advisory Committee Notes to Rule 23).

These various facts are dispositive under *Meyers* and *Coe*. Because individual questions

4

overwhelm common issues, the "intensely practical" determination whether the case can proceed as a class action tips sharply against certification, and there is no common basis for adjudicating any misrepresentations made, materiality, reliance or causation. (These facts preclude certification of all claims other than the claim asserted under Section 12(a)(1) of the 1933 Act, which provides a cause of action for the sale of an unregistered security). As discussed immediately below, class certification of plaintiffs' claims is <u>also</u> precluded on five additional grounds, <u>each</u> of which is independently dispositive.

<u>Plaintiffs cannot establish either the fact or amount of damages on a classwide basis</u>. Because the value of the opportunity to sell Pre-Paid memberships and recruit others to do so varies dramatically depending on a host of individual factors, there is no methodology, formula or approach that could provide a common basis for valuing "the opportunity," or for determining or measuring injuries sustained in connection with its "purchase." The methodology normally employed in securities cases is manifestly inapplicable, and if one seeks to apply it plaintiffs cannot establish damages on a classwide basis because no member of the proposed class would have sustained injury. (This shortcoming bars certification across the board, including with respect to the Section 12(a)(1) claim.)

<u>The record now before the Court demonstrates that it would be impossible to determine the existence or absence of a security (or pyramid scheme) on a classwide basis</u>. Among other things, there are extreme disparities in the <u>efforts</u> and resulting earnings of individual associates, and material differences in Fast Start training bonuses and the Players' Club, and the facts this Court previously identified as relevant to a determination of whether Pre-Paid is a pyramid scheme. While defendants believe the current record precludes <u>any</u> determination that the "opportunity" is a security or a pyramid scheme under any analysis, the facts upon which such determinations would have to be made are anything but common. (This defect precludes certification of plaintiffs' securities claims, including the claim asserted under Section 12(a)(1)).

<u>Certification is improper because the proposed class is riddled with conflicts and lacks the cohesiveness necessary to permit adjudication under Rule 23</u>. Associates in the putative class

have widely divergent interests in the survival and long-term financial health of Pre-Paid. This creates major conflicts with respect to the named plaintiffs' attack on Pre-Paid's marketing program, including their attempt to obtain a damage award that would put the Company out of business, because associates who depend on Pre-Paid for income would be harmed by the relief sought in the Complaint. Other conflicts flow from the fact that the solicitations plaintiffs claim were false and misleading were made <u>by</u> members of the proposed class <u>to other</u> class members, and thousands of proposed class members profited from the acts upon which the class would bring suit. If plaintiffs are correct, their profits came at the expense of other class members. Finally, if plaintiffs' allegations are well-founded, prosecution of their claims would create legal exposure for absent class members. (These conflicts bar certification of all claims, including those asserted under Section 12(a)(1).)

<u>Beyond insurmountable obstacles to classwide proof and case management, a single trial of plaintiffs' claims would be fundamentally unfair to defendants because it would permit a judgment as to all class members based on a "composite case" that is stronger than the individual claims</u>. Any such proceeding would permit plaintiffs to pick and choose from a vast menu of associates, recruiting communications, and individual strategies, efforts and results, to present an optimized case that would be stronger than the claims that could be asserted by any individual in the class. A judgment obtained in this fashion would bind defendants as to hundreds of thousands of associates with claims that bear no resemblance to the composite. Such a result is diametrically opposed to the purpose and rationale of Rule 23, and further underscores the reasons why class certification is not appropriate. (This defect applies to all claims.)

<u>A class action plainly would not provide a superior procedural vehicle in this case</u>. The individual issues, inability to establish liability or damage on a classwide basis, practical difficulties and unfairness inherent in adjudicating plaintiffs' claims in a single trial, and internal conflicts within the proposed class, make abundantly clear that plaintiffs cannot satisfy the superiority requirement of Rule 23. (This conclusion applies to all claims.)

## SUMMARY OF KEY FACTS REGARDING CLASS CERTIFICATION

The key facts demonstrating the predominance of individual issues, inability to adjudicate key components of plaintiffs' claims on a classwide basis, internal conflicts and the fact that a class action would not provide a superior procedural vehicle in this case are collected in the Appendix, which includes (1) excerpts from plaintiffs' deposition transcripts; (2) the Affidavit of Kathleen S. Pinson and supporting documents; (3) the Affidavits of Pre-Paid associates Tonnie Cobbs, Verna Heath, Mark McDonald, Mary Jo Neville, Diane Sloan and Doyce Tarkington; and (4) the Expert Affidavits of Allan W. Kleidon and Anne T. Coughlan. They cannot be recounted in the confines of this brief, but are summarized briefly here.

The factual variations that confound common adjudication cut across virtually all of the arguments referred to above, but fall into three main categories. The first category focuses on variations pertaining to recruiting communications, and is most directly relevant to the analysis under *Meyers* and *Coe,* and plaintiffs' inability to establish the representations themselves, materiality, reliance or causation on a classwide basis. Category II summarizes variations in the personal characteristics, objectives, strategies, efforts, earnings and economic interests of the individual class members. It is relevant to plaintiffs' inability to establish damage, causation, materiality, or the existence of a security on a classwide basis, and to the internal conflicts that preclude certification. The third category describes some of the variations in Pre-Paid's marketing program, and associate compensation plans and contracts, and is primarily relevant to the absence of a common basis upon which to show damage or the existence of a security or pyramid scheme.

### I. VARIATIONS IN THE FORM, CONTENT AND CHANNELS OF RECRUITING COMMUNICATIONS

Associates are not required to recruit other associates or build a downline sales organization, and many focus their efforts primarily -- and in some cases exclusively -- on selling

the memberships.[3] Although associates who recruit other associates do so in many different ways, the centerpiece of such efforts is one-on-one communications. As the depositions of the named plaintiffs make clear, these individualized recruiting communications are not "scripted," and most bear no resemblance to the get-rich-quick presentations alleged in the Complaint. Moreover, such individualized recruiting methods predominated throughout the relevant time period, irrespective of whether group meetings, written materials or tapes were involved in the communication mix.

Most of the named plaintiffs signed up as a Pre-Paid associate as a result of one-on-one communications with other associates.[4] None was recruited at any meeting at which any defendant or officer of Pre-Paid spoke. Corrente at 25:22-28:13; Jarvis at 39:17-19; Schweikert at 18:2-21, 24:24-25:15; Jefferson at 41:11-42:3; Sandler at 101:19 – 103:17. Plaintiffs Jarvis and Jefferson attended no meetings before they executed their associate agreements. Jarvis at 39:17-25, 43:12-19, 44:23-45:4; Jefferson at 41:3-42:19. Plaintiff Schweikert attended a meeting before becoming an associate, but he also had extensive face-to-face, telephonic and email communications with individual associates, and ultimately decided to become an associate to help a friend. Schweikert at 18:2-23:21, 20:5-13. Plaintiff Sandler also attended a meeting before deciding to become an associate, but had a private face-to-face meeting, as well as telephonic communication, before deciding to do so. Sandler at 101:15 – 103:20.

Sandler intended to sell memberships, either on-line or through individual discussions,[5] and made no real efforts to recruit others.[6] Schweikert had no real plan, and made no real effort, to sell memberships or recruit other associates.[7] The plaintiffs who did recruit -- Corrente, Jarvis and Jefferson -- did so in different ways, but largely through individualized, one-on-one

---

[3] See, e.g., Corrente at 78-79; Sandler at 45:11-13, 46:8-19; Pinson Aff. ¶ 4, 34; Associate Affidavits.
[4] Sandler at 103:6-104:14; Corrente at 27:13-18; Jarvis at 43:12-19; Schweikert at 18:2-21, 24:24-25:15; Jefferson at 29:20-22, 41:11-42:3.
[5] Sandler at 43:17-23.
[6] Sandler placed one ad, and Schweikert gave names to another associate to call upon with his permission. Sandler at 45:11-13, 46:8-19.
[7] Schweikert at 73:9-15, 75:15-21, 77:12-16, 88:21-23; 162:5-163:13.

8

communications that varied depending on the speaker, listener and circumstances.

Corrente focused on selling the memberships and told people about the possibility of becoming a Pre-Paid associate to see if they might be interested. Corrente at 76:22-77:7; 78:8-11. As he explained in his deposition, "you can pretty much assume that everyone was told of the business opportunity if they were told about the product, if they wanted to pursue that, great. If they didn't that was great too." Id. at 76:22-77:1. Corrente further emphasized that different associates recruited in different ways, and that his approach -- and the approach of many in his sales organization -- was talking to people one-on-one:

> THE WITNESS: Right. I believe I stated earlier <u>my approach is talking to people one-on-one</u>.
>
> * * * *
>
> Q. Okay. Did others in your downline sort of <u>adopt your philosophy of doing more one-on-one presentations</u> as distinguished from meetings or participating in meetings?
>
> A. <u>Some did, some didn't</u>. It's like everything else. You get ten people, you know, <u>everybody's going to take their approach</u>.
>
> Q. Because it was a <u>matter of individual choice</u> among the <u>individual associates</u> what approach they wanted to pursue; is that basically it?
>
> A. I'd say that's basically it. [Corrente at 62:20-63:18 (emphasis added).]

In elaborating on the same basic point, Corrente testified:

> Q. That's the whole spectrum [referring to immediately prior testimony about marketing "face-to-face," "on the telephone," "door-to-door," over "the Internet," "advertising," and via "meetings"] of choices that somebody has in selecting a method to sell Pre-Paid memberships?
>
> A. Right. <u>Nobody's forced to sell it in given way. They could be creative</u> and come up with some of their own ways.
>
> [Corrente at 44:2-7 (emphasis added).]

Jarvis testified that he was recruited by Corrente in a one-on-one meeting that focused on the membership but does not recall what was discussed beyond the fact that Corrente had used the membership to good advantage. He agreed to become an associate out of a sense of

...

obligation to a friend -- <u>not</u> as a result of anything Corrente told or provided to him. Jarvis at 37:24–44:15 (noting that Jarvis "signed up because Sal was a friend," and "[i]t was the old obligation to a friend."). Schweikert <u>also</u> made his decision to sign up as an associate in order to help a friend, rather than as a result of a sales pitch. Schweikert at 20:5-13 (noting that "[i]t was more to help her make money," "[t]hat was really the gist of it," and "[s]he kept pushing me and I finally said, 'Okay, I'll help you and I'll join.'")

Like Corrente, Jarvis recruited face-to-face -- in a low-key manner that was tailored to individual need, and had nothing to do with the "get-rich-quick" pitch plaintiffs attempt to portray as the uniform, scripted approach. He also based his discussions primarily on the appeal of the membership:

> A. Well, on the business opportunity . . . the way I would do it, <u>if I went to someone's house, I wanted to meet someone's need and if we were doing it for a group, I would always do the</u> membership first, and then I would say if any of you are interested in a business opportunity, wanting to <u>make a few pennies extra</u> just working at your own time scale, . . . <u>if anyone is interested</u>, please, if you want to stay, I'll go over that with you and <u>if you don't I understand and thank you for the membership</u>.[8]

Plaintiff Jefferson was recruited in a face-to-face meeting in his home. Jefferson at 34:6–36:6, 41:11–42:3. He pursued virtually every conceivable method and approach, and talked to individuals about Pre-Paid one-on-one at his regular job, after work and on weekends. Id. at 45:9-15, 125:25-126:9. He also had regular recruiting communications with individuals at one-on-one meetings in their homes (and various other locations). Id. at 51:4–54:8, 55:24–57:12.

Although group meetings are also an important part of the recruiting landscape, they vary widely and are conducted in concert with one-on-one discussions before, during and after the event. Corrente testified that meetings were "a very small portion" of recruiting efforts within his organization (Depo. at 61:13-15), and emphasized the ad hoc nature of the meetings that

---

[8] *Id.* at 103:21–104:12 (emphasis added). Jarvis further explained "I think I worded my program to be very realistic because, you know, I had friends in this thing and I wanted to be able to face my friends . . . ." *Id.* at 107:5-9. He didn't believe in "selling off emotion," and told everyone that becoming an associate "was for extra spending money," not something to "quit your job" for. *Id.* at 111:2-3, 126:16-20. *See also id.* at 102:15-103:12.

associates held by the associates in his upline and downline: "A few guys get together and decide they want to put on a meeting. It's really not too much different than hosting a party." *Id.* at 59:22-25. Different associates gave presentations or "testimonials" at meetings.[9] Some meetings were large and more structured;[10] most were smaller, and (as noted) less formal.[11]

Plaintiffs' depositions further show that the substance and tenor of meetings was far from uniform. As noted above, Jarvis testified that when he made presentations at meetings, he focused on the memberships, and talked about becoming an associate only to people who said they might be interested. Depo. at 103:21-104:13. He and others in his organization were careful to de-emphasize the prospect of large earnings. Jarvis did not believe in selling on emotion," told potential recruits they should think about signing up as a way to make "extra spending money," and avoided the more enthusiastic elements he had observed in other meetings. *Id.* at 111:2-3, 125:4-126:20, 213:21-214:23. By contrast, Jefferson testified that he gave meeting presentations that mimicked an enthusiastic presentation he had heard on a tape of another associate: "I had learned his presentation on the tape pretty much verbatim, so because when I did that and had the enthusiasm and had the highs and lows that he had ... it was like listening to the tape all over again." Depo. at 72:10-15.[12]

Highly individualized discussions also occur at the meetings themselves, and thereafter. Jefferson and Corrente testified that one-on-one and two-on-one discussions routinely take place at the meetings. Jefferson at 38:20-23, 63:9-65:5; Corrente at 56:3-9, 62:10-22. Sandler decided to become a Pre-Paid associate after a private, face-to-face discussion following a meeting, but does not recall the questions, answers or substance of the discussion. *Id.* at 101:23-104:25. Schweikert had extensive individualized discussions, and at least three face-to-face sit-downs, with several associates in the course of asking questions and making up his mind whether to

---

[9] Corrente at 60:3-61:2.
[10] Jefferson at 128:3-19.
[11] Corrente at 59:22-60:2; Jefferson at 38:20-23, 270:9-20, 273:17-22.
[12] Corrente's limited participation in meetings mirrored the approach adopted by Jarvis. Corrente at 62:4-9. After becoming associates, Sandler and Schweikert did not participate in, or bring anyone to, meetings. Sandler at 151:16-20; Schweikert at 112:3-5.

11

become a Pre-Paid associate after attending a meeting. Depo. at 33:5-42:14.

Communications regarding recruitment also occurred in three-way telephone conversations, print and radio advertisements, and on websites.[13] In addition, members of the proposed class made varying uses of a vast array of written materials, and audio and video tapes, any of which could have been used by associates in connection with efforts to recruit other associates. Pinson Aff. at ¶¶ 31, 38. These materials varied greatly in their content and emphasis, and the list of available items changed throughout the proposed class period. *Id.* at ¶ 38. They were used or not used as a matter of individual discretion, in any combination the associate might deem appropriate. *Id.* at ¶¶ 31, 34, 36.

Jefferson listened to one tape before signing up as an associate. Depo. at 30:5-36:6. He thereafter made wide use of tapes and written materials in selling memberships and recruiting. *Id.* at 174:2-180:2. Jarvis received no tapes when he was recruited by Corrente, and does not recall whether he reviewed written materials (although he believes he probably got a product brochure). Depo. at 38:23-45:4, 51:22-52:11. Jarvis never used any audio or video tapes in his own recruiting efforts, and limited his use of written materials to the sample contract application forms, and the product brochure and member kit describing the memberships. *Id.* at 94:11-96:11, 127:15-23. Corrente does not remember whether he received any tapes when he was deciding whether to become an associate. Depo. at 29:13-17. He handed out tapes from time-to-time, but does not recall which ones or what was on them. *Id.* at 49:20-51:7. When individuals indicated an interest in becoming an associate, Corrente provided them with one or more of a variety of written materials (including charts and tables that the Complaint alleges were false and

---

[13]Corrente and many associates in his organization used three-way phone calls to loop in an additional associate to provide information and verification to individuals who were considering whether to purchase a membership or become a Pre-Paid associate, and continues to maintain a website. Depo. at 129:19-130:20, 118:18-25. Jefferson placed advertisements in newspapers and on the radio, and had a website. Depo. at 78:9-13; 181-183, 253:4-16. Sandler had a website and handed out fliers, primarily for the purpose of selling memberships, and placed one newspaper ad for recruiting. Depo. at 41:4-43:23, 46:8-19. Schweikert had a website. Depo. at 146:4-23.

misleading). *Id.* at 112:15-117:24. *Id.* at 46:19-47:1.[14]

## II. VARIATIONS IN ASSOCIATE CHARACTERISTICS, GOALS, STRATEGIES AND EFFORTS

One of the distinguishing characteristics of multi-level marketing programs is a diversity among the individuals who sell the company's products, in the approaches and strategies they employ, in the efforts they exert, and in the results they achieve. Coughlan Aff. at ¶¶ 4, 15. Pre-Paid's sales associates exhibit a broad spectrum of skills, job experiences, personal circumstances, available time, individual objectives, strategies for achieving their goals, levels of effort, and outcomes and earnings. *See, e.g., id.* at ¶¶ 15, 29, 49, 51; Pinson Aff. at ¶¶ 19, 27.

While these variations -- which determine the importance that individual associates attach to recruiting messages and the scope and success of their efforts thereafter -- are far too numerous to list here, the basic point was summarized in Corrente's testimony that the path an associate pursued was "strictly a matter of choice." *Id.* at 41:20-24 (emphasis added). Corrente further explained that associates can "be creative" and "take their own approach" based on their own skills and predilections. Depo. at 78:11-79:8, 42:22-44:7; 63:8-18. Some associates choose to sell the memberships, and not to recruit at all; others recruit a downline and work to build and motivate a substantial sales organization; associates who like to talk to people one-on-one, or make group presentations, can pursue either of those strategies (or both); and associates who are not good at approaching or speaking to people can initiate contact through the Internet. *Id.* at 41:10-21.

Jefferson built a large sales organization, did business under the name Jefferson & Associates, and worked to organize, train, motivate and support the associates in his downline.[15] Corrente was recruited into, and then helped build, a substantial sales organization, worked with his downline and upline, operated his Pre-Paid business as a corporation, and sold memberships

---

[14] Sandler and Schweikert apparently did not review tapes or written materials before executing their associate agreements. Sandler at 103:6-104:4; Schweikert at 23:22-24:9.

[15] Jefferson at 95:13-96:20, 138:23-139:2, 155:14-22, 46:16-48:17; 146:4-147:5, 148:13-154:23.

in several states.[16]  He and Jefferson both traveled widely in connection with their Pre-Paid work, and took extensive business deductions for travel, advertising and other business expenses.[17] Jarvis also built and worked with a downline sales organization, but did business as an individual under his own name. Jarvis at 80:10-84:23, 94:14-95:25, 101:5-102:10, 194:25-195:13. Sandler and Schweikert did not build a sales organization or downline.[18]

As noted, Jefferson and Corrente devoted a significant amount of time and effort to their Pre-Paid businesses. Sandler made a very small effort,[19] and Schweikert made virtually no effort at all.[20] Jarvis fell somewhere in the middle.[21] None of the named plaintiffs attempted to make Pre-Paid anything approaching a full-time job. Other Pre-Paid associates have decided to approach Pre-Paid as more of a full-time job.[22]

Jefferson received about $30,000 from Pre-Paid; Corrente about $12,900; Jarvis about $5,000; Sandler $50; and Schweikert received nothing. Payments received by other associates exhibit much wider variations, from $0 to people who make no effort, and no sales, to over $100,000 per year for individuals who have the skills and strategies to earn more, set higher goals and/or devote more time and effort to attaining more ambitious objectives.[23]

Because different associates had different goals, and pursued different strategies and approaches at different levels of intensity, they also derived different degrees of benefit from the services and support that Pre-Paid provides at no charge beyond the Fast Start entry fee. Pre-Paid locates, trains and continuously monitors the law firms that provide legal services under the membership plans throughout the United States and in Canada. Pinson Aff. at ¶16-k. It also

---

[16] Corrente at 27:13-18, 38:20-41:24, 45:10-51:19, 52:19-53:18, 55:22-56:9, 58:13-59:11, 20:10-15, 85:21-86:2, 135:13-24, 140:17-141:3, 142:18-21.
[17] Jefferson at 250:23-259:4; Corrente at 90:7-92:11.
[18] Sandler at 80:8-81:18; Schweikert at 77:12-25.
[19] Sandler at 41:12-46:19.
[20] Schweikert at 88:16-23.
[21] Jarvis at 126:16-18, 111:21-112:5.
[22] See, e.g., Coughlan Aff. ¶ 49. Cobbs Aff. at ¶ 8; Heath Aff. at ¶ 5; Neville Aff. at ¶ 4, ¶ 10; Tarkington Aff. at ¶ 5.
[23] See, e.g., Coughlan Aff. at ¶ 29; Heath Aff. at ¶ 5; Neville Aff. at ¶¶ 4, 10; Sloan Aff. at ¶ 5; Tarkington Aff. at ¶ 6;

operates a number of departments to provide associates with a wide variety of accounting, administrative, licensing, marketing and group sales support, fields questions and resolves issues and complaints regarding the membership plans and legal services provided under them. *Id.* at ¶ 16.

Any associate who builds a substantial sales organization, sells large numbers of memberships, operates in states with license requirements, maintains a website or participates in group sales, necessarily benefits from them, albeit to differing degrees. Jefferson made extensive use of many of these various services and departments.[24] Because Corrente sold at least 67 memberships, built and worked with a sales organization, was licensed in several states and maintains a website, he derived substantial benefits from them as well.[25] Jarvis derived more modest benefits. Sandler and Schweikert benefited little, if at all.

Associates also make varying choices -- and derive varying benefits from -- training and certification to act as Fast Start trainers, to sell membership plans to employee groups, or to sell Pre-Paid's specialized small business and commercial driver plans. Pinson Aff. at ¶¶ 14, 15; Coughlan Aff. at ¶¶ 31-35. Jefferson was certified as a Fast Start trainer. Jefferson at 106:25-107:4. He was also trained and certified to sell Pre-Paid's group, small business and commercial driver plans, which, as he testified, require different knowledge, skills and techniques. *Id.* at 110:12-113:3, 115:6-117:19, 129:5-136:10. Corrente was certified to sell group and small business plans. He did not focus significant efforts in the group area. Corrente at 67:3-8; 74:9-16. Jarvis, Sandler and Schweikert undertook no such training, obtained no specialized certifications, and made no such sales.

In addition, plaintiffs and other associates have disparate views about whether they would like to see Pre-Paid continue in business, and whether they want their lawsuit prosecuted on their "behalf." Sandler testified that she "would be absolutely thrilled if this company went out of business." Depo. at 169:5-6. Corrente had the polar opposite view. He remains an associate,

---

[24] Jefferson at 98:3-14, 218:20-220:25; Pinson Aff. at ¶ 22.
[25] Corrente at 38:20-41:24, 45:10-51:19, 140:17-141:3, 117:25-120:24..

intends to continue in that role, and wants to continue his membership because "[i]t's a good product." Depo. at 95:11-16, 160:22-161:8. Not surprisingly, he "wouldn't want Pre-Paid to go out of business." *Id.* at 162:21-24.

Innumerable other associates depend on Pre-Paid and its marketing program as their primary means of support. They have worked to build their businesses and would be seriously injured by the destruction of the Company or dismantling of the marketing plan. *See, e.g.,* Cobbs Aff. ¶¶ 6-8, 14, 20; Heath Aff. ¶¶ 5-7, 13, 18; McDonald Aff. ¶¶ 12, 13; Neville Aff. ¶¶ 6, 10, 11; Sloan Aff. ¶¶ 4-6, 8; Tarkington Aff. ¶¶ 5-7, 14; Coughlan Aff. ¶¶ 20, 25. Such associates are harmed by the prosecution of this lawsuit and strongly object to it.[26]

### III. VARIATIONS PERTAINING TO PRE-PAID'S ASSOCIATE AGREEMENT, MARKETING AND COMPENSATION PLAN AND OTHER MATERIALS

During the class period, Pre-Paid made numerous and material changes to its Associate Agreement, Marketing and Compensation Plan and its other materials, including its Success Guide, its principal training manual, and the taped and written materials that were available for associates to use in membership sales or recruitment at their option. As a practical matter, and in addition to the extensive one-on-one oral communications that are the principal mode of recruitment communication, such changes resulted in significant variations in the terms of agreements Pre-Paid entered into with associates, the manner in which associates were compensated, and the representations about Pre-Paid that were communicated by Pre-Paid to its associates and by its active associates to prospective associates.

To start, the provisions of the Associate Agreement in use between 1999-2003 varied and included changes in language referencing loans, chargebacks, the debit balance, advance commissions, as well as the choice of law provision. Pinson Aff. ¶ 5, Ex.1. Also, all Associate Agreements as of May 2000 and thereafter included a mandatory arbitration provision. *Id.* Plaintiff Schweikert entered into an Associate Agreement containing a mandatory arbitration clause, as did approximately 71% of associates signing agreements in the 1999-2003 time period.

---

[26] *E.g.,* Cobbs Aff. ¶ 20; Heath Aff. ¶ 18; Neville Aff. ¶ 11; Sloan Aff. ¶ 8; Tarkington Aff. ¶ 14.

*Id.* The arbitration clause also contains a provision whereby associates agreed that they would not bring any claim against Pre-Paid, or its officers and directors, as a part of a class action. Pinson Aff. ¶ 5.

Pre-Paid also made various changes in the content of its Success Guide that was distributed to associates during the putative class period. *Id.* ¶ 39. Although the Success Guide is intended as a training and reference publication that is generally provided to associates in an Introductory Kit, associates can purchase it separately and use it as a recruiting tool. *Id.* During the class period Pre-Paid also made changes in the other taped and written material available to associates *Id.* ¶ 38.

The entry fees paid by Pre-Paid associates also changed several times during the relevant time period as well. *Id.* ¶ 10. The amount paid by non-Fast Start associates during the relevant period was $65.00, whereas the cost for associates who joined the Fast Start Program varied from $99 to $149 to $249 during multiple time periods. *Id.* There were significant changes in the Fast Start Program as well. For example, the Fast Start qualification requirements, formal training format, trainer compensation, field training bonuses, and success bonuses to associates all varied throughout the relevant time period. *Id.* ¶ 11, Ex. 3.

Pre-Paid also revised the manner in which it compensated associates during the applicable time period. These changes were effected through revisions made to the terms of the commission structure in the Marketing and Compensation Plan and the language thereof. *Id.* ¶ 7, Ex. 2. For example, the Company revised the period over which it advanced commissions several times (from three years to one year, and then permitting associates to choose either). *Id.* ¶ 7. The chargeback percentages on cancelled memberships varied, as did the manner for advancing in levels in compensation, the renewal commission standards, and the commission advance adjustments. *Id.* ¶ 7, Ex. 2. Similarly, compensation relating to various specialty plans changed during the putative class period, resulting in different advance periods for associates who chose to participate in selling certain specialty membership plans, such as the Commercial Drivers Legal Plan ("CDLP"). *Id.* ¶ 9.

Other compensation changes adopted by Pre-Paid during the relevant time period included: the enactment of the Payment Earnings Plan (which allowed some associates to receive cash advances instead of applications to their "debit balance") and the institution of a Reserve Balance Account (designed to assist group specialists in leveling their cash flow in months in which chargebacks may be higher).[27] The incentive program called the Players Club, which plaintiffs attempt to exploit throughout the Complaint, was not adopted until August, 2001, and thus was not even in effect during approximately half of the putative class period. *Id.* ¶ 12.

These changes in compensation, the agreements governing the Company's relationship with its associates, and the other materials would have influenced the myriad representations made between and among 550,000 associates. They also produce wide-spread variations in the manner in which associates were allegedly damaged or benefited by Pre-Paid's compensation plans.

## ARGUMENT

### I. A CLASS CANNOT BE CERTIFIED MERELY BECAUSE THE COMPLAINT ALLEGES PYRAMID-SCHEME/SECURITIES CLAIMS

Plaintiffs' overarching argument for class certification is that <u>all</u> cases alleging securities laws/pyramid scheme claims are well suited to class treatment because (1) a "common course of conduct" outweighs disparities in individual circumstances, and (2) SEC enforcement policies favor certification. Motion at 14-15. This argument fails on multiple grounds.

The notion that the existence of cases in which securities claims based on pyramid scheme allegations were certified <u>somehow gives plaintiffs a pass</u> on the analysis mandated by *Meyer* and *Coe* is fundamentally misconceived. This Court, the Tenth Circuit and the United States Supreme Court have made abundantly clear that the question whether to certify a class "'involves intensely practical considerations, most of which are purely factual or fact-intensive,'"[28] and the facts and practicalities of this case plainly preclude class certification.

In addition to bypassing the analysis mandated by *Meyers* and applied in a pyramid-

---

[27] Pinson Aff. at ¶ 9.
[28] *Meyers*, 181 F.R.D. at 501 (quoting *Reed*, 849 F.2d 1307, 1309-10).

scheme/securities context in *Coe,* plaintiffs' assertion that federal courts "routinely" certify such cases (as if they were all the same) is based on five cases decided over an 18 year period in circumstances tellingly unlike those presented here. Most importantly, each of the cases plaintiffs cite involved a business that was not a going concern.[29] In addition, four of the five involved parallel SEC enforcement actions.

In sharp contrast to the superficial decisions cited by plaintiffs, this case involves a 30 year old thriving nationwide business which paid $119.4 million in commissions to its sales associates in 2002, (about 5 1/2 times the enrollment for Fast Start fees for associates) (Kleidon Aff. ¶ 31), that has never been the subject of an SEC enforcement action. This is not a case in which a sham company with no real product hits an inevitable wall and leaves those associated with it empty-handed. Many of the associates on whose behalf this action is supposedly brought continue to make their livelihood from being a Pre-Paid associate and do not want these plaintiffs representing them. Moreover, this case involves primarily oral, individualized recruiting communications, individual efforts, goals and results, and individual benefits and/or damages, which vary dramatically both throughout the 5 1/2 year putative class period and on an individual case-by-case basis, and did not involve the scripted presentations, uniform efforts or formulaic damages generally present in plaintiffs' cases. Pre-Paid's compensation, Fast Start and incentive programs, another source of plaintiffs' pyramid scheme contentions, also varied throughout the

---

[29] The 1993 *Webster* order (Exhibit Y to Plaintiffs' Appendix) was in a case where the business had failed and only a Rule 23(b)(1) class was certified to divide the limited assets. *Bresson v. Thomson McKinnon Sec., Inc.*, 118 F.R.D. 339 (S.D.N.Y. 1988) and *Walco Inv., Inc. v. Theren*, 168 F.R.D. 315 (S.D. Fla. 1996) involved alleged Ponzi schemes where there was no longer a going business. Likewise, *Marshall v. Holiday Magic, Inc.*, 550 F.2d 1173 (9th Cir. 1977) and *Davis v. Avco Corp.*, 371 F.Supp. 782 (N.D. Ohio 1974) involved failed or failing businesses, with *Marshall* being only a settlement class certification. (In the *Davis* case, the appellate court even conceded that individual issues began to overwhelm after certification, but declined to reverse after the fact). Uniform scripts or representations/omissions, unlike the facts here, appear present in each of plaintiffs' cases, though the *Marshall* case did not address that issue on appeal. Perhaps the most telling difference of all is that the foundation for a uniform damage calculation required to justify certification was present in the case of the failed businesses in question in plaintiffs' cases, as with expectation of no future returns, or a limited asset situation, the returns are not individual-owner specific, as the pie is not big enough to divide on that basis. *See, eg.,* Kleidon Aff., ¶ 43, n.14. To the contrary here any damage claims are unique to each associate. *Id.*, ¶¶ 44-48.

putative class period in ways that are material to plaintiffs' claims.

## II. PLAINTIFFS CANNOT DEMONSTRATE REPRESENTATIONS, MATERIALITY, RELIANCE OR CAUSATION ON A CLASSWIDE BASIS

Classwide treatment of plaintiffs' claims is inappropriate under *Meyers, Coe* and innumerable other cases because the alleged misrepresentations and omissions were made by many thousands of Pre-Paid associates to the 550,000 members of the putative class, contain a myriad of material variations, emanate from different media, and raise significant individualized issues regarding the nature of the representations, materiality, reliance and causation. *See* pp. 1-18, *supra*. Plaintiffs are under a strict burden of proof that, <u>all</u> the requirements of Rule 23 are clearly met. *Meyers,* 181 F.R.D. at 501 (citing *Rex v. Owens,* 585 F.2d 432, 435 (10th Cir. 1978). Because the evidence in this case is overwhelming that individualized issues regarding the nature of the representations, materiality, reliance and causation will predominate, class certification should be denied. *See Meyers,* 181 F.R.D. at 502 ("[t]he predominance issue appears to be the most stringent standard plaintiff must meet before this Court may order certification ...").[30]

---

[30] Although plaintiffs' Section 12(1) and 12(a)(2) claims do not require proof of individual reliance as an element, both require proof of the fact of damage, and Section 12(a)(2) requires proof of the particular misrepresentation made by the particular offeror to the purchaser, proof of materiality, and proof (by defendant) of the absence of loss causation as an affirmative defense. *Coe,* 137 F.R.D. 252; *Rosen v. Fidelity Fixed Income Trust,* 169 F.R.D. 295, 299-300 (E.D. Pa. 1995). The state law claims of fraud under the Oklahoma Business Opportunity Act (another 10(b)5 analog) require proof of the misrepresentation/omissions themselves, individual reliance, materiality, loss and transactional causation. The OBOSA anti-fraud provisions relied on by plaintiffs, 71 O.S. §§ 819, 822 (Amended Complaint, ¶ 155-162) directly track the language of Rule 10b-5 and of the "fraudulent practices" provisions of the Oklahoma Securities Act, 71 O.S. Section 101, relied on by plaintiffs but dismissed herein. Accordingly, the OBOSA claims should be interpreted in the same light as the federal securities laws. *See, e.g., State, ex rel. Day v. Southwest Mineral Energy, Inc.,* 617 P.2d 1334, 1339 (Okla. 1980). The Consumer Protection Act claims require *at the least* proof of the representation/omission or other fraudulent act and proof of loss causation. *Patterson v. Beall,* 2000 OK 92, ¶ 14, 19 P.3d 839; *Walls v. American Tobacco Co.,* 2000 OK 66, 11 P.3d 626; *Tibbetts v. Sight and Sound Appliance Centers, Inc.,* 2003 OK 72, 77 P.3d 1042 ("to be aggrieved a consumer must sustain damages <u>as a result of</u> defendant's unlawful practice"). Other states' Consumer Protection Acts have been construed to require proof of individual reliance as well, though the Oklahoma courts have not ruled on this specific issue. *See, e.g., Weinberg v. Sun. Co.,* 777 A.2d 442, 446 (Pa. 2001); *Finstad v. Washburn University of Topeka,* 845 P.2d 685, 689-91 (Kan. 1993). As to unjust enrichment, "a right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is "contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another." *Lapkin v. Garland Bloodworth, Inc.,* 2001 OK CIV APP 29, ¶ 7, 23 P.3d 958. *See also French Energy, Inc. v. Alexander,* 1991 OK 106, ¶

(continued...)