It is well-established that, even when plaintiffs' claims have some common core, a case

such as this one is not appropriate for class treatment if there are material variations in the

representations made, or in the kinds or degrees of reliance by the persons to whom they are

addressed. *Meyers,* 181 F.R.D. at 502 (citing Advisory Committee Note to Rule 23, 39 F.R.D.

69, 103 (1966)). *Accord Moore v. PaineWebber,* 306 F.3d 1247, 1253 (2d Cir. 2002):

> Where there are material variations in the nature of the
> misrepresentations made to each member of the proposed class ...
> class certification is improper because plaintiffs will need to
> submit proof of the statements made to each plaintiff, the nature of
> the varying material misrepresentations, and the reliance of each
> plaintiff upon those misrepresentations in order to sustain their
> claims. [*Id.* at 1253.][31]

Federal courts have routinely held that claims based on oral, rather than written,

communications are inappropriate for class treatment absent a showing by plaintiffs that the

communications are standardized. *See, e.g., Broussard v. Mieneke Discount Muffler Shops,* 155

F.3d 331, 341 (4th Cir. 1998) (citations omitted).  Similarly, when written communications with

putative class members contain material variations, emanate from multiple sources, or do not

actually reach class members, they are no more valid a bases for a class action than dissimilar

oral representations. *Id.* at 341 (citation omitted).  Even when there are standardized written or

oral communications (which is not the case here), class certification should be rejected unless <u>all</u>

class members "received, read and relied" on the same literature. *Id.* at 341. Claims that require

"proof of what statements were made to a particular person, how the person interpreted those

---

(continued...)

11, 818 P.2d 1234. This balancing of the equities is an inherently fact specific inquiry requiring individualized determinations. *See e.g., Clay v. American Tobacco Co.,* 188 F.R.D. 483, 500-501 (S.D. Ill. 1999); *Smart Prof. Photocopy Corp. v. Childers-Sims,* 850 So.2d 1245, 1251-52 (Ala. 2002); *Hutson v. Rexall Sundown, Inc.,* 837 So.2d 1090, 1093 (Fla. Ct. App. 2003).
[31] *See also Grainger v. State Sec. Life Ins. Co.,* 547 F.2d 303, 307 (5th Cir. 1977) ("[T]he key concept in determining the propriety of class action treatment is the existence or non existence of material variations in the alleged misrepresentations"); *Lewis Tree Service v. Lucent Technologies,* 211 F.R.D. 228, 235 (S.D.N.Y. 2002) (class members raising claims will have to demonstrate "individual damages and causation, and this factual variance among individual plaintiffs defeats predominance"); *Augustin v. Jablonsky,* 2001 WL 770839, at 13 (E.D.N.Y. Mar. 8, 2001) (finding individual issues of proximate causation predominate despite plaintiffs' showing of commonality under Rule 23(a)(2)).

statements, and whether the person justifiably relied on those statements to his detriment are not susceptible to classwide treatment." *Id.* at 342 (citation omitted). *See also Coe,* 137 F.R.D. at 254 (Section 12(2) claims "require proof of the particular misrepresentation made by the particular offeror or seller to the purchaser").

The principles set forth by this Court in *Meyers,* and similarly applied in *Converse v. Ameritech Corp.,* 179 F.R.D. 533 (W.D. Mich 1997), are both instructive and controlling. *Meyers,* denied certification because plaintiffs failed to carry their burden of proof that oral presentations and numerous written contacts that sought to sell telephone inside wire maintenance services were scripted or uniform. 181 F.R.D. at 504-05. This Court noted that plaintiffs could identify no actual script from which employees repeat identical mantras to each customer, and that many customers enrolled in plans as a result of individual contacts with representatives of the defendant company. *Id.* The opinion further noted that the multiple avenues for these contacts support the conclusion that "individual issues of reliance and exactly what representations were made predominate over common issues." *Id.*

Plaintiffs in this case do not (and cannot) identify any script that was repeated as a mantra. As noted at pages 7-13 above, tens of thousands of associates (not defendants) "sold the opportunity" to the 550,000 members of the putative class through an extraordinary variety of oral and written communications -- none of which are uniform or scripted. Although one-on-one communications was the primary means of contact. The assortment of communications by which associates sold the "opportunity" included small business receptions, audio and videotapes, an assortment of brochures and written materials, via websites, newspaper advertisements and radio advertising, three way phone calls, and through success guides and other written materials that changed over time, and that could be adapted or truncated by associates to meet the needs of the situation.

As was true in *Meyers,* just determining "exactly what representations were made" to which class members would be a Herculean task that overwhelms any common issues. Clearly, such individual issues will predominate in this case. *See Converse,* 179 F.R.D. at 538-40

(denying class certification because individual issues predominate where proof is required for what information was disclosed to each class member in hundreds of thousands of different communications).[32] As noted above, the named plaintiffs had difficulty remembering what was said to them when they were being recruited, and two of them decided to become associates for reasons unrelated to what was said. *See* pp. 9-12, *supra*. Those basic problems would be multiplied thousands of times if the proposed class were certified.

The materiality of alleged misrepresentations and omissions will also "require substantially individualized determinations" as well. *Gelman v. Westinghouse Electric Corp.,* 73 F.R.D. 60, 67 (W.D. Pa. 1976). Materiality is an issue of fact to be determined on the basis of all the circumstances, and raises different issues at different points in time for different class members. *Id.* at 68. When the "intent, goals and strategy" of class members is different or changes over time, each putative class member's case "will require proof of facts unique to that individual." *Rosen v. Fidelity Fixed Income Trust,* 169 F.R.D. 295, 299-300 (E.D. Pa. 1995).

Here, the materiality of hundreds of thousands of individualized communications and representations will require individualized determinations that take into account the disparate intentions, goals, strategies, circumstances and characteristics of the individuals who became Pre-Paid associates. *See* pp.13-16, *supra*. What is "material" to one putative class member who plans to work only part-time and only sell memberships will differ great from another who may seek to work at Pre-Paid full-time, and sell both memberships and recruit a downline organization. Accordingly, because any materiality analysis must also consider such individualized factors on a case-by-case basis, individual issues will overwhelm any common

---

[32]*See also In re Life USA Holding Inc.,* 242 F.3d 136, 145-46 (3d Cir. 2001) (denying class certification where common issues do not predominate because plaintiffs' sales presentations were neither uniform nor scripted and arose "not out of one single event or misrepresentation," but involved representations made to over 280,000 purchasers by over 30,000 independent agents); *Gibbs Properties Corp. v. Cigna Corp.,* 196 F.R.D. 430, 440 (M.D. Fla. 2000) (denying class certification where "there are 40,000 potential class members" and inquiry into what was "specifically misrepresented and whether the class member relied" on the statement "would be unwieldy in the extreme").

issues.[33]

Plaintiffs' suggestion that defendants "uniformly" omitted facts -- e.g. that the Company is an alleged pyramid scheme -- fares no better. *See* Motion at 8. *Meyers, Coe* and *Converse* (among many other cases) did not parse omissions for separate analysis, and there is no basis for doing so here. Omissions can be actionable only to the extent that they render affirmative statements materially misleading, not in isolation or in the abstract. It makes no practical difference whether one focuses on alleged omissions, the myriad of communications remains the same. Well-reasoned decisions have examined class certification arguments based on omission contentions, and rejected them.

In *Lewis Tree Service, Inc. v. Lucent Technologies,* 211 F.R.D. 228 (S.D.N.Y. 2002), for example, plaintiff argued that common issues of fact exist "because all of the representations at issue involved an omission -- a failure to disclose a Y2K defect." *Id.* 232 n.3. The court rejected plaintiff's argument noting that "[a]t a basic level, even with respect to a failure to disclose Y2K defects, the plaintiff's claims are centered around individual conversations and representations that would have varied greatly." *Id.* So would the "subjective knowledge, sophistication and reliance of customers" have "differed markedly" over time. *Id.* Accordingly, the court concluded:

> The same variations and lack of common issues of fact are present,
> whether the defendants' fraud is characterized as a failure to
> disclose Y2K defects or as a deliberate misrepresentation that their

---

[33] Although defendants emphasize that plaintiffs fail to satisfy Rule 23(b)(3)'s requirement that common issues predominate, several cases have held that material variations in the nature of the misrepresentations alleged also fail to satisfy Rule 23(a)'s commonality and typicality requirements. *See Sprague v. General Motors Corp.,* 133 F.3d 388, 398 (6th Cir. 1998) (denying class certification because "myriad variations" of representations made, subjective understanding of them and reliance "lacked commonality"); *Lichoff v. CSX Trans.,* 218 F.R.D. 564, 572 (N.D. Ohio 2003) (denying class certification for lack of commonality where freight-train conductor recruiting programs "used different materials and strategies to present the material" and thus "individualized determinations" of what recruits were told "would be required to determine the merits of plaintiffs' claims"); *Rosen,* 169 F.R.D. at 299-300 (denying class certification for lack of typicality where materiality analysis involving differing "investment strategies" required "proof of facts irrelevant to Plaintiff's claims" that created "fundamental non-alignment of claims" between plaintiff and absent class members).

products have a useful life beyond the year 2000.  [*Id.* (emphasis added)]

This analysis is fully applicable here.  Whether plaintiffs attempt to characterize their claims as misrepresentations or omissions, plaintiffs' claims are centered around hundreds of thousands of communications, many of which are one-on-one interactions that raise a myriad of highly individualized inquiries which overwhelms any common issues.  *See also Coe,* 137 F.R.D. at 254 (denying class certification of Section 12(2) claim in action alleging pyramid scheme because "each presentation varied in material respects" and the "presentations were made by a variety of people").

Because literally hundreds of thousands of oral and written communications involving 550,000 class members will require individualized inquiries as to what statements were made and relied upon, individual issues as to materiality, reliance and causation clearly predominate, and preclude class certification.  *E.g., Meyers,* 181 F.R.D. at 504.[34]

## III.   PLAINTIFFS CANNOT ESTABLISH THE FACT OR AMOUNT OF DAMAGES ON A CLASSWIDE BASIS

Plaintiffs' request to certify a class in this action fails for the additional reason that they cannot establish the fact or amount of damages for each class member on a classwide basis.[35]  As demonstrated in the Kleidon Affidavit and discussed below, there are two potential methods for analyzing economic injury in the context of class certification.  The first method embodies the

---

[34] *See also Johnston v. HBO Film Management,* 265 F.3d 178, 189-92 (3d Cir. 2001) (affirming denial of class certification where "individual issues overwhelmed issues common to the class with regard to the element of a misstatement or material omission" noting that "the record from the plaintiffs' viewpoint is at best inconclusive" as to whether defendants made uniform oral misrepresentations); *Rowe v. Morgan Stanley Dean Witter,* 191 F.R.D 398, 413 (D.N.J. 1999) (denying class certification where plaintiffs' trading claim is based "on highly individualized facts, reliance and oral representations, rather than predicating the claim on a standardized common course of conduct instituted by the Defendants"); *In re Tri-State Crematory Litig.,* 215 F.R.D. 660, 693-94 (N.D. Ga. 2003) (denying class certification for fraud claims where oral and written representations varied from one class member to another, emanated from several sources, and required individual proof of reliance); *Cohn v. Massachusetts Mutual Life Ins. Co.,* 189 F.R.D. 209, 214-15 (D. Conn. 1999) (denying class certification because sales presentations "varied in significant respects from transaction to transaction" depending on the circumstances of the transaction including the nature of the questions asked, the purchaser's relationship with the salesperson, and the sales person's perception of the purchaser's need, objectives and financial sophistication").

[35] Each of plaintiffs' 1933 Act and State law claims require proof of damages.

approach generally used in securities class actions, and assumes incorrectly that the "opportunity" represents a pro-rata interest in Pre-Paid's marketing program. The second method acknowledges that the opportunity is not a pro-rata interest in the marketing program, and that its value varies as a function of individual factors relating to the purchasers. Kleidon Aff. ¶¶ 18, 28, 42-43. Class certification is improper under either method of analysis, because each leads to the conclusion that plaintiffs cannot demonstrate the fact or amount of damages on a classwide basis. *Id.* ¶¶ 39-40, 44-48.

Under the first method, the "opportunity" -- the alleged "security" -- is incorrectly treated like a normal security, and represents a pro-rata claim on the value of the marketing program. Kleidon Aff. ¶ 18. In return for the Fast Start enrollment fee that plaintiffs allege is the "purchase price" of the "opportunity" (which varied widely but never exceeded $249), associates are afforded the opportunity to receive benefits comprising direct financial gain, i.e. commissions for sales of the membership. *Id.* ¶ 29. An analysis of economic injury under this model demonstrates that during the purported class period "annual commissions paid to Pre-Paid associates were more than four times the annual associate fees received from Pre-Paid associates." *Id.* ¶ 31, Ex. 3. Thus, for example, in 2002, Pre-Paid's commissions paid to associates totaled $119.4 million, about 5.3 times the associate fees Pre-Paid received -- $22.6 million. *Id.* ¶ 31.

Associates also receive substantial indirect benefits such as services and support provided by Pre-Paid, net of any additional fees paid by class members. *Id.* ¶ 29. These indirect benefits from Pre-Paid including substantial back office support services to help them keep track of their downline associates and memberships sold. *Id.* ¶ 32. Different associates utilize these intangible services to different degrees and likely value them differently. *Id.* It is thus not possible to determine the cash value of these benefits to associates on a classwide basis. *Id.* The annual costs of providing associate support averaged about three times its revenue received from service fees paid by associates between 1999 through 2002. *Id.* For example, in 2002, Pre-Paid's associate support costs totaled $32.6 million, 2.2. times the revenue received from associate

services -- $14.8 million.  *Id.*

By combining the commissions paid to associates and net costs of associate support,

Dr. Kleidon concluded that under a pro-rata analysis Pre-Paid's direct and indirect payments to

associates over the total class period to be more than five times the "purchase price" of the

"opportunity." *Id.* ¶ 33.  In 2002, the ratio is as high as 6.1 times.  *Id.*  Using a similar analysis

that compares the purchase price of the "opportunity" and the present (discounted) value of all

future benefits yields similar results. *Id.* ¶ 34-38.

Accordingly, although the facts in this case contradict the notion that the associate

opportunities represent pro-rata shares in the Pre-Paid marketing program, plaintiffs have not

suffered economic injury: "even if we treat them as pro-rata shares and conduct an analysis of

these 'shares', the data show that the putative class has not suffered economic harm since, the ex

ante value of the future proceeds to those shares at the date of purchase exceeds the amount paid

for them by a substantial margin." *Id.* ¶ 39.  Thus, when the opportunity is viewed as a pro rata

interest in the marketing program classwide certification is inappropriate because plaintiffs

cannot demonstrate the fact or amount of any damages on a classwide basis.[36]

The second, and correct way, in which to analyze economic injury to the class recognizes

that the "opportunity" is not a pro-rata interest in the marketing program, because the payoffs to

"shareholders" will differ depending on their personal characteristics, strategies and efforts.

Kleidon Aff. ¶¶ 42-43.  When the opportunity is properly analyzed in this fashion, its value at the

---

[36]The Court may address the issue of the fact of damages (or no damages) insofar as it affects the class certification calculus. At class certification, "it may be necessary for the Court to probe behind the pleadings before coming to rest on the certification question." *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 160 (1982). Indeed, an "[e]valuation of many of the questions entering into determination of class action questions is intimately involved with the merits of the claims…. The more complex determination required in Rule 23(b)(3) class actions entail even greater entanglement with the merits…" *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469 n. 12 (1978). Thus, courts are "not precluded from 'necessary inquiry into the underlying elements of the case in order to evaluate whether Rule 23 has been met'" *Newton v. Merrill, Lynch, Pierce, Fenner & Smith,* 259 F.3d 154, 167 (3d Cir. 2001)(quoting 7B Wright, Miller & Kane §1785 p. 16 (West Supp. 2000)). Accordingly, "a preliminary inquiry into the merits is sometimes necessary to determine whether the alleged claims can be properly resolved as a class action." *Newton,* 259 F.3d at 168.

time of purchase must take into account all of the various tangible and intangible personal factors that bear on whether the expected non pro-rata payoffs to the particular "purchaser," which in turn depend on the associate's expected success in selling memberships and recruiting others to do so. *Id.* ¶ 44.

Because different individuals have different abilities, personalities, prior experience, available time, social networks, business strategies and work ethics, an analysis of the value of the opportunity to a particular associate at the date of purchase will necessarily involve highly individualized inquiries. *Id.* ¶¶ 44-48. Accordingly, there is no common basis upon which the value of the "opportunity" -- or the fact or amount of economic injury -- can be determined on a classwide basis.

Where assessments of plaintiffs' damages are "highly individualistic," and depend upon "a number of factors and characteristics specific to each particular plaintiff," the individual damages determinations "predominate over common issues." *Zapata v. IBP, Inc.*, 167 F.R.D. 147, 166 (D. Kan. 1996) (denying class certification because individual damages determinations predominate and any advantages of a class action are outweighed by significant problems of case manageability).

In *Newton*, 259 F.3d at 188, the Third Circuit affirmed the lower court's rationale for rejecting class certification noting that:

- "Proof of injury (whether or not an injury occurred at all) must be distinguished from calculation of damages (which determines the actual value of the injury);

- "Where proof of fact of damage requires evidence concerning individual class members, the common questions of fact became subordinate to the individual issues, thereby rendering class certification problematic;

- "Determining actual economic loss on the part of each investor would invoke individual questions that predominate over common ones;

- "The ability to calculate aggregate amount of damages does not absolve plaintiffs from the duty to prove each investor was harmed by the defendants' practice."

As demonstrated conclusively and at length in the Kleidon Affidavit, any attempt to

determine the <u>fact</u> of economic injury or damage for 550,000 class members will necessarily involve highly individualized inquiries into the myriad of factors applicable to each class member at the time of purchase including an evaluation of abilities, past experience, social networks, business plans and expected usage of Pre-Paid back-office operations and specialized training programs.  Any determination of the fact of damage would require the application of an enormous number of variables and probabilities on case-by-case basis inasmuch as it is impossible to know at the time an associate joins whether he or she will be successful.  *See* Kleidon Aff. ¶¶ 47-48.  Under settled law, class certification is improper in these circumstances because there is no common basis upon which to determine the fact or amount of damages, which can only be determined on an individualized basis.[37]  Because both the fact and calculation of damages under the assumption that the opportunity is not a pro-rata share in Pre-Paid's marketing program necessitate a highly individualized inquiry for each of 550,000 putative class members, individual issues of damages clearly predominate over common issues.  *See Newton*, 259 F.3d at 190.[38]

---

[37]*Broussard*, 155 F.3d at 342-43 (denying class certification where each class member's "damages was inherently individualized" and dependent on "any number of factors" including the "management skills of the franchisee"); *Sikes v. Teleline, Inc.*, 281 F.3d 1350, 1366 (11th Cir. 2002) (reversing granting of class certification holding that "claims will involve extensive individual inquiries on the issues of injury and damages -- so much so that a class action is not sustainable"); *Abrams v. Interco Inc.*, 719 F.2d 23, 31 (2d Cir. 1983) ("the necessity of individual trials on damages may be fatal if the class numbers in the thousands or millions"); *La Fata v. Raytheon Co.*, 207 F.R.D. 35, 47 (E.D. Pa 2002) (denying class certification in securities fraud action where plaintiffs alleged they were induced to remain employed with company by grant of stock options, "any such injury will have necessarily occurred on an individual basis, depending upon the individual motivations and alternative job options of the class members.  As proof of this claim will require individual assessments of this essential element, the common issues do not predominate over individual issues").

[38]Plaintiffs also mistakenly seek to certify this class under Rule 23(b)(2) as well as under Rule 23(b)(3).  *See* Motion at 21-30.  However, class certification under Rule 23(b)(2) is appropriate only where injunctive or declaratory relief is the <u>predominant</u> remedy sought for class members.  *Boughton v. Cotter Corp.*, 65 F.3d 823, 827 (10th Cir. 1995); *Harding v. Tambrands, Inc.*, 165 F.R.D. 623, 632 (D.Kan. 1996); *Heartland Communications, Inc. v. Sprint Corp.*, 161 F.R.D. 111, 117 (D.Kan. 1995).  *See also Rich v. Martin Marietta Corp.*, 522 F.2d 333, 341 (10th Cir. 1975).  Here, despite plaintiffs' attempt to claim in their Motion that they seek injunctive relief, plaintiffs primarily seek monetary damages.  *See, e.g.*, Compl. ¶¶ 132, 140, 147, 154, 162, 166, 173; Prayer ¶¶ 2, 3, 4, 6.  Moreover, the adversity of economic interest here, as well as the need to tailor any relief to each putative class member, destroy Rule 23(b)(2)'s presumption of cohesiveness, the hallmark of a Rule 23(b)(2) injunction action.  *Adamson v.*

(continued...)

IV.    **THE COURT CANNOT DETERMINE WHETHER THE "OPPORTUNITY" IS A
       SECURITY, OR PRE-PAID IS A PYRAMID SCHEME, ON A CLASSWIDE
       BASIS**

Whether or not the "opportunity" is an investment contract "security" and/or Pre-Paid is a "pyramid" scheme, cannot be determined on a classwide basis, due (among other things) to the extreme disparities of time, effort, training and earnings of hundreds of thousands of associates. Any attempt to make such determinations on a classwide basis will inevitably devolve into highly individualized analyses of the specific "efforts" engaged in by each associate, and whether those efforts are the "undeniably significant ones." Such individualized inquiries would overwhelm any common issues and would inevitably prevent the court from making a uniform determination of whether or not the "opportunity" is an investment contract "security" as defined under federal law.[39]

In *S.E.C. v. W.J. Howey Co.,* the Supreme Court defined an investment contract as (1) an investment of money, (2) in a common enterprise, (3) with profits to come solely from the efforts of others. 328 U.S. 293, 301 (1946) The Tenth Circuit (following several other circuits) has relaxed the third element somewhat, holding that the test is whether "efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Meyer v. Dans un Jardin, S.A.*, 816 F.2d 533, 535 (10th Cir. 1987) (citations omitted). Unless an "investment contract" satisfies each of the three prongs of the *Howey* test, it is not a security. *Teamsters v. Daniel*, 439 U.S. 551, 558 (1979) ("it is clear that an employee is selling his labor primarily to obtain a livelihood, not making an investment").

---

(continued...)
*Bowen*, 855 F.2d 668 (10th Cir. 1988) is not to the contrary but involved a Constitutional challenge to a Social Security policy of the Secretary of Health and Human Services. *In Re MTBE Prod. Liab. Litig.*, 209 F.R.D. 323, 342-344 (S.D. N.Y. 2002). *See, also, Allison v. Citgo Petroleum Corp.*, 153 F.3d 402, 413 (5th Cir. 1998). Certification under Rule 23(b)(2) is not warranted.
[39]Plaintiffs' inability to demonstrate that the opportunity is a security or that Pre-Paid is a pyramid scheme on a classwide basis, precludes any certification of a class alleging a Section 12(a)(1) claim in particular, which claim requires the registration of a "security."

Even if plaintiffs could show that some associates made an "investment" (as defined under the securities laws), in a common enterprise, with profits to come (solely or essentially) from the efforts of others, plaintiffs could not possibly establish these allegations on a classwide basis. An associate who sold memberships and did not recruit, or who recruited, trained and supported a substantial sales organization, would obviously be in a very different position from someone who sold no memberships and either had, or played no role concerning, a downline.

Many associates view their positions as Pre-Paid associates as their full-time careers through which they run businesses and earn their livelihoods, or as part-time work by which they earn extra income for their families.[40] Moreover, the "returns" on any such "investments" necessarily vary individually by the devotion of time, effort and the skills that associates bring to their work. As noted at pages 13-16 above, the named plaintiffs, and the proposed class as a whole, cover a vast array of skills, efforts and earnings.

Variations in the amount of time and effort associates place into selling memberships and recruiting is further compounded by variations in the degree of training and/or licensing associates choose to undertake. Training is necessary to sell certain Pre-Paid products, but anything beyond basic sales training is voluntary and is engaged in at different levels by different associates.[41] For, example, plaintiff Jefferson undertook extensive training; was qualified to sell multiple membership plans and to act as a Fast Start trainer, and studied for and obtained state licenses to sell the memberships. Jefferson at 48, 89-90, 106-08, 129. 134. Jarvis and Corrente are closer to the other end of the spectrum; Sandler and Schwieikert took no training beyond the Fast Start course. See pp. 15, supra.[42] Because the degree of an associate's training impacts the

---

[40]For example, Mary Jo Neville "work[s] on [her] Pre-Paid business full-time after twenty-five years of teaching." Verna Heath "makes [her] livelihood from [her] Pre-Paid business and make[s] a very good living." Diane Sloan "work[s] approximately twenty-five hours a week on [her] Pre-Paid business," as does Tonnie Cobbs (20-25 hours), who "plan[s] to increase [her] hours to 30-35 hours a week soon." Doyce Tarkington sells memberships "full time," as does his wife, who is also a Pre-Paid associate. They earn their "livelihood" from it.
[41]Coughlan Aff. ¶¶ 30, 36 (Exhibit 3, setting forth the number of associates participating in various areas of training).
[42] Jarvis at 120:20-121:3, Corrente at 67:7-8, 74:9-16.

calculus for determining whose "efforts" are the undeniably "significant" ones, the Court would be required to examine the degree of each associate's involvement or non-involvement in Pre-Paid's training programs.

The same multitude of variations and individualized questions prevent a uniform classwide determination of whether Pre-Paid is a pyramid scheme. As this Court has recognized, determinations regarding whether the focus of the marketing program is on recruiting in lieu of product sales depends largely on the practices and experiences of associates. *See* Order dated July 23, 2003 at 13, 16. As demonstrated herein, those practices and experiences vary widely -- from selling memberships alone to mixing membership sales and downline building in varying degrees. *See* pp. 13-16, *supra.* Moreover, approximately 25%-27% of Pre-Paid's memberships are sold through employer groups, where no recruiting takes place at all. Pinson Aff. ¶ 20; Coughlan Aff. ¶¶ 45-48.

Further, the primary programs on which plaintiffs rely for their "pyramid" scheme assertions -- the Fast Start program's qualification requirements and training bonuses, and the Players Club incentive program -- varied significantly throughout the putative class period. For example, no Fast Start Training Bonus to the upline was in effect during April 1, 2001 through January 1, 2003, qualification requirements involved only the selling of three memberships for part of the relevant time period, and the Players Club was not even instituted until 29 months after the putative class period began on March 1, 1999. Pinson Aff. ¶¶ 11, 12, Ex. 3. Accordingly, for these reasons as well, the determination of plaintiffs' pyramid scheme allegations cannot be made on a classwide basis.

## V.   CONFLICTS WITHIN THE CLASS BAR CERTIFICATION

Three sets of conflicts permeate the putative class. First, each associate in the proposed class was recruited by another associate, and many class members have benefited from the conduct upon which the class seeks to bring suit. Moreover, if plaintiffs are correct, many thousands of associates will have benefited at the expense of other putative class members all of whom would be asserting that the conduct at issue is harmful. Second, the named plaintiffs and

other members of the putative class seek to obtain an amount in damages that would dismantle the marketing plan and destroy the Company, whereas many other class members depend on the Company and the marketing plan for income -- and in some cases their only means of support -- and would be seriously injured if they could no longer conduct their Pre-Paid businesses. Third, the fact that associates included in the proposed class were recruited by other associates, who made statements plaintiffs allege are actionable, creates another adverse interest. If plaintiffs claims are well-founded, prosecution of this case will advance evidence and arguments that would make certain class members responsible for the alleged misconduct under Section 12 of the 1933 Act and FTC regulations.

> **A.      Class Certification Is Precluded Because Many Class Members Have Benefited From The Same Conduct Alleged Harmful By Other Putative Class Members.**

Many putative class members, including several named plaintiffs, have clearly <u>benefited</u> from their positions as associates at Pre-Paid. For example, plaintiff Jefferson received $29,920.90 for his work with Pre-Paid, and used his membership to seek legal advice with member law firms 15 times. Pinson Aff ¶ 22. Plaintiff Jarvis received $5,053.63 from Pre-Paid, and maintains his membership, which he has used at least 19 times. Jarvis at 89:14-20; Pinson Aff ¶ 25. Class member Corrente received $12,448.28 in commissions from Pre-Paid, is still an associate, and intends to continue in that capacity. Corrente at 160:22-161:8; Pinson Aff. ¶ 24. He has continued to maintain an active e-service Pre-Paid website even since the filing of this action and continues to disseminate statements and materials that plaintiffs allege are fraudulent. *Id.* at 117:25–132:1.

Many associates in the proposed class also: have made profits as associates[43]; work as associates for supplemental income[44]; work as associates for their full-time careers[45]; rely on

---

[43]*See e.g.,* Coughlan Aff. ¶¶ 20, 25, 25; Neville Aff. ¶10; Tarkington Aff. ¶6; Sloan Aff. ¶5; Cobbs Aff. ¶14; Heath Aff. ¶5; McDonald Aff. ¶12.
[44]*See e.g.,* Coughlan Aff. ¶¶ 20, 25; Sloan Aff. ¶¶4,5; Cobbs Aff. ¶16.
[45]*See e.g.,* Coughlan Aff. ¶¶ 20, 25; Neville Aff.¶4; Tarkington ¶¶5, 6; Cobbs Aff. ¶8; Heath Aff. ¶¶5, 14.

their Pre-Paid business for their entire income and livelihood (as much as $183,000 per year)[46]; use and benefit from Pre-Paid's membership and legal services[47]; and have gained business and speaking skills, useful training, licensing, financial independence, and the ability to work at home.[48]

It is well-established that class certification is inappropriate where some class members have benefited from the same conduct alleged harmful by other class members. *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (class cannot be certified where some members benefit from the same acts alleged to be harmful to other members; class fails adequacy of representation inquiry).[49] In this case, many thousands of class members have benefitted from the purported misconduct, and, on plaintiffs' theory, they have done so at the expense of other associates.

B.   **Many Members Of The Proposed Class Would Be Harmed By The Prosecution Of This Action**

Many associates in the putative class do not wish to see the demise of Pre-Paid or its marketing program. Some of these associates rely on Pre-Paid for extra income,[50] others have profited from their work with Pre-Paid,[51] and still others have made their work at Pre-Paid their

---

[46]*See e.g.,* Coughlan Aff. ¶¶ 20, 25; Neville Aff. ¶¶4,6; Tarkington Aff. ¶¶5,6,8;14; Cobbs Aff. ¶8 Heath Aff. ¶5.

[47]*See e.g.,* Coughlan Aff. ¶¶ 20, 25; Neville Aff. ¶¶3, 11; Tarkington Aff. ¶4; Sloan Aff. ¶3,4,6; Cobbs Aff. ¶2; Heath Aff. ¶3.

[48]Neville Aff. ¶¶5,6,11; Tarkington Aff. ¶¶7,8,9; Cobbs Aff. ¶6, 7, 14; Heath Aff. ¶3, 8, 9.

[49]*See also Valley Drug Co. v. Geneva Pharm.*, 350 F.3d 1181 (11th Cir. 2003) (a "fundamental conflict" exists where class members claim harm by the same conduct that benefited other members;" class thus fails adequacy of representation); *Bieneman v. City of Chicago*, 864 F.2d 463, 465-66 (7th Cir. 1988) (denying certification of a class of landowners near an airport because some benefited from the proximity of the airport). In fact, "[n]o circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class." *Valley Drug*, 350 F.3d at 1195 (noting that "the claims of . . . disparate groups cannot be mixed together under Rule 23(a) where the economic reality of the situation leads some class members to have economic interests that are significantly different"), (citing *Morris v. McCaddin*, 553 F.2d 866, 870-71 (4th Cir. 1977)); *Phillips v. Klassen*, 502 F.2d 362, 366-67 (D.C. Cir. 1974) (refusing class certification where some class members were pleased by defendants' actions).

[50]Sloan Aff. ¶¶4,5; Cobbs Aff. ¶20.

[51]Neville Aff. ¶4; Tarkington ¶¶5, 6.

careers, earning their livelihood working as Pre-Paid associates.[52] These putative class members have a vested interest in Pre-Paid's financial health and the continuation of the marketing program. They would be injured by the relief sought in this action, in which plaintiffs attack the marketing plan and seek to maximize a damage award that would cripple the Company.[53] *See* pp. 15-16, *supra*.

On the other hand, certain of the named plaintiffs would like nothing more than to put Pre-Paid out of business through maximizing damages in this lawsuit. Plaintiff Sandler herself stated: "I would be <u>absolutely thrilled if this company went out of business.</u>" Sandler at 169:5-6 (emphasis added). When some class members have an incentive to "kill the golden goose" that others depend upon for their livelihood, a fundamental economic conflict exists, and certification should be denied.[54]

### C.   If Plaintiffs' Allegations Are Well-Founded Prosecution Of This Lawsuit Would Create Legal And Regulatory Exposure For Absent Class Members

The alleged wrongful acts plaintiffs claim caused them harm under Section 12 (sales of

---

[52]Neville Aff. ¶¶4,6; Tarkington Aff. ¶¶5,6;14; Cobbs Aff. ¶8 Heath Aff. ¶5.

[53]Neville Aff. ¶11; Tarkington Aff. ¶14; Cobbs Aff. ¶20; Heath Aff. ¶18.

[54]*See, e.g., Broussard,* 155 F.3d at 337-338 (certification improper because interests of current and former franchisees in class were not aligned; former franchisees' interest in maximizing damages conflicted with current franchisees' interest in ongoing business relationship with, and the long-term health of, defendant company), (citing *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 626-628 (1997)) (affirming denial of certification where some parties' interests were to maximize damages, while others' were to ensure future funds)). *See also General Tel. Co. v. EEOC,* 446 U.S. 318, 331 (1980); *Kamean v. Local 363,* 109 F.R.D. 391 395-396 (S.D.N.Y. 1986) (denying certification because named plaintiffs "have no stake whatsoever in the continued economic viability of [the defendant union]" ); *Free World Foreign Cars, Inc. v. Alfa Romeo,* 55 F.R.D. 26, 28-29 (S.D.N.Y. 1972) (denying certification where named plaintiff's interest as former franchisee, unconcerned with defendant's economic survival, were not co-extensive with those of present franchisees who depend upon defendant's economic; adequacy inquiry fails); *Thompson v. T.F.I Companies,* 64 F.R.D. 140, 149 (N.D. Ill. 1974) (denying certification of a class consisting of former and current licensees, given disparate interests in maximizing damages and continued economic viability of defendant); *Southern Snack Foods v. J&J Snack Foods Corp.,* 79 F.R.D. 678, 680 (D.N.J. 1978) (denying class certification based on conflict between past distributors seeking maximum recovery and present franchisees who depend on the continued economic viability and public goodwill of the defendant); *Aamco Automatic Transmissions, Inc. v. Tayloe and Paro,* 67 F.R.D. 440, 445-447 (E.D.Pa. 1975); *Chateau deVille Productions, Inc.* v. *Tams-Witmark Music Library, Inc.* (named plaintiffs had different economic interests than absent class members because they were larger and willing to destroy defendant even though absent class members were dependent on defendant's continued existence. 586 F.2d 962 (2d Cir. 1978).

an unregistered security and misrepresentations and omissions about Pre-Paid's business) are the very same acts that thousands of associates engage in when they recruit other associates. The statutory definition of a "seller" under Section 12 includes anyone who "solicits the purchase at least in part by a desire to serve his own financial interest ...." *Pinter v. Dahl*, 486 U.S. 622, 647 (1988); *See also Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 635-36 (3d Cir. 1990). Thus, thousands of class members who sold to and recruited the 550,000 member putative class would themselves be liable -- without any showing of scienter -- to their own recruits under Section 12.

Prosecution of this lawsuit would also create exposure for absent class members under FTC regulations. The FTC has explicitly warned that participants in multilevel marketing plans can be individually prosecuted for statements they make to their own customers and recruits:

> If you decide to become a distributor, <u>you are legally responsible for the claims you make</u> about the company, its product and the business opportunities it offers. <u>That applies even if you are repeating claims you read in a company brochure or advertising flyer</u>....
>
> In addition, if you solicit new distributors, you are responsible for the claims you make about a distributor's earnings potential.... If these promises fall through, remember that <u>you could be held liable</u>.

FTC Consumer Alert "The Bottom Line About Multilevel Marketing Plans" (October 2000) (emphasis added). Accordingly, these liability conflicts generated among class members also preclude class certification.[55]

## VI.   CERTIFICATION OF A CLASS WOULD UNFAIRLY PERMIT PLAINTIFFS TO CONSTRUCT A "COMPOSITE CASE" IN VIOLATION OF RULE 23

Rigorous application of Rule 23 "is also necessary to avoid the real risk . . . of a composite case being much stronger than any plaintiff's individual action would be." *Broussard,* 155 F.3d at 343-45; *O'Connor v. Boeing North American, Inc.*, 197 F.R.D. 404, 415 (C.D.Cal. 2000). Certification of a class despite the many fundamental variations discussed

---

[55]Nor would an opt-out provision pursuant to Rule 23(c)(2) solve the difficulties posed by the massive conflicts that exist among the putative class. *See Free World Foreign Cars*, 55 F.R.D. at 29; *Thompson*, 64 F.R.D. at 149; *Aamco Automatic Transmissions*, 67 F.R.D. at 445-447. *See also Jim Moore Ins. Agency v. State Farm Mut. Auto. Ins. Co.*, 2003 WL 21146714, at 7 (S.D. Fla. May 6, 2003) (opting out does not cure the defect because "[p]rospective conflicts between class representatives and class members must be assessed at the outset of the litigation.").

herein would enable plaintiffs to "create the composite 'perfect plaintiff'" who relied upon all of

the alleged misrepresentations, who listened to and was persuaded by all of the multitudes of

messages in all possible formats in recruiting associates, who was "damaged" despite the profits

and benefits afforded putative class members (including several named plaintiffs), and to present

a fictional case consisting of facts that would be far stronger than any individual action could be.

Such an effort would be fundamentally unfair to defendants, who would be bound as to

each individual in the class. *See Lott v. Westinghouse Savannah River Co.,* 200 F.R.D. 539, 564

(D. S.C. 2000). ("[t]his purely fictional 'perfect plaintiff' representative would, however, bear no

likeness to any one of the real plaintiffs in this case.")  This approach violates Rule 23 because it

enables plaintiffs to improperly expand the substance of the claims of class members. *Id.* (citing

28 U.S.C. §2072(b)) (Federal Rules "shall not abridge, enlarge or modify any substantive right").

## VII.   PLAINTIFFS CANNOT DEMONSTRATE THAT A CLASS ACTION IS SUPERIOR TO OTHER METHODS

Rule 23(b)(3) requires that a class action be "superior to other available methods for the

fair and efficient adjudication of the controversy." *Zapata,* 167 F.R.D. at 162. As this Court and

the Tenth Circuit have emphasized, the question whether class certification is appropriate is

intensely practical, and turns on the particular facts of a particular case. *See, e.g., Meyers*, 181

F.R.D. at 501; *Reed v. Bowen*, 849 F.2d 1307, 1309-10 (10th Cir. 1988).  The facts discussed

throughout this brief demonstrate that classwide adjudication of plaintiffs' claims would be

impossible, not merely impractical, unfair and wholly unmanageable.[56]  Numerous federal courts

have denied class certification in circumstances far less vexing than those presented here.[57]

---

[56]Under Tenth Circuit law, class certification may be denied solely upon a determination that a class action is not superior to other methods. *Zapata,* 167 F.R.D. at 162 (citing *Wilcox v. Commerice Bank*, 474 F.2d 336, 345 (10th Cir. 1973).

[57]*See, e.g., In re Life USA Holding Inc.*, 242 F.3d at 147-48 (reversing district court and holding superiority requirement not satisfied where 30,000 agents issued over 280,000 annuities because "a class trial would not only be inordinately time consuming and difficult, but it would impermissibly transgress upon the required standards of fairness and efficiency"); *LaFata*, 207 F.R.D. at 47 (class action not superior because claims asserted on behalf of stock option class would involve "the presence of individual questions of fact" and "[s]uch mini-trials would present serious and unsurmountable manageability problems"); *Weisfeld*, 210 F.R.D 136, 146 (D. N.J. 2002) (denying class certification for lack of superiority "because there will be little, if any,

(continued...)

Nor is it harsh or unfair to deny plaintiffs a class action vehicle, particularly in light of the fact that the vast majority of putative class members have <u>both</u> agreed to mandatory arbitration for all disputes and claims involving Pre-Paid, <u>and</u> have otherwise contracted away whatever right they might otherwise have had to bring their claims as part of a class action.  *See* Pinson Aff. ¶ 5.[58]  Moreover, the arbitration provisions raise yet another issue that would require an individualized inquiry to determine which potential class members do (or do not) contain mandatory arbitration clauses.

## CONCLUSION

This is a paradigm example of a case in which claims are not amenable to classwide adjudication, and class certification is inappropriate.  For all of the reasons set forth herein, plaintiffs' Motion should therefore be denied.

---

(continued...)
efficiency in certifying a class, because scores of individual determinations will still have to be made by this Court"); *Windham v. American Brands,* 565 F.2d 59, 70 (4th Cir. 1997) (affirming denial of class certification where "computation of damages would be a complex, highly individualized task, imposing an intolerable burden on the judicial system").

[58]"[I]t is generally accepted that arbitration clauses are not unconscionable because they preclude class actions." *Pick v. Discover Financial Services, Inc.,* 2001 WL 1180278, at 5 (D. Del. Sept. 28, 2001), (citing *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 32 (1991)).  *See also Livingston v. Associates Finance, Inc.,* 339 F.3d 553, 559 (7th Cir. 2003) (("[t]he Arbitration Agreement at issue here explicitly precludes [plaintiffs] from bringing class claims or pursuing 'class action arbitration' so we are therefore 'obliged to enforce the type of arbitration to which these parties agreed, which does not include arbitration on a class basis'"); *Johnson v. West Suburban Bank,* 225 F.3d 366, 369 (3d Cir. 2000) (holding that arbitration "clauses are effective even though they may render class actions to pursue statutory claims... unavailable"); *Randolph v. Green Tree Financial Corp.,* 244 F.3d 814, 818 (11th Cir. 2001) (same); *Champ v. Siegel Trading Co.,* 55 F.3d 269, 276 (7th Cir. 1995), (quoting *Burton v. Bush,* 614 F.2d 389, 390 (4th Cir. 1980)) ("'[w]hen contracting parties stipulate that disputes will be submitted to arbitration, they relinquish the right to certain procedural niceties which are normally associated with a formal trial'... One of these 'procedural niceties' is the possibility of pursuing a class action under Rule 23").

Dated:  February 17, 2004

Respectfully submitted:

Robert P. Varian, Esq.
Stephen M. Knaster, Esq.
Sherry Hartel Haus, Esq.
CLIFFORD CHANCE US LLP
One Market, Steuart Street Tower
San Francisco, California  94105
Tel:  (415) 778-4700

Fax:  (415) 778-4701


and

Brooke S. Murphy, OBA #6524
CROWE & DUNLEVY
20 North Broadway, Suite 1800

Oklahoma City, Oklahoma  73102-8273
Tel:  (405) 235-7735
Fax:  (405) 272-5278


ATTORNEYS FOR DEFENDANTS
PRE-PAID LEGAL SERVICES, INC.,
HARLAND C. STONECIPHER AND
WILBURN L. SMITH

## CERTIFICATE OF SERVICE

The undersigned certifies that on the 17th day of February, 2003, a true and correct copy of the above and foregoing was mailed, postage prepaid, to:

Lead Counsel for Plaintiffs.

Steven E. Fineman (via overnight mail)
Wendy R. Fleishman
Rachel Geman
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
780 Third Avenue, 48th Floor
New York, NY  10017-2024
Tel: (212) 255-9500
Fax: (212) 355-9592

Richard Heimann
LIEFF, CABRASER, HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 30th Floor
San Francisco, CA  94111-3339
Tel: (415) 956-1000
Fax: (415) 956-1008

Liaison Counsel for Plaintiffs.

Clell I. Cunningham III
DUNN, SWAN & CUNNINGHAM, P.C.
210 Park Avenue, Suite 2800
Oklahoma City, OK  73102
Tel: (405) 235-8318
Fax: (405) 235-9605

Brooke S. Murphy