IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| In re Pre-Paid Legal Services, Inc. | ) | Master Docket |
| Litigation II | ) | No. CIV-02-273-C |
| | ) | |
| | ) | |

## **O R D E R**

Plaintiffs Caroline Sandler, Robert Schweikert, Richard Jarvis, and Vincent Jefferson

brought this action on behalf of themselves and others who purchased an "Opportunity" from

Pre-Paid Legal Services, Inc.  By purchasing the Opportunity, they and others became

associates in Pre-Paid's multi-level marketing (or direct selling) program, obtaining the right

to sell Pre-Paid's legal service plans or "memberships" and to recruit other associates.[1]

Although Plaintiffs assert a number of claims, their fundamental grievance is that the

marketing program is an illegal pyramid scheme.  Having survived Defendants' motion to

dismiss on several claims, Plaintiffs now move for certification under Fed. R. Civ. P. 23 of:

(1) a Class of individuals who purchased the Opportunity between March 1, 1999, and the

date notice of the certification is disseminated; and (2) a Subclass (for purposes of the

§ 12(a)(1) claim) who purchased the Opportunity between March 1, 2001, and the notice

date.  Defendants oppose certification on multiple grounds.  For the reasons stated below, the

Court agrees that class certification is not warranted.

---

[1] Additional training is necessary to sell certain plans, and associates in certain states must
satisfy licensing requirements.

## STANDARD

As the parties seeking certification, Plaintiffs bear the burden of proving that all the

requirements of Fed. R. Civ. P. 23(a) and the requirements of one subsection of

Fed. R. Civ. P. 23(b) are met.   Rex v. Owens, 585 F.2d 432, 435 (10th Cir. 1978).

Fed. R. Civ. P. 23 (a) lists the following prerequisites to any class action:  "(1) the class is

so numerous that joinder of all members is impracticable, (2) there are questions of law or

fact common to the class, (3) the claims or defenses of the representative parties are typical

of the claims or defenses of the class, and (4) the representative parties will fairly and

adequately protect the interests of the class."  Although Plaintiffs seek certification under

either Fed. R. Civ. P. 23(b)(2) or (3), the Court views subsection (b)(3) as establishing the

appropriate test.[2]  It requires that:

> The court find[] that the questions of law or fact common to the members of
> the class predominate over any questions affecting only individual members
> and that a class action is superior to other available methods for the fair and
> efficient adjudication of the controversy.  The matters pertinent to the findings
> include: (A) the interest of the members of the class in individually controlling
> the prosecution or defense of separate actions; (B) the extent and nature of any
> litigation concerning the members of the class; (C) the desirability or
> undesirability of concentrating the litigation of the claims in the particular
> forum; (D) the difficulties likely to be encountered in the management of a
> class action.

---

[2] Plaintiffs seek injunctive relief in the form of "a prohibition of further offers or sales in violation of applicable law." (Pls.' Mem. of Law in Supp. of Mot. for Class Certification at 30. ) However, because the predominate relief sought is money damages, the Court declines to consider whether the requirements of Rule 23(b)(2) are satisfied. See Boughton v. Cotter Corp., 65 F.3d 823, 827 (10th Cir. 1995).  If the Class and/or Subclass were certified under Rule 23(b)(3), Plaintiffs could receive injunctive relief, as well as damages.

In keeping with these factors, the decision whether to grant certification "involves intensely practical considerations, most of which are purely factual or fact-intensive." Reed v. Bowen, 849 F.2d 1307, 1309 (10th Cir. 1988) (citing United States Parole Comm'n v. Geraghty, 445 U.S. 388 (1980)).  "Each case must be decided on its own facts, on the basis of 'practicalities and prudential considerations.'"  Id. (quoting Geraghty, 445 U.S. at 406 n.11).  Therefore, the Court focuses on whether the requirements of Rule 23 are satisfied and makes no decision as to whether Plaintiffs' claims have merit. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974).   And, although courts are inclined to err in favor of certification, Plaintiffs are in no way excused from their "strict burden of proof." Meyers v. Southwestern Bell Tel. Co., 181 F.R.D. 499, 501 (W.D. Okla. 1997) (quoting Rex, 585 F.2d at 435); see also General Tel. Co. of the Southwest v. Falcon, 457 U.S. 147, 161 (1982) (requiring courts to perform a "rigorous analysis" to ensure that procedural requirements are met).

## DISCUSSION

Having already recounted the substance of Plaintiffs' allegations in a previous order, it is unnecessary to do so again here.  Thus, the Court begins with a description of Plaintiffs' remaining claims.[3]  Plaintiffs' federal claims are for violations of § 12(a)(1) and (2) of the Securities Act of 1933.  Section 12(a)(1) imposes liability on those who offer or sell a

---

[3]  Plaintiffs' claims under Section 10 of the Securities Exchange Act of 1934 and the Oklahoma Securities Act were dismissed without prejudice on July 23, 2003.  See Order, Dkt. No. 51.

security in violation of section 5, which requires that non-exempt securities be registered.

15 U.S.C. § 77*l*(a)(1) & 77e.

> Liability for the sale of unregistered securities under § 12(a)(1) of the Securities Act is very nearly strict liability; no showing of scienter is required, and mere proof of sale of the unregistered securities is sufficient.  Thus, the sanctions provided by § 12(a)(1) of the Securities Act for violation of the registration or prospectus provisions of the Securities Act are applicable whether or not a sale is effected by means of misrepresentations or misleading nondisclosures of material facts. . . .  In view of the strict nature of the liability under § 12(1) of the Securities Act, it is clear that a plaintiff does not have to prove that had he had access to the omitted information, he would have relied on that information, or that such information would be material to his investment decision.

29A Fed. Proc., L. Ed. § 70:494 (footnotes omitted); see also Woodward v. Wright, 266 F.2d 108, 115 (10th Cir. 1959) (explaining, "The imposition of absolute liability for failure to register nonexempt transactions was intended to ensure the full and truthful disclosure of all pertinent facts to undisclosed and unidentified prospective purchasers . . . .").

Section 12(a)(2), on the other hand, creates a right of action for certain material misstatements or omissions in the offer or sale of a security.  15 U.S.C. § 77*l*(a)(2). Specifically, a seller will be liable under § 12(a)(2) for untrue statements or omissions of material facts (necessary in order to make affirmative statements not misleading) "by means of a prospectus or oral communication."  Id.  Reliance and scienter are not requirements of a § 12(2) claim.  See, e.g., Rombach v. Chang, 355 F.3d 164, 169 n.4 (2d Cir. 2004). "Section 12 turns on status, not scienter: it imposes liability without requiring 'proof of either fraud or reliance.' . . . Instead, [Plaintiffs] must show 'only some causal connection between the alleged communication and the sale, even if not decisive.'"  In re WorldCom, Inc.

Securities Litig., 294 F. Supp. 2d 392, 408 (S.D.N.Y. 2003) (quoting Gustafson v. Alloyd

Co., 513 U.S. 561, 582 (1995), and Metromedia Co. v. Fugazy, 983 F.2d 350, 361 (2d Cir.

1992)).  However, recovery may be limited if the seller proves some portion of the loss did

not result from the violation.  15 U.S.C. § 77*l*(b) (describing "loss causation" defense).

Like the federal claims, Plaintiffs' three state law claims relate to the promotion of the

Opportunity and Defendants' maintenance and perpetuation of an allegedly fraudulent

marketing program.  In particular, Plaintiffs allege that Defendants employed a fraudulent

scheme or course of business in marketing the Opportunity in violation of §§ 819 and 822

of the Oklahoma Business Opportunity Sales Act (the "OBOSA").  (Amend. Compl. (Fifth

Claim for Relief)).  Those sections make it unlawful for any person to publish, circulate, or

use any advertising containing, or to otherwise make, a materially untrue statement or

omission or to employ a deceptive or fraudulent device, scheme, or course of business in

connection with the offer of sale of any business opportunity.  71 Okla. Stat. §§ 819 & 822.

Plaintiffs also allege that the knowing and repeated misrepresentations by Defendants in

marketing the Opportunity violated the Oklahoma Consumer Protection Act (the "OCPA").

(Amend. Compl. (Seventh Claim for Relief)).  Under the OCPA, a consumer may recover

for injuries resulting from an "unlawful practice" that occurs in the course of a defendant's

business.  Patterson v. Beall, 2000 OK 92, ¶ 14, 19 P.3d 839, 846.  Finally, Plaintiffs assert

a claim for unjust enrichment based on Defendants' alleged inequitable retention of associate

monies.  (Amend. Compl. (Sixth Claim for Relief)).  Unjust enrichment is an equitable claim

for restitution based on another's retention of an undeserved benefit.  See, e.g., N.C. Corff

P'ship, Ltd. v. OXY USA, Inc., 1996 OK CIV APP 92, 929 P.2d 288, 295.

After reviewing the briefs and the extensive evidentiary submissions, the Court

determines that the proposed Class and Subclass should not be certified.  Because this is not

a typical securities case, the notion that "securities claims are particularly well suited for

class action status" is inapplicable.  City P'ship Co. v. Jones Intercable, Inc., 213 F.R.D. 576,

581 (D. Colo. 2002).  As detailed below, the differences among the putative class members

regarding their motivation, solicitation, and experience (or loss) in the Pre-Paid program, as

well as changes in the program itself, counsel against certification.

The widely divergent expectations, experiences, and viewpoints of associates

presented in the depositions and affidavits highlight the basic problem in maintaining this

litigation as a class action.  Because of variations in time, effort, training, and earnings of

associates and program reward and requirement changes, Defendants argue that a fact-finder

could not determine whether the Opportunity is a security or whether Pre-Paid is a pyramid

scheme on a class-wide basis.  (Defs.' Opp'n at 30.)  Although Plaintiffs tie the question of

whether the Opportunity is a security to the ultimate issue of whether Pre-Paid is a pyramid

scheme, they are not entitled to a pass at certification simply because they allege that the

marketing program is a pyramid scheme but that associates were never told.  An investment

contract (which is a security for purposes of the federal claims) includes transactions or

schemes whereby a person invests money in a common enterprise and is led to expect profits

"solely" from the efforts of the promoter or a third party.  SEC v. W.J. Howey Co., 328 U.S.

293, 298-99 (1946).[4] Unlike legitimate multi-level marketing programs, participants in a true

pyramid scheme pay for the right to sell a product and the right to receive recruiting benefits

unrelated to the sale of those products to ultimate users.  See In re Koscot Interplanetary,

Inc., 86 F.T.C. 1106, 1181 (1975), aff'd mem. sub nom., Turner v. F.T.C., No. 76-1227 (D.C.

Cir. July 5, 1978).

Plaintiffs are correct that there is authority that pyramid schemes (which can be

generically described as fraudulent schemes bearing the characteristics of a security)

implicate the federal securities laws.  See, e.g., Webster v. Omnitrition Int'l, Inc., 79 F.3d

776, 781 & 783 (9th Cir. 1996) (explaining that the operation of a pyramid scheme

constitutes fraud for purposes of § 12(a)(2) and that if a program is shown to be a pyramid

scheme the investments in that program are securities).  Yet, the evidence in this case shows

that associates purchased the Opportunity for different reasons and with varied expectations

and intentions.  Two Plaintiffs testified that they were influenced to purchase the Opportunity

to help a friend.  Jarvis Dep. at 44 (reporting that he "signed up because [the recruiting

associate] was a friend"); Schweikert Dep. at 20 (explaining that he joined as a result of

persistent pressuring from a friend).  Others, like Jefferson, embraced the Pre-Paid program

as more of a business plan than as a passive investment.  Thus, because of the dramatically

different purchasing motivations, the Court is not satisfied that even Plaintiffs' collective

---

[4] The Tenth Circuit has adopted the view that the "solely from the efforts of others" element means that """"the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.""" Meyer v. Dans un Jardin, S.A., 816 F.2d 533, 535 (10th Cir. 1987) (citations omitted).

experiences reflect the range sought to be represented or that they could establish that the

Opportunity is a security on a class-wide basis.   Moreover, changes in associate

compensation and reward policies also could affect if, at a given time, Pre-Paid operated a

legitimate multi-level marketing program or an illegal pyramid scheme. See Pinson Aff. ¶¶ 5

& 7-12.

In addition, conflicts and other inconsistencies pervade the proposed Class and

Subclass.  Notwithstanding the willingness of some courts to look past inherent conflicts in

a pyramid scheme context, a class generally will not be certified when its members have

opposing interests or when it consists of members who benefit from the same acts alleged to

be harmful to other members of the class.  See, e.g., Pickett v. Iowa Beef Processors, 209

F.3d 1276, 1280 (11th Cir. 2000).  Here, the record again shows that associates are not united

in their views regarding the marketing program.  As the affidavits from Pre-Paid's selected

"success stories" suggest, some associates value the Opportunity and oppose this litigation.

Moreover, regardless of their current inclinations, three Plaintiffs also profited from their

involvement with Pre-Paid. Pinson Aff. ¶¶ 22-25.  And, at least one has expressed an interest

in continuing as a Pre-Paid associate–a future contrary to the rescissory remedy and

injunctive relief being sought.  See Corrente Dep. at 95, 160-61.  Thus, it is far from clear

that this litigation reflects the wishes or best interests of some, not insubstantial, portion of

the Class/Subclass.  The profiting Plaintiffs, like other successful associates, also benefitted

from the same acts alleged to be harmful to themselves and other recruits.[5]   Against this

backdrop, the Court is not only concerned about the typicality of Plaintiffs' claims but also

about their ability to fairly and accurately represent class members.

As an additional obstacle to the certification hurdle, Plaintiffs' claims based on

recruiting misrepresentations and omissions are not susceptible to generalized proof.

Defendants contend that certification is not appropriate because the recruiting

communications underlying most of Plaintiffs' claims "went back and forth among hundreds

of thousands of purported class members through a multitude of channels[] and varied widely

in their subject matter, content and emphasis." (Defs.' Opp'n at 1.)[6] Based on the deposition

excerpts and affidavit testimony before the Court, it is undeniable that the putative Class

members were recruited in a myriad of ways.  Recruits did not all attend group meetings or

conference calls or watch any, or identical, videos or listen to any, or identical, tapes.

Similarly, not all recruits were given any Pre-Paid-prepared promotional materials or

exposed to flip charts or other such "tools."

In fact, it appears that many associates were recruited based on one-on-one

conversations they had with an associate (of which there are hundreds of thousands and who

may have been a friend or family member).  See, e.g., Corrente Dep. at 62 (explaining that

his approach to recruiting is to talk one-on-one).  Individual associates may or may not have

---

[5] It is also possible, as Defendants suggest, that Plaintiffs and other associates could be liable as "sellers" for purposes of the federal violations.

[6] The viability of Plaintiffs' § 12(a)(1) claim is not affected by this discussion.

utilized Pre-Paid's stories or "suggested formats" with particular recruits and sometimes incorporated their own experiences into those discussions.  In addition, although a "vast majority of associates" signed associate agreements, different versions were used during the relevant time period.  Pinson Aff. ¶ 5.

Nevertheless, Plaintiffs contend that Defendants' recruiting message was tightly controlled and ingrained in all associates to ensure that every recruit, even one who purchased after speaking to an associate and without the benefit of any Pre-Paid materials, was presented with the core "message" but not alerted to key problems with the Pre-Paid product and marketing system.  According to Plaintiffs, "[t]he message is that Pre-Paid is a solid company selling a needed product (legal services plans) in a wide-open market[] and [that] those who buy the Opportunity to sell the product and recruit others can enrich themselves through the efforts of those recruits and the strength of the product." (Pls.' Mem. at 6; see also Pls.' Reply at 4-5 (paraphrasing the "uniform message")).)  Plaintiffs further allege that the following material facts are systematically omitted:

(1)    The marketing program is a pyramid scheme;

(2)    The renewal rate of memberships is low due to problems with the memberships, such as attorney access and the less-than-promised coverage;

(3)    The associate commission structure is based on loans or advances;

(4)    Deductions (or "chargebacks") are assessed when members fail to renew;

(5)    The top recruiters did not work their way through the program.

Pls.' Mem. at 8.

However, class-wide liability is not established simply by pointing to a central or coordinated scheme.  The advisory committee's notes to Rule 23 explain:

> [A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.  On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action *if there was material variation in the representations made* or in the kinds or degrees of reliance by the persons to whom they were addressed.

(Emphasis added).  Thus, the general rule is that actions based substantially on oral rather than written representations are not suitable for class treatment.  The Second Circuit has described the trend in several circuits holding that oral representations are presumptively individualized.  Moore v. PaineWebber, Inc., 306 F.3d 1247, 1253 (2d Cir. 2002).  Those courts "treat class certification of fraud claims based upon oral misrepresentations as improper, absent a showing that the misrepresentations were made pursuant to a written, standardized sales script and that the sales agent participated in a common training program that emphasized uniformity in sales techniques."  Id. at 1253 & 1255 (refusing to require specific forms of proof when determining whether material variations existed).  Although the Tenth Circuit was not included in that list, Defendants make much of the fact that this Court has declined to certify a class with fraud claims, which were based primarily on oral misrepresentations, because there was no showing that those misrepresentations were made pursuant to a written or standardized sales script.  Meyers v. Southwestern Bell Tel. Co., 181 F.R.D. 499 (W.D. Okla. 1997).

In <u>Meyers</u>, all claims related to allegedly deceptive and misleading solicitation, marketing, and sales techniques used to induce Oklahoma customers into purchasing inside wire maintenance service. Although many of the oral solicitations were similar, the plaintiffs identified only "recommended sample language" rather than scripts, and the evidence indicated great inconsistencies regarding customer representations. Likewise, although the numerous written contracts presented to customers over the years contained the same (mis)representation (i.e., that the service would save them money), the disclaimers and limitations varied greatly.

Like <u>Meyers</u>, the majority of Plaintiffs' claims depend primarily on oral communications that were only loosely based on "suggested formats" rather than true scripts. <u>See, e.g.</u>, Pinson Aff. ¶¶ 35-36 (reporting that Pre-Paid does not require associates to utilize any method of presentation or form of wording). Although all associates received basic training and were exposed to the Pre-Paid materials Plaintiffs cite as confirming the basic message and omissions, the evidence reveals that recruiting discussions did not follow any particular model. Each Plaintiff adopted his or her own approach to recruiting, and the interests or concerns of particular recruits played a role in terms of what information was conveyed and the level of detail given. In sum, the solicitations or recruiting experiences and what specifically was communicated might have been similar but were hardly uniform.

No doubt in an effort to compensate for the lack of consistency in recruiting communications, Plaintiffs have stripped down the misrepresentations in the Amended Complaint to an almost trivial "message" and corresponding omissions. The Amended

Complaint's description of a fraudulent recruitment strategy included affirmative representations, such as promises of "an easy sale, invoking a hungry (and vast) audience or buyers for the membership plan, and claiming a huge retention rate among members" "potential enormous material gain," and that the member persistency rate was as high as 76%.  See, e.g., Amend. Compl. ¶¶ 11, 48, 51.  Instead of the promises of great wealth through recruiting (an apparently exaggerated version of the "core" message), Plaintiffs now suggest that every associate was at least told that by selling memberships and the Opportunity they would be "enriched."  The core message/key omission theory advanced at certification is a far cry from those hallmark "get rich quick" promises originally alleged and which, apparently, some associates were actually told.

To support the contention that the basic recruiting message was uniformly conveyed, Plaintiffs point to associate training, the plethora of Pre-Paid materials confirming this message, and the proscription against unapproved advertising or promotional materials. Admittedly, every associate apparently received basic training.  Coughlan Aff. ¶ 36.  Others earned special certifications and/or attended meetings or conventions.  Pre-Paid also provided associates with "tools" for use in recruiting, as well as reference materials (including the Success Guide).  Thus, regardless of their level of training, all associates were exposed to some Pre-Paid materials, which, notwithstanding their differences, appear to have confirmed elements of the core message and arguably perpetuated the omissions.  See Pls.' Reply Exs. G, I, J.  Plaintiffs also note evidence of Pre-Paid admonishing associates not to go into too many details about the product or make specific promises about retention rates and income

when selling and recruiting.  See Pls.' Mem. Ex. I (Policies & Procedures).  Pre-Paid also

required that all advertising and promotional materials be approved or conform to the

company model.  Nevertheless, no method of presentation or form of wording was required

of recruiting associates.  Associates were free to choose their own words, borrow from Pre-

Paid suggestions or their own experiences, and decide what, if any, "tools" to use–which

Plaintiffs' testimony shows that they did to varying degrees.  Thus, the Court is not

persuaded that training, repeated themes, or control over promotional materials were such

that solicitations occurred without material variation.

Plaintiffs' emphasis of omissions over affirmative representations cannot unite what

are inescapably uncommon and highly individualized solicitations. Plaintiffs' own testimony

confirms that even the core message was not consistently or uniformly conveyed.  Notably,

the promise of financial gain varied.  Plaintiff Jarvis, for example, intentionally downplayed

the potential income–referring only to an opportunity to earn additional spending cash or "to

make a few pennies extra just working at your own time scale."  Jarvis Dep. at 104.  On the

other hand, Plaintiff Schweikert was told that there was "a tremendous amount of money to

be made" and that others had "made millions in a few years."  Schweikert Dep. at 19.  It is

also less than clear that each associate was advised that recruitment would be his or her "key

to success."  The uncertainty regarding what was actually represented (and therefore omitted)

is compounded by the fact that individual associates may not reliably remember the details

of their own recruitment or the events surrounding their purchase of the Opportunity.

14

Because the accuracy of several key omissions goes to the heart of this dispute, extensive review of the evidence is not required to determine that they were routinely "omitted" from recruiting presentations.  It is a virtual given that associates were *not* told Pre-Paid was a pyramid scheme, that membership retention was low, or that serious problems existed with the plans.  Similarly, no associate appears to have been told that top recruiters did not work their way up through the program.  However, the more "substantive" omissions pose a problem for Plaintiffs.  Individual questions rear their heads with respect to whether recruits were told about advance commissions and chargebacks.  The four associate agreements used during the class period reference these issues but in varying language.  See Pinson Aff. Ex. 1.  More importantly, some associates were clearly told *something* about commission policies.  See, e.g., Corrente Dep. at 29 (testifying that the compensation plan was explained when he was recruited and that he was told that if someone cancels no more than 50 % would be taken back).  And, it is that *something* that is not susceptible to generalized proof.  The remainder of what an individual associate was told when he or she was recruited would be relevant to whether there was an omission or whether there was a misrepresentation for which the associate agreement provided corrective information.

In sum, because recruiting communications were not standardized to ensure that the content did not vary in any material respect, individual questions predominate over those that are common on Plaintiffs' § 12(a)(2), OBOSA, OCPA, and unjust enrichment claims. Plaintiffs cannot rely solely on their allegation of a fundamentally fraudulent marketing scheme because those claims require proof of what was communicated and its materiality.

That it is likely that all putative Class members were told something about Pre-Paid being

a solid company with "good products" and that the Opportunity would be "enriching" does

not obviate the need for individual inquiries.  Reduced to the most general, the core

message/key omission formula deprives the fact-finder of critical information regarding the

circumstances surrounding each purchase.  Thus, it is impossible to assess, without an idea

of what else was said or omitted, what a reasonable investor or person would consider

important or to determine the effect on the total mix of information on a class-wide basis.[7]

Individual questions regarding whether particular associates suffered any loss and how

to value that loss are also predominate and render the proposed representative action

unmanageable.  Recovery under any of the claims asserted requires that the claimant suffered

a net loss.[8]  In this case, whether a particular associate suffered a loss will require an

---

[7] The Court recognizes that if Plaintiffs' claims were based on the simple (i.e., singular) failure to tell recruits that the marketing program was in fact a pyramid scheme, then that omission might be presumptively material and make anything else that was communicated misleading. However, even Plaintiffs' scaled-back version of their claims, focusing on a core message rather than more specific misrepresentations, does not seem to go that far.  Because the Court believes there are other reasons to deny certification, it is unnecessary to speculate further or to attempt to refashion Plaintiffs' claims to pass the predominance test.

[8] Violations of § 12(a)(1) or (2) are remedied by rescission or rescissory damages. Rescission is mutual and requires that both parties be returned to the status quo before the transaction.  Therefore, in addition to determining what an associate paid, some accounting for the benefit or income that associate received is required.  Similarly, to recover under the OCPA, a consumer must prove actual damages or injury-in-fact. Tibbets v. Sight N' Sound Appliance Ctrs., 2003 OK 72, 77 P.3d 1042; 15 Okla. Stat. § 761.1(A).  The alleged violations of the OBOSA authorize the Class to sue "for rescission, for recovery of all money or other valuable consideration paid for the business opportunity and for actual damages, together with interest . . . , reasonable attorney's fees and court costs."  71 Okla. Stat. § 824 (B).  Finally, Class members could recover for unjust enrichment only by showing an "'enrichment to another coupled with a resulting injustice.'" OXY USA, Inc., 929 P.2d at 295 (quoting Teel v. Public Serv. Co. of Okla., 1985 OK 112 ¶ 23, 767 P.2d 391, 398 (superseded by statute on other grounds)).  It is thus painfully clear that

assessment of the money he paid to Pre-Paid, as well as any commissions and other benefits he received. Unlike more traditional securities cases, even if Plaintiffs establish that Pre-Paid's marketing program is a pyramid scheme, they are not entitled to a class-wide presumption of loss. Some associates, including some Plaintiffs, have reported thousands of dollars of income. Although critical financial data is missing, the Court can reasonably surmise that there will be members of the proposed Class and Subclass, and quite possibly more than a few, who received income in excess of the consideration paid.[9]

Nevertheless, Plaintiffs offer expert testimony that they can account for different individual experiences with statistics and construct a formula to show the fact or the amount of economic injury on a class-wide basis. Specifically, they claim that class-wide loss can be determined by comparing the median costs and median commissions of all Class members:

> To the extent that the median costs are greater than the median commissions, the Opportunity had no expected value and plaintiffs paid an inflated price for the Opportunity and were damaged thereby. Conversely, if the median commissions were greater than the median costs, the Opportunity had an expected value greater than zero and there was no inflation.

---

calculating individual damages on any of these claims would be no mere mechanical task.

[9] If any Plaintiff did not suffer a net loss or injury-in-fact, his or her ability to represent others is jeopardized. Class representatives must be part of the class and possess the same interest and suffer the same injury as other class members. Therefore, if a class representative does not have standing to pursue the class claims, those claims fail the typicality requirements of Rule 23. Rector v. City & County of Denver, 348 F.3d 935, 950 (10th Cir. 2003). In this case, it is possible that Jarvis, Corrente, and Jefferson lack standing to pursue the claims asserted.

Preston Decl. ¶ 13.  Not surprisingly, Defendants disagree and argue that, regardless of the

Opportunity's characterization, individual factors impact its value and therefore whether any

associate suffered a loss.  See, e.g., Kleidon Aff. ¶¶ 18 & 27.  Defendants' expert summarizes

the critical obstacles to certification:

> First, an analysis of the associate opportunity on a pro-rata basis is not
> appropriate, because the value of the opportunity varies as a function of
> individual factors related to Pre-Paid associates.  Second, to analyze the Pre-
> Paid opportunity on a non-pro-rata basis requires one to account for individual
> differences in the value of the opportunity.  Third, both at the time of purchase
> and subsequently, the opportunity differs in value precisely because of the
> individual characteristics and intentions of Pre-Paid associates, many of which
> cannot be readily observed or quantified, making uniform valuation
> impossible.

Kleidon Rebuttal Aff. ¶ 33.  Moreover, Defendants contend that comparing the aggregate

annual enrollment fees with the aggregate annual commissions and other net benefits (but

ignoring associates' non-enrollment payments) shows (because commissions + benefits "far

exceed" enrollment fees for any relevant year) that "the *ex ante* value of the average proceeds

from a pro-rata opportunity share likely far exceeds the purchase price of the share." Kleidon

Aff. ¶ 30.

    At the certification stage, the Court is not permitted to "weigh conflicting expert

evidence or engage in 'statistical dueling' of experts." In re Visa Check/MasterMoney

Antitrust Litig., 280 F.3d 124, 134 (2d Cir. 2001) (citation omitted).  Given the differences

between these experts, Daubert challenges on both sides seem inevitable.  Still, the critical

issue is not whether some formula could accurately predict whether the hypothetical

"average" associate or the Class/Subclass as a whole suffered a loss.  Determining individual

loss and calculating those damages would require extensive consideration of each associate's

individual circumstances.  Any fact-finder would need to assess, at a minimum and on an

individual basis, an associate's expenses, commissions, residual income, bonuses, and use

of Pre-Paid services and support.  Even if no further or more subjective valuation was

required, that kind of detailed and individualized analysis would overwhelm all other

common, liability-related questions.  As a consequence, any advantage in maintaining this

case as a class action would be lost due to the significant manageability issues related to

damages.  Therefore, for these additional reasons, the Court finds that certification of the

Class and Subclass is not appropriate.

### CONCLUSION

Due to Plaintiffs' failure to satisfy Rule 23 requirements Plaintiffs' Motion for Class

Certification (Dkt. No. 65) is DENIED.  Likewise, their request that Class and Subclass

Representatives and Counsel be designated is DENIED.

IT IS SO ORDERED this 8th day of September, 2004.


_____
ROBIN J. CAUTHRON
United States District Judge